**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

CIRBA INC. (d/b/a/ DENSIFY)
and CIRBA IP, INC.,

                    Plaintiffs,

    v.

VMWARE, INC.,

                    Defendant.

Civil Action No. 1:19-cv-00742-LPS

**JURY TRIAL DEMANDED**

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS CLAIM I OF THE FIRST AMENDED COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(B)(6) AND 35 U.S.C. § 101**

Kenneth L. Dorsney (#3726)
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6855
kdorsney@morrisjames.com

**ATTORNEYS FOR PLAINTIFFS
CIRBA, INC. and CIRBA IP, INC.**

# TABLE OF CONTENTS

I.             INTRODUCTION .................................................................................................... 1

II.          NATURE AND STAGE OF PROCEEDINGS ..................................................... 1

III.        SUMMARY OF ARGUMENT .............................................................................. 2

IV.       BACKGROUND ..................................................................................................... 2

      A.    The Computer Problems Addressed By The '687 Patent. ...................................... 3

      B.    The '687 Patent Provided A Technological Solution To Problems Grounded In Enterprise IT Environments. ................................................................................... 5

V.         LEGAL STANDARD ............................................................................................ 9

VI.       ARGUMENT ......................................................................................................... 10

      A.    Directed To The Design Of A Virtual Environment, The '687 Patent Is  Eligible Under Alice Step One. .......................................................................................... 10

          1. The Claims Are Tailored To Optimization of Virtual Environments — By Definition, an Improvement of Computer Technology.................................... 10

          2. *Electric Power* And Related Authorities Are Inapplicable............................ 14

          3. A Human Using VMware's "Pencil and Paper" Is Not Capable Of Performing The '687 Patent's Claimed Method. ............................................................... 16

      B.    The Claims Contain An Inventive Concept Satisfying *Alice* Step 2. ................... 18

          1. The '687 Patent Prosecution History Confirms The "Inventive Concept" of The Claimed Specific Technique. ................................................................... 18

          2. VMware's Own Prosecution History Demonstrates That The '687 Patent PI Claims Do Not Preempt The Field. ............................................................... 19

VII.      CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    882 F.3d 1121 (Fed. Cir. 2018) ...............................................................................9

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ................................................................................... *passim*

*Amdocs v. Openet Telecom, Inc.*,
    841 F.3d 1288 (Fed. Cir. 2016) .............................................................................18

*Ancora Techs., Inc. v. HTC Am., Inc.*,
    908 F.3d 1343 (Fed. Cir. 2018) ....................................................................10, 18

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018) .............................................................................10

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ..................................................................................9

*California Institute of Technology v. Hughes Communications Inc.*,
    59 F. Supp. 3d 974 (C.D. Cal. 2014) ....................................................................17

*Dana Corp. v. Am. Axle & Mfg., Inc.*,
    279 F.3d 1372 (Fed. Cir. 2002) .............................................................................11

*Data Engine Techs. LLC. v. Google LLC*,
    906 F.3d 999 (Fed. Cir. 2018) ..........................................................................6, 17

*Electric Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) ..............................................................13, 14, 15

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) ......................................................10, 11, 14, 16

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018) ..................................................................... *passim*

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018) .............................................................................15

*McRO, Inc. v. Bandai Namco Games America Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) ..............................................................16, 18, 19

11053769/1

*Perdiemco, LLC v. Industrack LLC,*
  No. 2:15-CV-1216-JRG-RSP, 2016 WL 5719697 (E.D. Tex. Sept. 21, 2016)......................11

*SAP Am., Inc. v. Investpic,*
  LLC, 898 F.3d 1161 (Fed. Cir. 2018) ...................................................................................15

*Search & Soc. Media Partners, LLC v. Facebook, Inc.,*
  346 F. Supp. 3d 626 (D. Del. 2018).......................................................................................15

*Spruill v. Gillis,*
  372 F.3d 218, 223 (3d Cir. 2004)............................................................................................9

*SRI Int'l, Inc. v. Cisco Sys., Inc.,*
  No. 2017-2223 0974 (Fed. Cir. July 12, 2019).............................................................15, 16

*TQP Development, LLC v. Intuit Inc.,*
  No. 2:12-cv-180-WCB, 2014 WL 651935 (E.D. Tex. Feb. 19, 2014) ...................................17

*Trading Techs. Int'l, Inc. v. IBG LLC,*
  921 F.3d 1378 (Fed. Cir. 2019).............................................................................................15

*Uniloc USA, Inc. v. ADP, LLC,*
  No. 2018-1132, 2019 WL 2245938 (Fed. Cir. May 24, 2019) .........................................10, 18

*Visual Effect Innovations, LLC v. Sony Elecs. Inc.,*
  No. CV 17-1276-LPS, 2018 WL 4700225 (D. Del. Sept. 30, 2018).......................................9

*Visual Memory LLC v. NVIDIA Corp.,*
  867 F.3d 1257 (Fed. Cir. 2017)...................................................................................9, 10, 14

**Federal Statutes**

35 U.S.C. § 101.................................................................................................... *passim*

35 U.S.C. § 112...................................................................................................................14

**Other Authorities**

*Concise Oxford English Dictionary* (12th ed. 2011) ...................................................12

.

## I.      INTRODUCTION

Densify's patent centers on the design of a virtualized computer environment so as to optimize the placement of virtual machines ("VMs") on servers.   By definition this is an improvement in the functioning of a computer system, and therefore eligible for patenting under controlling Federal Circuit cases.  The language of the four claims at issue describe a specific way of designing a computer server system with VMs — in particular, it describes software that determines the optimal placements of VMs on specific servers based on technical, business, and workload constraints.   The specification is rich with detail about the claimed invention with extensive descriptions, explanations, and figures describing the design of a virtualized infrastructure that optimizes host-based placement of VMs.

VMware plucks particular words out of one of the four claims in an effort to apply case law holding that patents merely collecting, analyzing, and displaying information are not eligible for patenting.  The claims use data from VMs and servers as a tool to accomplish their virtual environment design — i.e., the data manipulation is not an end, but rather a means to accomplishing the improvement in how virtualized computer systems function.  The record reflects the virtual infrastructure design improvements and the many associated benefits flowing to users of Densify's technology.   The market has recognized the innovation reflected in Densify's software and the '687 patent with commercial success, awards, and accolades.   Indeed, even VMware's own materials recognize the improvements over conventional systems of the virtual infrastructure technology in Densify's patent.

## II.     NATURE AND STAGE OF PROCEEDINGS

On April 25, 2019, Cirba Inc. (d/b/a Densify) and Cirba IP, Inc. (collectively, "Densify") filed the present action against VMware, Inc. ("VMware"), alleging infringement of U.S. Patent No. 8,209,687 (the "'687 patent," D.I. 1-1, Ex. 12) and U.S. Patent No. 9,654,367 and trademark

1

infringement.  (D.I. 1.)  Densify moved for a preliminary injunction based on claims 2, 7, 13, and 16 of the '687 patent on May 6, 2019.  (D.I. 11.)  On June 7, 2019, VMware moved to dismiss only the PI Claims under Rule 12(b)(6) and Section 101 of the Patent Act.  (D.I. 46.)  On June 18, 2019, Densify filed its First Amended Complaint, in which it added additional VMware products accused of infringing as well as additional factual detail.  (D.I. 68 ("FAC").)  Again, focusing solely on the '687 patent claims at issue in the preliminary injunction, VMware moved to dismiss under Section 101 on July 2, 2019.  (D.I. 80.)

## III.    SUMMARY OF ARGUMENT

1.      The claims of the '687 patent are directed to patent eligible subject matter: the design of virtual environments to optimize the placement of VMs on servers, which by definition is an improvement in computer technology.  Each of the claims uses a specific optimization technique not known in conventional systems to improve the functioning of a virtualized computer system, and therefore they are patent-eligible under *Alice* step one.

2.      The claims also satisfy *Alice* step 2.  They are directed to the inventive concept of optimizing a virtualized environment by evaluating each VM against each server and other VMs based on technical, business, and workload constraints so as to provide a design for host-based placement of VMs.  This inventive concept, reflected in the claims, is underscored by the Examiner's reasons for allowing the '687 patent, as well as VMware's own patent portfolio and prosecution histories, each of which show that the '687 patent does not preempt the field.

## IV.    BACKGROUND

Densify's virtual infrastructure optimization technology saves its customers millions of dollars in software and hardware costs by improving the design of their virtual infrastructure. (FAC ¶¶ 17, 29, 31.)  Densify's highly-recognized "Optimization Engine" — i.e., the software that provides a design for optimized virtual environments — enables improved placement of VMs

on "hosts" (e.g., servers with virtualization software), allowing companies to increase efficiency, decrease risk, improve functionality of their servers, all while significantly decreasing costs.  (*Id.* ¶¶ 3, 17, 27, 28, 29.)  Densify's software, and the '687 patent in particular, focuses on optimizing the placement of VMs on hosts based on certain key factors, which are known as "constraints." (*Id.* ¶ 24, 64-65.)  Densify was built on innovation in the virtual infrastructure market, for which it won numerous industry awards, attracted significant investment, and grew to over 180 employees, counting among its customers many of the world's most sophisticated companies.  (*Id.* ¶¶ 1, 2, 6, 17, 31.)

### A.      The Computer Problems Addressed By The '687 Patent.

"Virtualization" generally refers to software that simulates hardware functionality and creates a virtual computer system. (*Id.* ¶ 20.)  Virtualization allows users to run more than one virtual computer system (VM) on a single physical server.  (*Id.*)  With a server hosting numerous VMs, fewer physical resources, software licenses, and other costly parts of a server network are needed.  (*Id.* ¶ 21.)  In the simplest form, these virtual environments are highly complex and when companies run substantial numbers of servers, which can number in the thousands, (*id.* ¶¶ 19, 80), or even tens of thousands, it is beyond human comprehension.  Background on virtualized computer systems is provided in the First Amended Complaint. (*Id.* ¶¶ 18-25.)

Decisions must be made about which VMs to run on which hosts (servers).  (*Id.* ¶ 24.) Running too few VMs on a host means systems are underutilized and more hosts than necessary must be purchased.  (*Id.*)  On the other hand, running too many VMs on a host can create risk by over-utilizing hardware, i.e., creating resource contention between VMs.  (*Id.*)  And under certain conditions, "it is better to keep certain virtual machines together or apart[,]" ('687 patent at 31:16-17), which can be described as affinity rules and anti-affinity rules.  (*Id*. 31:17-24.)  Determining optimal hosts for VMs is extremely complex in large environments when anticipating risk, meeting

compliance and key operating policies, avoiding unnecessary movement of VMs, ensuring adequate hardware resource (e.g., certain processing power), and avoiding performance issues. (*See* FAC ¶¶ 24-30.)

The '687 patent recognized the problems IT organizations faced with "[c]omplex systems configurations, diverse business requirements, dynamic workloads and the heterogeneous nature of distributed systems," which caused "incompatibilities between systems." (*Id.* ¶ 63 (citing '687 patent, 2:12-21.))  The patent recognized that there are a "virtually infinite number of possible consolidation permutations which include suboptimal and incompatib[le] system combinations," which "make choosing appropriate consolidation solutions difficult, error prone, and time consuming." ('687 patent at 2:15-21; FAC ¶ 63 ("This virtually infinite number of possible consolidation permutations make it impossible to choose the appropriate consolidation with mental processes…."))  In conventional systems, companies were unable to optimize complex virtualized designs in a holistic way in dynamically-changing multidimensional environments and relied on restrictive assumptions to avoid the need to do a full analysis. (FAC ¶ 25.)  Specifically, in conventional systems, the infrastructure managers would accommodate this enormous complexity and constant change by grouping hosts and then treating that group as homogeneous.  They would not consider different placement alternatives by evaluating each VM on each host in the group. By grouping the hosts and treating them as homogeneous, they would forgo optimal placements of VMs and in turn forgo an optimal design of their virtual environments. (*Id.* ¶ 23; FAC Ex. 13 at p. 59.)  The patented innovation included designing the host-based placement of each VM on each host based on the workload, technical and business constraints — i.e., continuously identifying the optimal individual host for each VM and thereby improving the virtual infrastructure technology on a continuous basis.  (*Id.* ¶ 65.)

**B.      The '687 Patent Provided A Technological Solution To Problems Grounded In Enterprise IT Environments.**

The '687 patent solved these problems through virtual infrastructure design that optimized the placement of VMs on hosts.  (*Id.* ¶ 65.)  The '687 patent describes in detail how the solution to the problem of suboptimal and incompatible host placement works.  Specifically, the solution provides a "program for determining compatibilities in a computing environment . . . along with specific virtualization rule sets and user interfaces (UIs) to address the considerations of a virtualization infrastructure." ('687 patent at 5:67-6:4.)  Three sets of constraints are used to determine the compatibility between VMs and hosts, as well as between VMs and other VMs: technical, business, and workload constraints. (*Id.* at 6:59-65.)  Technical constraints are those affecting the configurational compatibility of VMs and hosts, such as processors, memory, network configuration, and other technical requirements.  (*See id.* at 25:39-26:22 (technical rule sets address "what can go together."))  Business constraints are those concerned with business and process choices, such as locations, departments, application owners, and other non-technical criteria established by the owner.  (*See id.* at 26:23-44 (business rule sets address "what should go together" from a business and process perspective.))  A particularly important business constraint in the context of this case is software license control — i.e., the requirement that VMs running on licensed software be concentrated on the fewest possible hosts to minimize licensing costs.  (FAC ¶¶ 3, 17, 21, 29, 56, 57, 62.)  Workload constraints are those based on utilization levels related to servers, processors, memory, networks, and other infrastructure where utilization of resources may vary.  (*See id.* at 26:44-27:17 (workload rule sets are based on "what fits together."))

Densify has been innovating in the VM and cloud computing space for years and has a wide portfolio of patents covering its technology.  For example, other Densify patents directed to "rule sets" and "analysis programs," which are incorporated by reference into the '687 patent and

5

are an important baseline on which its new techniques depend.[1]  The '687 patent brings optimal and compatible VM-host placement to both physical-to-virtual ("P2V") as well as virtual-to-virtual ("V2V") environments by addressing *business constraints* in addition to technical and workload constraints. ('687 patent at 6:17-21.)  Conventional systems did not analyze the three compatibility constraints (business, technical and workload compatibility) between VMs and hosts in addition to other VMs.  *See* Ex. A ('687 Patent Notice of Allowance, Mar. 6, 2012, p.2.)[2]  Indeed, VMware itself acknowledged that its prior products previously "did not support affinity between VMs *and hosts,*" on the grounds that administrators should "think less about individual hosts and more about aggregate clusters."   (FAC ¶ 67; FAC Ex. 13.)   VMware's materials recognized that "other requirements such as software licensing [i.e., business constraint requirements] … made administrators want to isolate VMs onto a set of hosts."  (FAC Ex. 13.)  VMware's acknowledged lack of VM to Host affinity and anti-affinity rules reflected that hosts were considered homogeneous and each VM on each host was not evaluated — i.e., cluster-based placement of VMs only worked if hosts in that cluster were homogeneous in relevant respects.

At a high level, the '687 patent claims a way of designing a virtual environment to optimize the placement of VMs on hosts.  Determining the placement of a VM on a particular host or instructing the movement of a VM to a specified host, is a key design element of a virtualized computer system. This placement determines how VMs on a host will interact, how VMs will share host resources and whether the virtual environment is meeting the business objectives of the company. The '687 patent claimed a way to solve a technological problem that exists only in a computer environment, and by so doing improved the way a virtualized computer system operates.

---

[1]     *See* '687 patent at 11:37-41, 7:19-23.

[2]     The prosecution history is part of the intrinsic record and a "matter[] of public record." *Data Engine Techs. LLC. v. Google LLC,* 906 F.3d 999, 1008 n.2 (Fed. Cir. 2018).

(FAC ¶ 63.)  For example, claim 2 discloses a method of managing a virtual environment that included generating a virtual environment design for physical systems (hosts) using technical, business, and workload constraints.  Software using this method obtains data about systems in the virtualized environment, checking VMs against hosts and other VMs using rule sets pertaining to these three constraints.  The computerized method rebalances these systems when necessary by determining VM-host placements by looking at compatibilities in a variety of VM-host placements, thereby determining a design of the virtualized environment to optimize the system. (*See* '687 patent at 37:48-67.)

Similarly, at a high level, claim 7 discloses a method for validating a virtualized environment.  This validation is a computerized process—using the same multi-dimensional algorithms as the design phase, discussed below—that enables (i.e., makes the system operational through) alternative placements of VMs on hosts when it identifies VMs with suboptimal placements.  It evaluates the placement of these VMs by evaluating each VM against each host and other VMs against information pertaining to technical, business, and workload constraints.  Validation of a computerized environment is central to the design of complex systems.  (*See id.* at 38:57-39:5.)

Claim 13 also focuses on "computer executable instructions for designing a virtualized environment" based on the physical environment, a problem arising only in computers and directly related to the improvement in the layout of a virtualized environment (as is the case with the other claims).  Claim 13 determines VM-host placements based on the virtual environment design generated using the steps of the claim.  To design this environment, the claim teaches that the computer system should obtain information pertaining to the parameters of the hosts, and performing three iterations of the compatibility analyses on VMs and hosts using rule sets related

7

to technical, business, and workload constraints.  (*See id.* at 39:63-40:18.)  Claim 16 depends from claim 13 and builds on this concept by facilitating the deployment of VMs and hosts within the virtual environment design.  It provides an ongoing check as to whether VM placement can be refined and rebalanced based on compatibilities relating to technical, business, and workload constraints.  (*See id.* at 40:41-58.)

The claims are supported and informed by a lengthy specification, rich with detail, with 56 figures disclosing detailed embodiments.  The '687 specification teaches that the claimed compatibility analysis program uses technical and business-related rule sets as well as workload compatibility considerations to design a virtual environment. (*Id.* at 8:58-66.)  When using a multi-dimensional compatibility mode, the claimed invention evaluates compatibility of multiple sources to be transferred to a common target and determines compatibility "for each specified transfer set." (*Id.* at 9:58-63.)

In the design phase, the multi-dimensional analysis uses an algorithm analyzing three critical rule constraints—technical, business, and workload—to generate an optimal layout design of source-to-target systems. (*Id.* at 30:29-41.)

The multi-dimensional analysis also is used for virtual environment validation.  As shown in Figure 43, the deployed source and target systems (based on a prior design), are again analyzed in the multi-dimensional and consolidation programs using the technical, business, and workload constraints.  Just as in the design phase, the multi-dimensional analysis performs the auto-fit algorithm, which assesses compatibility based on the current VM placements so as to enable the redesign of the system. (*Id.* at 35:10-12.)  When the resulting compatibility analysis scores demonstrates that the source VMs are compatible with their current host, this result demonstrates that the VMs continue to meet the technical, business and workload constraints.  If, however, the

multi-dimensional analysis results in an unacceptable compatibility score, the software will direct movement a different host to refine and optimize system design.  (*Id.* at 35:16-23; 30:6-14.)

The results of the multi-dimensional analysis for a combined "net-effect" of the technical, business, and workload constraints is an "overall affinity map."  (*Id.* at 27:44-46.) This map, illustrated in Figure 31 as a 3-D structure, shows which source systems are compatible across multiple criteria, and is the result of billions of interrelated computations.

## V.    LEGAL STANDARD

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). The Court must take factual representations from the patent specification as true at the motion to dismiss stage.  *See Visual Effect Innovations, LLC v. Sony Elecs. Inc.*, No. CV 17-1276-LPS, 2018 WL 4700225, at *5 (D. Del. Sept. 30, 2018) (citation omitted)).

The Supreme Court has established a two-step test to determine whether a patent is eligible under 35 U.S.C. § 101. At step one, the court must determine whether the claims as a whole are directed to an abstract idea ("*Alice* step one"). *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). If the claims are not directed to an abstract idea, the § 101 inquiry ends. *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 127, 1262 (Fed. Cir. 2017).  If the court finds the claims are directed to an abstract idea, the analysis turns to step two to determine whether the claims contain an "inventive concept" that "transform[s] that abstract idea into a patent-eligible invention." ("*Alice* step two"). *Alice*, 134 S. Ct. at 2357. Whether the claims contain an inventive concept is a factual issue. *See, e.g., Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d

9

1121, 1125 (Fed. Cir. 2018); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018).

The specification is highly relevant to the *Alice* inquiry.  *See, e.g.*, *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1304 (Fed. Cir. 2018) (finding a pioneering 'behavior-based' approach to virus scanning "[wa]s disclosed in the '844 patent's specification"); *Visual Memory*, 867 F.3d at 1255, 1259-60 (reviewing the specification and determining that the claims encompassed the improvement in computer capabilities, and were therefore patent-eligible).  In addition to the specification, the prosecution history, as part of the public record, may also be relevant particularly when an examiner's notice of allowance addresses the "specific technique" that underscores a claim's patent-eligibility.  *See Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348-49 (Fed. Cir. 2018); *see also Uniloc USA, Inc. v. ADP, LLC*, No. 2018-1132, 2019 WL 2245938, at *5 (Fed. Cir. May 24, 2019) (non-precedential).

## VI.     ARGUMENT

### A.     Directed To The Design Of A Virtual Environment, The '687 Patent Is Eligible Under Alice Step One.

#### 1.     The Claims Are Tailored To Optimization of Virtual Environments — By Definition, an Improvement of Computer Technology.

The focus of the '687 patent's claims is on improving the design of virtual computer systems.  Specifically, the claims are directed to a method for designing a virtualized environment by placing VMs on hosts based on evaluating each VM against each host and other VMs with rule sets of technical, business, and workload constraints.  The Federal Circuit's cases make clear that software-based innovations can make non-abstract improvements to computer technology when they are focused on "an improvement in computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016).  "[T]he self-referential table database found patent eligible in *Enfish* did more than allow computers to perform familiar tasks with greater speed and efficiency;

it actually permitted users to launch and construct databases in a new way." *Finjan*, 879 F.3d at 1305.

The '687 patent readily meets the standard in *Enfish* and its progeny. The claimed invention is necessarily rooted in computer technology, as it overcomes a problem specifically arising in the computerized environment of virtual systems. The invention allows users to construct virtual systems in a new way. For example, Claim 2 is directed to managing a virtualized environment by generating a virtual environment design of an existing physical system (servers) using technical, business, and workload constraints.[3] The method then, on an ongoing basis, performs a validation routine to evaluate each VM against each host and other VMs in that system using rule sets comprising technical, business, and workload constraints. It uses this information to rebalance the system based on compatibility. This is the design of a virtual system — when a VM is placed on a host in accordance with criteria (here, technical, business, and workload constraints) — it results in a new design of that computer system so as to make it work in a better (more optimized) fashion.[4]

Similarly, claim 7 software runs a validation routine using technical, business, and workload constraints to create a design for host-based placement of VMs, again, evaluating each

---

[3]     VMware asserts claim 7 is representative but has not met its burden of showing that the other asserted claims are substantially similar. *Perdiemco, LLC v. Industrack LLC*, No. 2:15-CV-1216-JRG-RSP, 2016 WL 5719697, at *7 (E.D. Tex. Sept. 21, 2016), *report and recommendation adopted*, No. 2:15-CV-727-JRG, 2016 WL 5475707 (E.D. Tex. Sept. 29, 2016) ("When the movant relies on a representative claim in its §101 analysis, it bears the burden of showing that the other asserted claims are 'substantially similar and linked to the same abstract idea[.]'") (quotations and citations omitted). That Densify cited claim 7 as "illustrative" in its preliminary injunction brief for a "likelihood of success" infringement showing does not make it "representative" under the §101 ineligibility standard. *Dana Corp. v. Am. Axle & Mfg., Inc.*, 279 F.3d 1372, 1376 (Fed. Cir. 2002).

[4]     VMware concedes, as it must, that the '687 patent PI claims are directed to a "computer environment." (D.I. 80 at 4.)

VM against each host and other VMs to determine optimized placements.  Using these three constraints and evaluating movement of VMs to particular hosts by performing a compatibility check at the VM to host level, particularly involving business constraints, was a new way of designing a virtual system, allowing for changes to the system as system parameters and usage change dynamically.  This claim teaches that suboptimal placements can be identified so as to put into effect (enable) alternative host-based placement of VMs.[5]

Claim 13 addresses the invention through a computer readable medium with executable instructions for designing a virtualized environment.  These instructions analyze compatibility of candidate VMs, candidate hosts, and then VMs against hosts to generate a virtual environment design that determines host-based placement of VMs.  It evaluates a plurality of virtual design scenarios (i.e., various host-based placements of VMs) before optimizing based on technical, business, and workload constraints.  Claim 16, which depends on claim 13, adds the ongoing rebalancing of the virtual environment, again based on the three constraints.

These four claims, as explained in the specification, focus on improving the way a virtualized environment operates by optimizing the placement of VMs on hosts based on technical, business, and workload constraints.  This improves the functioning of the computer system by increasing efficiency, reducing redundancies and under-utilized hardware, reducing or eliminating unnecessary processing capacity and incompatibilities, reducing errors, decreasing costs, requiring less maintenance, decreasing heat and power consumption, increasing the ease of maintaining

---

[5]  Validation is understood as having "[a] practical difficulty in the validation of large hardware systems is choosing the proper design abstraction level which provides a trade-off between simulation complexity and error modelling accuracy.  In practice, validation is performed at all levels of abstraction from behavioral down to layout.  *See, e.g.*, https://www.validation-online.net/system-hardware-validation.html.  In addition, the "enable" term in the last step of claim 7 is also understood in the context of computer environments as:  "2.COMPUTING make (a device or system) operational; activate."  "enable." *Concise Oxford English Dictionary* (12th ed. 2011).

compliance or risk de-concentration, and generally being easier to manage.  (FAC ¶ 65.)

*Finjan* is instructive.  There, the Federal Circuit considered a simplistic three-step method claim directed to a "behavior-type" virus scan, which involved (1) receiving a downloadable program, (2) generating a security profile for the program identifying suspicious code, and (3) linking the security profile to the program before the server makes the program available to clients. *Finjan*, 879 F.3d at 1303.  In finding this "behavior-based" virus scan method claim patent-eligible under *Alice* step 1, the court emphasized that the user's computer determines whether to access a downloaded program by reviewing its security profile according to whatever rules are associated with the user, allowing administrators to tailor access with security policies.  *See id.* at 1305.  The court rejected defendant's argument that "the [claims] remain abstract because they do not sufficiently describe how to implement that idea." *Id*. The court noted that defendant's results-based cases "hearken[ed] back to a foundational patent law principle:  that a result, even an innovative result is not itself patentable . . . ."  *Id.*[6]  The *Finjan* court found, however, that the claims "recite more than a result.  Instead, *they recite specific steps* — generating a security profile that identifies suspicious code and linking it to a downloadable — *that accomplish the desired result.*"  *Id.* (citations omitted) (emphasis added).

Here, the claims are equally patent-eligible. For example, the *Finjan* claim-at-issue did "not identify any specific hardware elements, an operating system, . . . or even a particular algorithm," as VMware demands. (D.I. 80 at 10.)  Instead, the claim at-issue in *Finjan* "merely identifie[d] steps to take—without claiming any particular way of doing so," contrary to VMware's suggested standard.  *Id.*  Here too, the claims more than adequately "recite specific steps . . . that

---

[6]     The cases distinguished in *Finjan* represent a variation on a theme of *Electric Power Group* where an abstract idea is merely implemented on generic computer components, in particular, those that are directed to a result using functional language, unlike here.

13

accomplish the desired [optimization] result." *Finjan*, 879 F.3d at 1305.  Simply put, *Finjan* did

not require the heightened patent-eligibility standard VMware urges — as in *Finjan*, the patent

discloses the specific steps to be taken by the claimed software, which in turn accomplishes the

desired optimization result.[7]

### 2.     *Electric Power* And Related Authorities Are Inapplicable.

VMware draws superficial parallels to *Electric Power* that do not withstand scrutiny.  The

claims there were directed to merely monitoring the performance of an electric power grid by

collecting data from multiple sources, analyzing it, and displaying the results.  *Electric Power*

*Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1351 (Fed. Cir. 2016).  The court made clear that the

"claims here are unlike the claims in *Enfish*," because they were not improvements in computer

functionality; instead, the *Electric Power* claims were simply using computers in aid of collecting,

analyzing, and displaying data.  *Id.* at 1354.  VMware cherry-picks particular words such as

"obtaining a data set" or "evaluating" out of one claim (to draw parallels with *Electric Power*, but

glosses over the focus of the claim (much less the other three claims) on creating a design for a

virtual environment that improves the functioning of the computer system.  The claim gathers and

evaluates information about VMs and hosts as a <u>tool</u> to create a new virtual environment design

through host-based placement.   It uses specific technological means rooted exclusively in

computers — e.g., evaluating the placement of each VM against each host and other VMs to

optimize VM placement based on technical, business, and workload constraints.  Separately, the

---

[7]     VMware cites no authority for its heightened patent-eligibility standard, which
subsumes at least the separate Section 112 requirements of definiteness and enablement.
Specifically,  VMware's "how to" arguments, (D.I. 80 at 1, 5), sound in enablement, not patent
eligibility.  *See Visual Memory*, 867 F.3d at 1261-62 ("[W]hether a patent specification teaches an
ordinarily skilled artisan how to implement the claimed invention presents an enablement issue
under 35 U.S.C. § 112, not an eligibility issue under § 101.").

court in *Electric Power* was careful to note that the patent there was not limited to any "particular assertedly inventive technology" for collecting, analyzing, and displaying data.  Here, the focus of the '687 patent is the particular inventive technology described above — software that determines host-based placement based on evaluating each VM against each host and other VMs according to the three criteria, an innovative methodology absent in conventional systems.  The claim is not merely data manipulation – it creates a design in which host-based placements are made.

This case is much closer to *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 2017-2223 (Fed. Cir. July 12, 2019).[8]  There, the Federal Circuit found patent-eligible under *Alice* step 1, a "computer-automated" method claim directed "to using a *specific technique*—using a plurality of network monitors that each analyze specific types of data on the network and integrating reports from the monitors—to solve a technological problem arising in computer networks: identifying hackers or potential intruders into the network."  *Id.*, slip op. at 8-9 (emphasis added).  In so finding, the *SRI* court rejected the defendant's analogy of the claim at issue to that of *Electric Power Group* as "simply directed to generic steps required to collect and analyze data."  *Id.*, slip op. at 10.  Instead the *SRI* court distinguished the *Electric Power* claims as "drawn to using computers as tools to solve a power grid problem, rather than improving the functionality of computers and computer networks themselves."  *Id.*[9]  As in *SRI*, the claims here are directed to designing and continuously

---

[8]     On July 12, 2019, the same Federal Circuit panel withdrew and reissued *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 2017-2223.  The reissued opinion contains the same Section 101 analysis as previously issued in 918 F.3d 1368, 1376 (Fed. Cir. 2019) (now withdrawn).

[9]     VMware's litany of string-cite cases also falls squarely in this "generic computer" line of cases: *SAP Am., Inc. v. Investpic*, LLC, 898 F.3d 1161, 1168 (Fed. Cir. 2018) ("Here, the focus of the claims is not any improved computer or network, but the improved mathematical analysis; and indeed, the specification makes clear that off-the-shelf computer technology is usable to carry out the analysis."); *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384-85 (Fed. Cir. 2019); *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1345 (Fed. Cir. 2018); *Search & Soc. Media Partners, LLC v. Facebook, Inc.*, 346 F. Supp. 3d 626, 635 (D. Del. 2018).

ensuring an optimal virtual system, which by definition is a form of computer technology, as VMware concedes.  (D.I. 80 at 4.)

>
> **3.**    **A Human Using VMware's "Pencil and Paper" Is Not Capable Of Performing The '687 Patent's Claimed Method.**

VMware's oversimplification of the '687 patent claims is most evident in its "pencil and paper" analogy (also referred to as the "mental process" exception).  (*See* D.I. 80 at 12.) As the Federal Circuit has repeatedly warned, "describing the claims at [] a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337; *see also McRO, Inc.*, 837 F.3d at 1313 ("[C]ourts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims.") (citation omitted); *SRI*, slip op. at 11 (upholding claims as "not the type of human activity that § 101 is meant to exclude" because "the human mind is not equipped to detect suspicious activity by using network monitors and analyzing network packets as recited by the claims.").

In this case, the human mind is not "equipped," to paraphrase *SRI*, to "evaluat[e] the placement of said virtual machines in said virtualized environment using said data sets by evaluating each virtual guest against each virtual host and other virtual guests using one or more rule sets pertaining to said technical, business and workload constraints to determine guest-host placement."  ('687 patent at 38:64-39:2.)  The '687 patent's multi-dimensional analysis invokes the "infinite number of possible consolidation permutations" referred to in the specification as the problem to be solved and is conceptually illustrated in Figure 31. It would be impossible for a human mind to create a virtual environment design involving ten thousand servers, hosting 2 million VMs evaluating each VM against each host and other VMs across the three constraints.

VMware's "pencil and paper" analogy is also inapplicable when the algorithm, such as

here, entails iterations of transfer permutations that cannot be performed in the human mind.  In

*TQP*, Judge Bryson (sitting by designation) examined the origins of the "mental process"

exception.  *TQP Development, LLC v. Intuit Inc.*, No. 2:12-cv-180-WCB, 2014 WL 651935 (E.D.

Tex. Feb. 19, 2014).  Distinguishing the "simple conversion" and "extraordinary breadth" of the

*Benson* invention, the *TQP* court reasoned that "the invention involve[d] a *several-step*

*manipulation of data that*, except perhaps in its most simplistic form, could not conceivably be

performed in the human mind or with pencil and paper."  *Id.* at *4 (denying summary judgment

where an expert declaration stating "mental process" was not possible created a factual dispute).

Further, in *California Institute of Technology v. Hughes Communications Inc.*, 59 F. Supp.

3d 974 (C.D. Cal. 2014), the district court likewise rejected a "pencil and paper" argument, finding

patent claims directed to bit parity to be patent-eligible:

> Many inventions could be theorized with pencil and paper, but pencil and paper can
> rarely produce the actual effect of the invention. Likewise, with regard to software, a
> human could spend months or years writing on paper the 1s and 0s comprising a
> computer program and applying the same algorithms as the program. At the end of the
> effort, he would be left with a lot of paper that obviously would not produce the same
> result as the software.

*Id.* at 994.[10] The *Hughes* court also rejected the pencil and paper test as a "stand-in for another

concern: that human engaged in the same activity long before the invention of computers." *Id.* at

995.  There, the court observed that the codes at issue "were not conventional activity that humans

engaged in before computers . . . simply because humans can do math."[11]

---

[10]    "The problems of pencil-and-paper analysis are heightened in the context of
software, which necessarily uses algorithms to achieve its goals. Pencil-and-paper analysis can
mislead courts into ignoring a key fact: although a computer performs the same math as a human,
a human cannot always achieve the same results as a computer." *Id.* at 995.

[11]    *See also Data Engine Techs.*, 906 F.3d at 1011 ("It is not enough, however, to
merely trace the invention to some real-world analogy. *The eligibility question is not whether
anyone has ever used tabs to organize information. That question is reserved for §§ 102 and 103*.")
(emphasis added).

### B.      The Claims Contain An Inventive Concept Satisfying *Alice* Step 2.

In *Alice* step two, the analysis turns to "a search for an "inventive concept" — i.e., an element or ordered combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Amdocs v. Openet Telecom, Inc.*, 841 F.3d 1288, 1293-1294 (Fed. Cir. 2016) (citations omitted).  "The preemption concern arises when the claims are not directed to a specific invention and instead improperly monopolize 'the basic tools of scientific and technological work.'"  *McRO, Inc.*, 837 F.3d at 1314 (quoting *Alice,* 134 S. Ct. at 2354).

### 1.      The '687 Patent Prosecution History Confirms The "Inventive Concept" of The Claimed Specific Technique.

The prosecution history underscores the "inventive concept" of the '687 patent PI claims, where the "heart" of the invention is the specific technique of performing the multi-dimensional analysis between both hosts and other VM guests using the rules (constraints) taught in the '687 specification. *See Uniloc USA, Inc.*, 2019 WL 2245938, at *5 ("It is undisputed that the addition of the file packet limitation during prosecution was the heart of the patent's allowance"). Specifically, in a Notice of Allowance, the Examiner stated that the prior art did not disclose the following claim 1 limitation of  "generat[ing] a virtual environment design for virtualizing said plurality of systems by evaluating each candidate virtual guest against each candidate virtual host and other candidate virtual guests using said one or more rule sets to determine guest-host placements based on compatibilities of a plurality of virtual design scenarios." Ex. A ('687 Patent Notice of Allowance, Mar. 6, 2012, p.2.)  The Examiner also stated that claims 2 and 7 were allowable for the same reason. *Id. See Ancora Techs., Inc.*, 908 F.3d at 1348-49 (reviewing both the specification as well as the prosecution history, in particular the examiner's reasons for allowance, to find "[i]mproving security—here, against a computer's unauthorized use of a

18

program—can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem.") (citing *Finjan*, 879 F.3d at 1304-05).

Here, this particular limitation that is present in each of the claims represents the "inventive concept" required in the *Alice* step 2 analysis. This is a specific way of designing a virtualized environment and an improvement over conventional systems. VMware claims that the abstract idea to which the '687 claims are directed is collecting and analyzing information. (D.I. 80 at 8.) The '687 patent claims significantly more than collecting and analyzing data — as described above, it claims a specific way of placing VMs on hosts by evaluating each VM against each host and other VMs based on technical, business, and workload constraints. There are many other ways of collecting and analyzing data, to be sure.

### 2.      VMware's Own Prosecution History Demonstrates That The '687 Patent PI Claims Do Not Preempt The Field.

The concept of preemption, although not dispositive, further supports the patent-eligibility of the '687 patent claims. "The preemption concern arises when the claims are not directed to a specific invention and instead improperly monopolize 'the basic tools of scientific and technological work.'" *McRO, Inc.*, 837 F.3d at 1314 (quotation omitted). Here, the claims are tailored to a specific technique that does not preempt "collecting and analyzing data" (the abstract concept asserted by VMware). That the basic tool of technology is free for others to use is demonstrated in VMware's patent prosecution history. VMware has cited the '687 patent in 20 of its own patents and patent applications. Ex. B at 20-25 (showing 156 forward citations). In particular, VMware's own U.S. Pat. No. 9,864,601, entitled "Resource Management in Distributed Computer Systems Using Dispersion Rules," was required to amend its claims and argue around not only a Section 101 rejection but also Densify's '687 patent, cited as prior art. Ex. C at 12-15

19

('601 patent prosecution history, rejections over publication of '687 patent).

As to the Section 101 objection, VMware stated: "the invention recited in the amended independent claim 1 involves <u>specific computer resource allocation techniques</u>, which are necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer resource management." Ex. C at 9. More importantly, VMware repeatedly distinguished Densify's '687 patent on the basis that, *inter alia*, the '687 patent "consolidated" rather than "dispersed" as required in VMware's '601 Patent. *See id.* at 13-15. That VMware's '601 Patent issued is proof that Densify's '687 patent does not preempt the entire field of "collecting and analyzing data" as VMware contends.

## VII.    CONCLUSION

For the foregoing reasons, Densify respectfully requests the Court deny VMware's motion to dismiss.

Dated: July 16, 2019

Respectfully submitted,

*/s/ Kenneth L. Dorsney*

Kenneth L. Dorsney (#3726)
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6855
kdorsney@morrisjames.com

**ATTORNEYS FOR PLAINTIFFS
CIRBA, INC. and CIRBA IP, INC**

Sarah O. Jorgensen (*pro hac vice*)
sjorgensen@reichmanjorgensen.com
Reichman Jorgensen LLP
1201 West Peachtree, Suite 2300
Atlanta, GA 30309
Telephone: (650) 623-1403
Telecopier: (650) 623-1449

Christine E. Lehman (*pro hac vice*)
clehman@reichmanjorgensen.com
Reichman Jorgensen LLP
1615 M Street, NW, Suite 300
Washington, DC 20036
Telephone: (202) 894-7311
Telecopier: (650) 623-1449

Jaime F. Cardenas-Navia (*pro hac vice*)
jcardenas-navia@reichmanjorgensen.com
Wesley L. White (*pro hac vice*)
wwhite@reichmanjorgensen.com
Reichman Jorgensen LLP
100 Park Avenue, Suite 1600
New York, NY 10017
Telephone: (646) 921-1474
Telecopier: (650) 623-1449

Of Counsel:
Courtland L. Reichman (*pro hac vice*)
creichman@reichmanjorgensen.com
Shawna Ballard (*pro hac vice*)
sballard@reichmanjorgsensen.com
Jennifer P. Estremera (*pro hac vice*)
jestremera@reichmanjorgensen.com
Phillip J. Lee (*pro hac vice*)
plee@reichmanjorgensen.com
Joachim B. Steinberg (*pro hac vice*)
jsteinberg@reichmanjorgensen.com
Michael G. Flanigan (*pro hac vice*)
mflanigan@reichmanjorgensen.com
Kate Falkenstien (*pro hac vice*)
kfalkenstien@reichmanjorgensen.com
Reichman Jorgensen LLP
303 Twin Dolphin Drive, Suite 600
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Telecopier: (650) 623-1449

**ATTORNEYS FOR PLAINTIFFS**
**CIRBA, INC. and CIRBA IP, INC.**

# Exhibit A



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| 27871 | 7590 | 03/06/2012 |
|---|---|---|

BLAKE, CASSELS & GRAYDON LLP
BOX 25, COMMERCE COURT WEST
199 BAY STREET, SUITE 4000
TORONTO, ON M5L 1A9
CANADA

| EXAMINER |
|---|
| COLEMAN, ERIC |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2183 | |

DATE MAILED: 03/06/2012

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/201,323 | 08/29/2008 | Tom Silangan Yuyitung | 59612/00030 | 9240 |

TITLE OF INVENTION: METHOD AND SYSTEM FOR EVALUATING VIRTUALIZED ENVIRONMENTS

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1740 | $300 | $0 | $2040 | 06/06/2012 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

## PTO/SB/ALT

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>

**Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**

**or** <u>Fax</u>  **(571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

27871        7590        03/06/2012

BLAKE, CASSELS & GRAYDON LLP
BOX 25, COMMERCE COURT WEST
199 BAY STREET, SUITE 4000
TORONTO, ON M5L 1A9
CANADA

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/201,323 | 08/29/2008 | Tom Silangan Yuyitung | 59612/00030 | 9240 |

TITLE OF INVENTION: METHOD AND SYSTEM FOR EVALUATING VIRTUALIZED ENVIRONMENTS

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1740 | $300 | $0 | $2040 | 06/06/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| COLEMAN, ERIC | 2183 | 718-001000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).
☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.
☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)
PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE or COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :  ☐ Individual  ☐ Corporation or other private group entity  ☐ Government

4a. The following fee(s) are submitted:
☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): (**Please first reapply any previously paid issue fee shown above**)
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)
☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.     ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____        Date _____

Typed or printed name _____        Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/201,323 | 08/29/2008 | Tom Silangan Yuyitung | 59612/00030 | 9240 |

27871          7590          03/06/2012
BLAKE, CASSELS & GRAYDON LLP
BOX 25, COMMERCE COURT WEST
199 BAY STREET, SUITE 4000
TORONTO, ON M5L 1A9
CANADA

| EXAMINER |
|---|
| COLEMAN, ERIC |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2183 | |

DATE MAILED: 03/06/2012

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 629 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 629 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. | Applicant(s) | |
|---|---|---|---|
| | 12/201,323 | YUYITUNG ET AL. | |
| | Examiner | Art Unit | |
| | ERIC COLEMAN | 2183 | |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *amendment (including arguments) filed 12/19/2011*.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____;
   the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1-7 and 10-20*.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   a) ☐ All   b) ☐ Some*   c) ☐ None   of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the
      International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF
   INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
   (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
      1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____ .
   (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
      Paper No./Mail Date _____ .

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of
   each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the
   attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3. ☐ Information Disclosure Statements (PTO/SB/08),
   Paper No./Mail Date _____
4. ☐ Examiner's Comment Regarding Requirement for Deposit
   of Biological Material

5. ☐ Notice of Informal Patent Application
6. ☐ Interview Summary (PTO-413),
   Paper No./Mail Date _____ .
7. ☐ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☐ Other _____ .

/ERIC COLEMAN/
Primary Examiner, Art Unit 2183

Application/Control Number: 12/201,323                                    Page 2
Art Unit: 2183

## REASONS FOR ALLOWANCE

The following is an examiner's statement of reasons for allowance: The combination of features in each of the claims was not found in the prior art. The prior art includes plural servers and virtual machines and guests and migration, monitoring of systems and performing compatibility analysis. However the combination of features in each of  the independent claims was not found in the prior art. Claim 1 includes a combination including "generate a virtual environment design for virtualizing said plurality of systems by evaluating each candidate virtual guest against each candidate virtual host and other candidate virtual guests using said  one or more rule sets to determine guest-host placements based on compatibilities of a plurality of virtual design scenarios". This combination of features was not found in the prior art.  The variations to his combination found in  claim 2, claim 3, claim 7 and claim 15  respectively also were not found in the prior art.

Claim 4 includes the "performing a first compatibility analysis…by evaluating each system against said first rule set to determine an intermediate set of virtualization host candidates that are qualified to be virtual hosts; and performing a second compatibility analysis...by evaluating each intermediate candidate against each other to determine which of said intermediate candidates  are compatible  with each other and form one or more groups of compatible hosts to be used as said set of virtualization hosts". This combination of features was not found in the prior art.

Application/Control Number: 12/201,323                                                Page 3
Art Unit: 2183

 Claim 6 includes a combination of features including "determining aggregate workload requirements based on workload data pertaining to guest candidates… determining aggregate workload capacity based on configuration data pertaining to host candidates…comparing said workload requirements against said workload capacity to determine if sufficient capacity exists to satisfy said workload requirements; and if there is insufficient capacity, adding hypothetical server models to said host candidates to meet said workload requirements". This combination of features was not found in the prior art.

 The claims that depend from the one  of the independent claims also includes the features of the corresponding independent claim and are allowable for the same reasons.

 Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

 Any inquiry concerning this communication or earlier communications from the examiner should be directed to ERIC COLEMAN whose telephone number is (571)272-4163.  The examiner can normally be reached on Monday-Friday.

Application/Control Number: 12/201,323                                        Page 4
Art Unit: 2183

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Eddie Chan can be reached on (571) 272-4162.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

EC

/ERIC  COLEMAN/
Primary Examiner, Art Unit 2183

# Exhibit B

 

Patents

# Method and system for evaluating virtualized environments

## Abstract

A system and method are provided for incorporating compatibility analytics and virtualization rule sets into a transformational physical to virtual (P2V) analysis for designing a virtual environment from an existing physical environment and for ongoing management of the virtual environment to refine the virtualization design to accommodate changing requirements and a changing environment.

## Images (53)



## Classifications

G06Q10/06 Resources, workflows, human or project management, e.g. organising, planning, scheduling or allocating time, human or machine resources; Enterprise planning; Organisational models

---

**US8209687B2**

United States

Download PDF | Find Prior Art | Similar

**Inventor :** Tom Silangan Yuyitung, Andrew Derek Hillier

**Current Assignee :** CIRBA IP INC.

**Worldwide applications**

2008 CA EP US WO

**Application US12/201,323 events**

| | |
|---|---|
| 2007-08-31 | Priority to US96934407P |
| 2008-08-29 | Application filed by CiRBA Inc |
| 2009-03-12 | Publication of US20090070771A1 |
| 2012-06-26 | Publication of US8209687B2 |
| 2012-06-26 | Application granted |
| 2019-04-25 | First worldwide family litigation filed ⓘ |
| 2019-07-15 | Application status is Active |
| 2031-03-18 | Adjusted expiration |

Show all events ⌄

**Info:** Patent citations (30), Non-patent citations (10), Cited by (156), Legal events, Similar documents, Priority and Related Applications

**External links:** USPTO, USPTO Assignment, Espacenet, Global Dossier, Discuss

---

## Claims (18)

Hide Dependent ∧

1. A method for designing a virtualized environment based on an existing physical environment comprising a plurality of systems, said method comprising:

    obtaining a data set for each of said plurality of systems, each data set comprising information pertaining to parameters associated with a corresponding system;

    performing a first compatibility analysis on said systems to determine candidate virtual guests;

    performing a second compatibility analysis on said systems to determine candidate virtual hosts; and

    performing a third compatibility analysis using said candidate virtual hosts, said candidate virtual guests and one or more rule sets pertaining to technical, business and workload constraints to generate a virtual environment design for virtualizing said plurality of systems by evaluating each candidate virtual guest against each candidate virtual host and other candidate virtual guests using said one or more rule sets to determine guest-host placements based on compatibilities of a plurality of virtual design scenarios.

2. A method for managing a virtualized environment, said method comprising:

    generating a virtual environment design for a plurality of existing physical systems using technical, business and workload constraints;

    facilitating the deployment of said virtualized environment according to said design; and

    on an ongoing basis:

    obtaining data pertaining to systems being used in said virtualized environment;

    validating placement of said systems in said virtualized environment by evaluating each virtual guest against each virtual host and other virtual guests using one or more rule sets pertaining to technical, business and workload constraints;

    if necessary, rebalancing said systems by determining guest-host placements based on compatibilities of a plurality of virtual design scenarios; and

    refining said virtualized environment according to said one of said plurality of virtual design scenarios.

3. A method for performing a virtual to virtual (V2V) transformation for a plurality of existing virtual guests and hosts, said method comprising:

analyzing said existing virtual guests and hosts based on technical, business and workload constraints by evaluating each virtual guest against each virtual host and other virtual guests using one or more rule sets pertaining to said technical, business and workload constraints to determine guest-host placements;

based on said analyzing, determining which of said existing virtual servers are most suitable for conversion from one virtualized platform to another virtualized platform; and

providing a mapping from said one platform to said another platform to facilitate said transformation.

4. A method for determining a set of virtualization hosts for a virtualized environment based on an existing physical environment comprising a plurality of systems, said method comprising:

obtaining a data set for each of said plurality of systems, each data set comprising information pertaining to parameters associated with a corresponding system;

performing a first compatibility analysis of said plurality of systems using said data sets and a first rule set pertaining to virtualization specific constraints by evaluating each system against said first rule set to determine an intermediate set of virtualization host candidates that are qualified to be virtual hosts; and

performing a second compatibility analysis of said intermediate set of virtual host candidates using a second rule set pertaining to migration specific constraints by evaluating each intermediate candidate against each other to determine which of said intermediate candidates are compatible with each other and form one or more groups of compatible hosts to be used as said set of virtualization hosts.

5. The method according to claim 4 further comprising incorporating one or more hypothetical hosts into said set of virtualization hosts based on workload requirements for said virtualized environment.

6. A method for evaluating virtualization candidates to determine if additional systems are required to implement a desired virtualized environment, said method comprising:

obtaining a set of virtualization guest candidates and determining aggregate workload requirements based on workload data pertaining to said guest candidates;

obtaining a set of virtualization host candidates and determining aggregate workload capacity based on configuration data pertaining to said host candidates;

comparing said workload requirements against said workload capacity to determine if sufficient capacity exists to satisfy said workload requirements; and

if there is insufficient capacity, adding hypothetical server models to said host candidates to meet said workload requirements.

7. A method for validating an existing virtualized environment comprising a plurality of virtual machines placed on one or more virtual hosts, said method comprising:

obtaining a data set for each of said plurality of virtual machines, each data set comprising information pertaining to technical, business and workload constraints associated with a corresponding virtual machine;

evaluating the placement of said virtual machines in said virtualized environment using said data sets by evaluating each virtual guest against each virtual host and other virtual guests using one or more rule sets pertaining to said technical, business and workload constraints to determine guest-host placements; and

identifying the existence of virtual machines with suboptimal placements to enable alternative placements for said virtual machines.

8. The method according to claim 1, wherein said second compatibility analysis comprises:

performing a third compatibility analysis of said plurality of systems using said data sets and a first rule set pertaining to virtualization specific constraints by evaluating each system against said first rule set to determine an intermediate set of virtualization host candidates that are qualified to be virtual hosts; and

performing a fourth compatibility analysis of said intermediate set of virtual host candidates using a second rule set pertaining to migration specific constraints by evaluating each intermediate candidate against each other to determine which of said intermediate candidates are compatible with each other and form one or more groups of compatible hosts to be used as said set of virtualization hosts.

9. The method according to claim 8 further comprising incorporating one or more hypothetical hosts into said set of virtualization hosts based on workload requirements for said virtualized environment.

10. The method according to claim 1, further comprising:

facilitating the deployment of a virtualized environment according to said virtual environment design; and

on an ongoing basis:

obtaining data pertaining to systems being used in said virtualized environment;

validating placement of said systems in said virtualized environment by evaluating each virtual guest against each virtual host and other virtual guests using one or more rule sets pertaining to technical, business and workload constraints, to determine guest-host placements based on compatibilities of a plurality of virtual design scenarios;

if necessary rebalancing said systems according to one of said plurality of virtual design scenarios; and

refining said virtualized environment according to said one of said plurality of virtual design scenarios.

11. The method according to claim 1, further comprising:

comparing workload requirements of said virtual guests against said workload capacity of said virtual hosts, to determine if sufficient capacity exists to satisfy said workload requirements; and

if there is insufficient capacity, adding hypothetical server models to virtual host candidates to meet said workload requirements.

12. The method according to claim 1, further comprising:

evaluating the placement of virtual machines in a virtualized environment based on said virtual environment design by evaluating each virtual guest against each virtual host and other virtual guests using one or more rule sets pertaining to said technical, business and workload constraints to determine guest-host placements;

and

identifying the existence of virtual machines with suboptimal placements to enable alternative placements for said virtual machines.

13. A computer readable medium comprising computer executable instructions for designing a virtualized environment based on an existing physical environment comprising a plurality of systems, said computer executable instructions comprising instructions for:

obtaining a data set for each of said plurality of systems, each data set comprising information pertaining to parameters associated with a corresponding system;

performing a first compatibility analysis on said systems to determine candidate virtual guests;

performing a second compatibility analysis on said systems to determine candidate virtual hosts; and

performing a third compatibility analysis using said candidate virtual hosts, said candidate virtual guests and one or more rule sets pertaining to technical, business and workload constraints to generate a virtual environment design for virtualizing said plurality of systems by evaluating each candidate virtual guest against each candidate virtual host and other candidate virtual guests using said one or more rule sets to determine guest-host placements based on compatibilities of a plurality of virtual design scenarios.

14. The computer readable medium according to claim 13, wherein said second compatibility analysis comprises instructions for:

performing a third compatibility analysis of said plurality of systems using said data sets and a first rule set pertaining to virtualization specific constraints by evaluating each system against said first rule set to determine an intermediate set of virtualization host candidates that are qualified to be virtual hosts; and

performing a fourth compatibility analysis of said intermediate set of virtual host candidates using a second rule set pertaining to migration specific constraints by evaluating each intermediate candidate against each other to determine which of said intermediate candidates are compatible with each other and form one or more groups of compatible hosts to be used as said set of virtualization hosts.

15. The computer readable medium according to claim 14 further comprising instructions for incorporating one or more hypothetical hosts into said set of virtualization hosts based on workload requirements for said virtualized environment.

16. The computer readable medium according to claim 13, further comprising instructions for:

facilitating the deployment of a virtualized environment according to said virtual environment design; and

on an ongoing basis:

obtaining data pertaining to systems being used in said virtualized environment;

validating placement of said systems in said virtualized environment by evaluating each virtual guest against each virtual host and other guests using one or more rule sets pertaining to technical, business and workload constraints, to determine guest-host placements based on compatibilities of a plurality of virtual design scenarios;

if necessary rebalancing said systems according to one of said plurality of virtual design scenarios; and

refining said virtualized environment according to said one of said plurality of virtual design scenarios.

17. The computer readable medium according to claim 13, further comprising instructions for:

comparing workload requirements of said virtual guests against said workload capacity of said virtual hosts, to determine if sufficient capacity exists to satisfy said workload requirements; and

if there is insufficient capacity, adding hypothetical server models to virtual host candidates to meet said workload requirements.

18. The computer readable medium according to claim 13, further comprising instructions for:

evaluating the placement of virtual machines in a virtualized environment based on said virtual environment design by evaluating each virtual guest against each virtual host and other virtual guests using one or more rule sets pertaining to said technical, business and workload constraints to determine guest-host placements; and

identifying the existence of virtual machines with suboptimal placements to enable alternative placements for said virtual machines.

## Description

This application claims priority from U.S. Application No. 60/969,344 filed on Aug. 31, 2007, the contents of which are incorporated herein by reference.

### TECHNICAL FIELD

The present invention relates generally to information technology infrastructures and has particular utility in designing and evaluating visualized environments.

### BACKGROUND

As organizations have become more reliant on computers for performing day to day activities, so too has the reliance on networks and information technology (IT) infrastructures increased. It is well known that large organizations having offices and other facilities in different geographical locations utilize centralized computing systems connected locally over local area networks (LAN) and across the geographical areas through wide-area networks (WAN).

As these organizations grow, the amount of data to be processed and handled by the centralized computing centers also grows. As a result, the IT infrastructures used by many organizations have moved away from reliance on centralized computing power and towards more robust and efficient distributed systems.

While the benefits of a distributed approach are numerous and well understood, there has arisen significant practical challenges in managing such systems for optimizing efficiency and to avoid redundancies and/or under-utilized hardware. In particular, one challenge occurs due to the sprawl that can occur over time as

7/15/2019 US8209687B2 - Method and system for evaluating virtual machines in a heterogeneous environment - Google Patents

Case 1:19-cv-00742-LPS Document 91 Filed 07/16/19 Page 39 of 102 PageID #: 4612

applications and servers proliferate. Decentralized control and decision making around capacity, the provisioning of new applications and hardware, and the perception that the cost of adding server hardware is generally inexpensive, have created environments with far more processing capacity than is required by the organization.

When cost is considered on a server-by-server basis, the additional cost of having underutilized servers is often not deemed to be troubling. However, when multiple servers in a large computing environment are underutilized, having too many servers can become a burden. Moreover, the additional hardware requires separate maintenance considerations; separate upgrades and requires the incidental attention that should instead be optimized to be more cost effective for the organization. Heat production and power consumption can also be a concern. Even considering only the cost of having redundant licenses, removing even a modest number of servers from a large computing environment can save a significant amount of cost on a yearly basis.

As a result, organizations have become increasingly concerned with such redundancies and how they can best achieve consolidation of capacity to reduce operating costs. The cost-savings objective can be evaluated on the basis of consolidation strategies such as, but not limited to: virtualization strategies, operating system (OS) level stacking strategies, database consolidation strategies, application stacking strategies, physical consolidation strategies, and storage consolidation strategies.

Virtualization involves virtualizing a physical system as a separate guest OS instance on a host machine. This enables multiple virtualized systems to run on a single physical machine, e.g. a server. Examples of virtualization technologies include VMware®, Microsoft Virtual Server®, IBM LPAR®, Solaris Containers®, Zones®, etc.

The consolidation strategies to be employed, for virtualization or otherwise, and the systems and applications to be consolidated, are to be considered taking into account the specific environment. Consolidation strategies should be chosen carefully to achieve the desired cost savings while maintaining or enhancing the functionality and reliability of the consolidated systems. Moreover, multiple strategies may often be required to achieve the full benefits of a consolidation initiative.

Complex systems configurations, diverse business requirements, dynamic workloads and the heterogeneous nature of distributed systems can cause incompatibilities between systems. These incompatibilities limit the combinations of systems that can be consolidated successfully. In enterprise computing environments, the virtually infinite number of possible consolidation permutations which include suboptimal and incompatibility system combinations make choosing appropriate consolidation solutions difficult, error-prone and time consuming.

It is therefore an object of the following to address the above concerns.

SUMMARY

In one aspect, there is provided a method for designing a virtualized environment based on an existing physical environment comprising a plurality of systems, the method comprising: obtaining a data set for each of the plurality of systems, each data set comprising information pertaining to parameters associated with a corresponding system; performing a first compatibility analysis on the systems to determine candidate virtual guests; performing a second compatibility analysis on the systems to determine candidate virtual hosts; and performing a third compatibility analysis using the candidate virtual hosts, the candidate virtual guests and one or more rule sets pertaining to technical, business and workload constraints to generate a virtual environment design for virtualizing the plurality of systems.

In another aspect, there is provided a method for managing a virtualized environment, the method comprising: generating a virtual environment design for a plurality of existing physical systems using technical, business and workload constraints; facilitating the deployment of the virtualized environment according to the design; and on an ongoing basis: obtaining data pertaining to systems being used in the virtualized environment, validating placement of the systems in the virtualized environment, if necessary rebalancing the systems, and refining the virtualized environment.

In yet another aspect, there is provided a method for performing a virtual to virtual (V2V) transformation for a plurality of existing virtual servers, the method comprising: analyzing the existing virtual servers based on technical, business and workload constraints; based on the analyzing, determining which of the existing virtual servers are most suitable for conversion from one virtualized platform to another virtualized platform; and providing a mapping from the one platform to the another platform to facilitate the transformation.

In yet another embodiment, there is provided a method for determining a set of virtualization hosts for a virtualized environment based on an existing physical environment comprising a plurality of systems, the method comprising: obtaining a data set for each of the plurality of systems, each data set comprising information pertaining to parameters associated with a corresponding system; performing a first compatibility analysis of the plurality of systems using the data sets and a first rule set pertaining to virtualization specific constraints to determine an intermediate set of virtualization host candidates; and performing a second compatibility analysis of the intermediate set of candidates using a second rule set pertaining to migration specific constraints to determine the set of virtualization hosts.

In some embodiments, the method for determining the set of virtualized hosts comprises incorporating one or more hypothetical hosts into the set of virtualization hosts based on workload requirements for the virtualized environment.

In yet another aspect, there is provided a method for evaluating virtualization candidates to determine if additional systems are required to implement a desired virtualized environment, the method comprising: obtaining a set of virtualization guest candidates and determining aggregate workload requirements based on workload data pertaining to the guest candidates; obtaining a set of virtualization host candidates and determining aggregate workload capacity based on configuration data pertaining to the host candidates; comparing the workload requirements against the workload capacity to determine if sufficient capacity exists to satisfy the workload requirements; and if there is insufficient capacity, adding hypothetical server models to the host candidates to meet the workload requirements.

In yet another aspect, there is provided a method for validating an existing virtualized environment comprising a plurality of virtual machines placed on one or more virtual hosts, the method comprising: obtaining a data set for each of the plurality of virtual machines, each data set comprising information pertaining to technical, business and workload constraints associated with a corresponding virtual machine; evaluating the placement of the virtual machines in the virtualized environment using the data sets; and identifying the existence of virtual machines with suboptimal placements to enable replacement of the virtual machines.

In yet another aspect, there is provided a method for performing a power utilization analysis for a server, the method comprising: determining server load; determining power consumption for the server at idle and maximum loads; and estimating power utilization by combining the idle power consumption with a measurement based on a relationship between the maximum and idle power consumption.

In some embodiments, the method for performing a power utilization analysis comprises estimating the power utilization according to the following relationship: Estimated Power=Idle Power+Server Load*(Maximum Power−Idle Power).

BRIEF DESCRIPTION OF THE DRAWINGS

An embodiment of the invention will now be described by way of example only with reference to the appended drawings wherein:

FIG. 1 is a block diagram of a transformational physical to virtual (P2V) analytics system.

FIG. 2 is a flow diagram of a transformational P2V analysis process using the system shown in FIG. 1.

FIG. 3(*a*) is a block diagram of the analysis program depicted in FIG. 1.

FIG. 3(*b*) is a block diagram illustrating a sample consolidation solution comprised of multiple transfers.

FIG. 4 is an example of a compatibility analysis map.

FIG. 5 is a process flow diagram of the compatibility and consolidation analyses.

FIG. 6 is a process flow diagram illustrating the loading of system data for analysis.

FIG. 7 is a high level process flow diagram for a 1-to-1 compatibility analysis.

FIG. 8 is a process flow diagram for the 1-to-1 compatibility analysis.

FIG. 9 is a flow diagram illustrating operation of the rule engine analysis.

FIG. 10 is a flow diagram of the 1-to-1 rule-based compatibility analysis.

FIG. 11 is a flow diagram illustrating the evaluation of a rule set.

FIG. 12 is a flow diagram of workload data extraction process.

FIG. 13 is a flow diagram of the 1-to-1 workload compatibility analysis.

FIG. 14 is a screen shot of a date settings tab accessed through a workload settings page.

FIG. 15 is screen shot of an advanced workload settings page accessed through the 7 workload settings page shown in FIG. 14.

FIG. 16 is a screen shot of a limits tab accessed through the workload settings page.

FIG. 17 is a screen shot of a parameters tab accessed through the workload settings page.

FIG. 18 is a high level process flow diagram of the multi-dimensional compatibility **12** analysis.

FIG. 19 is a flow diagram showing the multi-dimensional analysis.

FIG. 20 is a flow diagram showing use of a rule set in an N-to-1 compatibility analysis.

FIG. 21 is a flow diagram showing use of a rule set in an N-by-N compatibility analysis.

FIG. 22 is a process flow diagram of the multi-dimensional workload compatibility analysis.

FIG. 23 is a process flow diagram of the consolidation analysis.

FIG. 24 is a process flow diagram of an auto fit algorithm used by the consolidation analysis.

FIG. 25 is process flow diagram showing further detail of the transformational P2V analysis process shown in FIG. 2.

FIG. 26 is a process flow diagram of an example implementation of the diagram shown in FIG. 25 using the analysis program illustrated in FIGS. 3 to 24.

FIG. 27 is a process flow diagram of an example aggregate workload sizing estimate process for evaluating resource capacity requirements.

FIG. 28 is a screen shot showing the main tab of an analysis editor program.

FIG. 29 is a screen shot showing the workload tab of the analysis editor program.

FIG. 30 is a compatibility map showing the result of a virtualization rule set applied against a set of physical systems.

FIG. 31 shows a net effect cube illustrating an N×N×M map for affinity and optimization analysis.

FIG. 32 is a target system compatibility map showing which systems in a current physical environment are candidates for being a virtualization host.

FIG. 33 is a screen shot showing an aggregate utilization report showing normalized utilization of an environment.

FIG. 34 is a live migration compatibility map showing the sets of systems that are compatible from a live migration perspective.

FIG. 35 is screen shot showing a transfer auto-fit tab of the analysis editor of the analysis program.

FIG. 36 is a screen shot showing a dashboard summarizing the analysis results viewed through the analysis program.

FIG. 37 is a screen shot of the proposed transfers from the analysis results viewed through the analysis-program.

FIG. 38 is a screen shot of a transfer map from the analysis results viewed through the analysis program.

FIG. 39 is a map showing a cluster-based view of virtual machines in a virtualized environment.

FIG. 40 is a screen shot of an affinity rule programming interface showing anti-affinity rules derived from the analysis results.

FIG. 41 is another screen shot of the affinity rule programming interface that supports the synchronization of affinity and anti-affinity rules with a third-party virtualization management framework.

FIG. 42 is a process flow diagram showing further detail of the ongoing management stage shown in FIG. 1.

FIG. 43 is a process flow diagram showing further detail of the VM placement validation step shown in FIG. 42.

FIG. 44 is a process flow diagram showing further detail of the VM rebalancing step shown in FIG. 42.

FIG. 45 is a screen shot of a main tab as viewed in the analysis editor program when used for a placement validation process.

FIG. 46 is a screen shot of a systems tab as viewed in the analysis editor program when used for a placement validation process.

FIG. 47 is a screen shot of a rule sets tab as viewed in the analysis editor program when used for a placement validation process.

FIG. 48 is a screen shot of the workload tab as viewed in the analysis editor program when used for a placement validation process.

FIG. 49 is a screen shot of a placement validation summary screen.

FIG. 50 is screen shot of a transfer summary produced during a placement validation process.

FIG. 51 is a screen shot of a placement validation compatibility map.

FIG. 52 is a screen shot of the main tab as viewed in the analysis editor program when used for a rebalancing process.

FIG. 53 is a screen shot of the rule sets tab as viewed in the analysis editor program when used for the rebalancing process.

FIG. 54 is a screen shot of the placement validation summary screen for the rebalancing process.

FIG. 55 is a screen shot of the placement validation compatibility map for the rebalancing process.

FIG. 56 is screen shot of the transfer summary produced during the rebalancing process.

DETAILED DESCRIPTION OF THE DRAWINGS

It has been recognized that virtualization often involves more than considering sizing, for example, it is beneficial to understand all the constraints that govern and impact a target environment and ensure that these constraints are taken into account when planning and managing a virtual environment. This has been found to be especially true of virtualization infrastructures such as VMware Infrastructure®, where sophisticated features such as VMotion, distributed resource scheduling (DRS) and HA require careful planning and diligent administration of virtual environments. It has been found that to fully realize the capabilities of the virtualization infrastructure, the virtualization scheme being used should be combined with accurate intelligence and focused analytics in order to safely and effectively transform existing systems into a new virtual paradigm. In order to provide such intelligence and focused analytics, an analysis program for determining compatibilities in a computing environment 12 can be utilized along with specific virtualization rule sets and user interfaces (UIs) to address the considerations of a virtualization infrastructure.

Virtualization Analysis and Optimization Overview

Turning now to FIG. 1, transformational physical-to-virtual (P2V) analytics system 9 can be implemented as noted above, by utilizing the principles and features provided by an analysis program 10 and incorporating virtualization rule sets 11 and a virtualization user interface 13, to transform an existing physical environment 12 comprising one or more systems 16 into a virtualized environment 21. As can also be seen in FIG. 1, the system 9 can be used on an ongoing basis once the virtualized environment 21 has been deployed to track the environment 21 as well as enable further analysis and optimization as servers and constraints change over time. It will be appreciated that although the examples provided herein are directed to P2V analyses, the principles and processes are equally applicable to transformational virtual-to-virtual (V2V) analysis, e.g. VMware® to Hyper-V® and vice versa.

Transformational P2V Analysis and Ongoing Management Overview

FIG. 2 provides a high-level process flow diagram 99 illustrating various stages performed by the transformational P2V analytics system 9. As will be explained in greater detail below, in order to intelligently analyze the physical environment 12 for virtualization, one or more data sets 18 are obtained, which pertain to information associated with parameters of the physical systems 16. These data sets 18 are used to perform a physical environment analysis 100 and a current asset assessment 102. The physical environment analysis 100 analyzes existing physical systems 16 in the current physical environment 12 to be virtualized to evaluate various technical, business and workload constraints and affinity considerations of the virtualization candidates. In this way, the suitability of each system 16 to be virtualized can be determined to identify suitable source systems for virtualization to facilitate the design of the virtual environment 21. The current asset assessment 102 evaluates the viability of repurposing existing physical systems 16 as virtualization hosts. A virtualization host refers to a target system that runs hypervisor software and is capable of hosting virtual machines. This allows for an assessment of the equipment that is currently available to minimize the amount of new equipment required for virtualization.

The outcome of the current asset assessment 102 can be used to perform a virtualization host system definition 104, which can incorporate an analysis of hypothetical systems used to model target systems that do not currently exist in the physical environment 12. This allows users to evaluate a wide range of scenarios. The virtualization host system definition 104 can also incorporate live migration compatibilities amongst a target solution (set of target systems based on current asset assessment 102 and hypothetical systems). In this way, a target solution can be defined to facilitate the design of the virtual environment 21, i.e. in conjunction with the outcome of the physical environment analysis 100.

The set of source systems and the set of target systems are then used to perform a virtual environment optimization 106, which determines the optimal layout of the source systems onto the target systems based on technical, business and workload constraints according to a multi-dimensional compatibility and consolidation analysis using the analysis program 10. It can be seen in FIG. 2 that virtualization rule sets 11 are used during stages 100-106 in various ways as will be explained below. The virtualization UI 13 can also be used during these stages to permit a user to interact with the analysis program 10 and ultimately generate a virtual environment design 110. It will be appreciated that the process flow shown in FIG. 2 is for illustrative purposes only and may proceed differently in different scenarios. For example, based on outcomes of the physical environment analysis 100 and virtualization host system definition 104, various analyses may be conducted iteratively to narrow in on progressively more optimal solutions to accommodate both existing constraints and changing environments (both physical and virtual). The virtual environment design 110 can then be used to create a virtualization solution 112 that, when implemented, can be tracked, analyzed and refined over time by conducting ongoing management 15.

As discussed above, the transformational P2V analysis 9 advantageously utilizes the components and principles of the analysis program 10. As such, to assist in understanding the transformational P2V analytics 9, an overview of an example of the analysis program 10 will be provided. It may be noted that additional detail pertaining to the analysis program is described in U.S. patent application Ser. No. 11/738,936 filed on Apr. 23, 2007 and published under U.S. 2007/0250829, the contents of which are incorporated herein by reference.

Analysis Program Overview

A block diagram of an analysis program 10 for determining compatibilities in computing environment 12 is provided in FIG. 3(a). The analysis program 10, accessed through a computer station 14, gathers data 18 pertaining to a collection of systems to be consolidated 16. The analysis program 10 uses the gathered data 18 to evaluate the compatibility of the computer systems 28 and provide a roadmap 20 specifying how the original set of systems can be consolidated to a smaller number of systems 22.

A distinct data set is obtained for each system **16** to contribute to the combined system data **18** shown in FIG. 3(a). Each data set comprises one or more parameters that relate preferably to technical **24**, business **26** and workload **28** characteristics or features of the respective system **16**. The parameters can be evaluated by scrutinizing program definitions, properties, objects, instances and any other representation or manifestation of a component, feature or characteristic of the system **16**. In general, a parameter is anything related to the system **16** that can be evaluated, quantified, measured, compared etc. Examples of technical parameters relevant of the consolidation analysis include the operating system, OS version, patches, application settings, hardware devices, etc. Examples of business parameters of systems relevant to the consolidation analysis include the physical location, organization department, data segregation requirements, owner, service level agreements, maintenance windows, hardware lease agreements, software licensing agreements, etc. Examples of workload parameters relevant to consolidation analysis include various resource utilization and capacity metrics related to the system processor, memory, disk storage, disk I/O throughput and network bandwidth utilization.

The system data parameters associated with a system **16** comprise the system model used in the analyses. In the following examples, a source system refers to a system from which applications and/or data are to be moved, and a target server or system is a system to which such applications and/or data are to be moved. For example, an underutilized environment having two systems **16** can be consolidated to a target system (one of the systems) by moving applications and/or data from the source system (the other of the systems) to the target system.

The computer systems **16** may be physical systems, virtual systems or hypothetical models. In contrast to actual physical systems, hypothetical systems do not currently exist in the computing environment **12**. Hypothetical systems can be defined and included in the analysis to evaluate various types of "what if" consolidation scenarios. Hypothetical systems can be used to simulate a case where the proposed consolidation target systems do not exist in the environment **12**, e.g. adding a system **16**. Similarly, hypothetical source systems can be used to simulate the case where a new application is to be introduced into the environment **12** and "forward consolidated" onto existing target systems **16**. Hypothetical systems can be created through data imports, cloning from actual systems models, and manual specification by users, etc. The system model can be minimal (sparse) or include as much data as an actual system model. These system models may also be further modified to address the analysis requirements.

The compatibility analysis can also be generalized to evaluate entities beyond physical, virtual or hypothetical systems. For example, entities can be components that comprise systems such as applications and database instances. By analysing the compatibility of database instances and database servers with database stacking rule sets, database consolidation can also be assessed. Similarly, application consolidation can be evaluated by analyzing application servers and instances with application stacking rules. The entity could also be a logical application system and technical data can pertain to functional aspects and specifications of the entity. It will therefore be appreciated that a "system" or "computer system" hereinafter referred, can encompass any entity which is capable of being analysed for any type of compatibility and should not be considered limited to existing or hypothetical physical or virtual systems etc.

Consolidation as described above can be considered to include one or more "transfers". The actual transfer describes the movement of a single source entity onto a target, wherein the specification identifies the source, target and transfer type. The transfer type (or consolidation strategy) describes how a source entity is transferred onto a target, e.g. virtualization, OS stacking etc. A transfer set **23** (see FIG. 3(b)) can be considered one or more transfers that involve a common target, wherein the set specifies one or more source entities, the target and a transfer type. A consolidation solution (or roadmap) is one or more transfer sets **23** based on a common pool of source and target entities. As can be seen in FIG. 3(a), the consolidation roadmap can be included in the analysis results **20**. Each source or target entity is referenced at most one time by the transfer sets that comprise the solution. FIG. 3(b) shows how an example pool **24** of 5 systems (S1, S2, S3, S4 and S5) can be consolidated through 2 transfer sets **23**: stack S1 and S2 onto S3, and stack S4 onto S5. The transfer sets **23** include 3 transfers, and each system **16** is referenced by the transfer sets **23** only once. In the result, a consolidated pool **26** of 2 systems is achieved. It will be appreciated that the principles described herein support many transformation strategies and consolidation is only one example.

The following discusses compatibilities between systems **16** based on the parameters to determine if efficiencies can be realized by consolidating either entire systems **16** or aspects or components thereof. The analyses employ differential rule sets **28** to evaluate and quantify the compatibility of systems **16** with respect to technical configuration and business related factors comprised in the gathered system data **18**. Similarly, workload compatibility of a set of systems **16** is assessed using workload stacking and scoring algorithms **30**. The results of configuration (technical), business and workload compatibility analyses are combined to produce an overall compatibility score for a set of systems **16**. In addition to compatibility scores, the analysis provides details that account for the actual scores. The scores can be presented in color coded maps **32** that illustrate patterns of the compatibility amongst the analyzed systems as shown generally in FIG. 4.

The compatibility analysis map **32** provides an organized graphical mapping of system compatibility for each source/target system pair on the basis of configuration data. The map **32** shown in FIG. 4 is structured having each system **16** in the environment **12** listed both down the leftmost column and along the uppermost row. Each row represents a consolidation source system, and each column represents the possible consolidation target. Each cell **92** contains the score **36** corresponding to the case where the row system is consolidated onto the column (target) system **16**.

The output shown in FIG. 4 arranges the systems **16** in the map **32** such that a 100% compatibility exists along the diagonal where each system **16** is naturally 100% compatible with itself. The map **32** is preferably displayed such that each cell **92** includes a numerical score **36** and a shade of a certain colour **34**. As noted above, the higher the score (from zero (0) to one hundred (100)), the higher the compatibility. The scores are pre-classified into predefined ranges that indicate the level of compatibility between two systems **16**. Each range maps to a corresponding colour or shade for display in the map **32**. For example, the following ranges and colour codes can be used: score=100, 100% compatible, dark green; score=75-99, highly compatible, green; score=50-74, somewhat compatible, yellow; score=25-49, low compatibility, orange; and score=0-24, incompatible, red.

The above ranges are only one example. Preferably, the ranges can be adjusted to reflect more conservative and less conservative views on the compatibility results. The ranges can be adjusted using a graphical tool similar to a contrast slider used in graphics programs. Adjustment of the slider would correspondingly adjust the ranges and in turn the colours. This allows the results to be tailored to a specific situation. It is therefore seen that the graphical output of the map **32** provides an intuitive mapping between the source/target pairs in the environment **12** to assist in visualizing where compatibilities exist and do not exist. Detailed differences and other information can be viewed by selecting a relevant cell **92**, which accesses information such as differences tables showing the important differences between the two systems, the rules and weights that were applied and may even provide a remediation cost.

A collection of systems **16** to be consolidated can be analyzed in one of three modes: 1-to-1 compatibility, multi-dimensional compatibility and consolidation analyses. These analyses share many common aspects but can be performed independently.

The 1-to-1 compatibility analysis evaluates the compatibility of every possible source-target pair combination in the collection of systems **16** on a 1-to-1 basis. This analysis is useful in assessing single transfer consolidation candidates. In practice, it may be prudent to consolidate systems **16** incrementally and assess the impact of each transfer before proceeding with additional transfers. The multi-dimensional compatibility analysis evaluates the compatibility of transfer sets that can involve multiple sources being transferred to a common target. The analysis produces a compatibility score for each specified transfer set **23** by evaluating the compatibility of the systems **16** that comprise the transfer set **23**. The consolidation analysis searches for a consolidation solution that minimizes the number of remaining source and target entities after the proposed transfers are applied, while meeting requisite compatibility constraints. This analysis employs the multi-dimensional compatibility analysis described above to evaluate the compatibility of postulated transfer sets.

7/15/2019     US8209687B2 - Methods and systems for evaluating the compatibility of virtualization stacking strategies for consol...

Case 1:19-cv-00742-LPS   Document 91   Filed 07/16/19   Page 43 of 102   PageID #: 4616

The analysis program **10** performs consolidation analyses for virtualization and stacking strategies as will be explained in greater detail below, however, it will be appreciated that other consolidation strategies may be performed according to similar principles.

Referring now to FIG. 5, a process flow diagram illustrates the data flow for performing the compatibility and consolidation analyses. The flow diagram outlines four processes: a data load and extraction process (A), a 1-to-1 compatibility analysis process (B), a multi-dimensional compatibility analysis process (C), and a consolidation analysis process (D).

In process A, the system data **18** collected via audits or imports as discussed above is prepared for use by the analyses. The compatibility and consolidation analyses processes B, C and D can be performed independently. The analyses share a common analysis input specification and get system data **18** from the data repository **54** and caches **56** and **58**. The multi-dimensional compatibility and consolidation analyses take additional inputs in the form of a consolidation solution and auto fit input parameters **84** and **86** respectively.

The 1-to-1 compatibility analysis process B evaluates the compatibility of each system pair on a 1-to-1 basis. In contrast, the multi-dimensional analysis process C evaluates the compatibility of each transfer set **23** in the consolidation solution that was specified as part of its input.

The consolidation analysis process D searches for the best consolidation solution that fulfills the constraints defined by the auto fit input **86**. The consolidation analysis employs the multi-dimensional compatibility analysis C to assess potential transfer set candidates.

A process flow diagram for the data load and extraction process A is illustrated in FIG. 6. System data including technical configuration, business related and workload collected through audits, data import and user input are prepared for use by the analyses processes B, C and D.

When system data **18** and attributes are loaded into the analysis program **10**, they are stored in the audit data repository **54** and system attribute table **55**, respectively. As well, system data **18** referenced by rule set items **28** (see FIG. 9), workload types **30** and benchmarks are extracted and loaded into their respective caches **56**, **58**. Alias specifications **60** describe how data can be extracted and if necessary, normalized from a variety of data sources.

The data repository **54** and caches **56** and **58** thus store audited data **18**, system attributes, the latest rule set data, historical workload data and system workload benchmarks.

A high level flow diagram of the 1-to-1 compatibility analysis is shown in FIG. 7. The 1-to-1 compatibility analysis can take into account analysis input, including input regarding the systems **16** to be analyzed, rule set related parameters, workload related parameters, workload benchmarks and importance factors **88** used to compute overall scores.

The compatibility analysis evaluates the compatibility of every specified system as source-target pairs on a 1-to-1 basis. This analysis produces a compatibility score for each system pair so that analyzing a collection often (10) systems **16** produces 10×10 scores. The compatibility analysis is based on the specified rule sets and workload types. An analysis may be based upon zero or more rule sets and zero or more workload types, such that at least one rule set or workload type is selected.

The selection of rule sets **28** and workload types **30** for an analysis depends on the systems **28** and the consolidation strategy to analyze. For example, to assess the consolidation of a set of UNIX™ systems **16**, an analysis may employ the UNIX™ application stacking, location, maintenance window and ownership rule sets **28**, and CPU, memory, disk space, disk I/O and network I/O workload types **30**.

A process flow diagram of the 1-to-1 compatibility analysis is shown in FIG. 8. The analysis generally comprises four stages. In the first stage, data referenced by the selected rule sets **28** and workload types **30** for the specified date range are retrieved from the data repository **54** and caches **56**, **58** for each system **16** to be analyzed. This analysis data is saved as a snapshot and can be used for subsequent analyses. In the second stage, technical and business related compatibility may be analyzed the using the specified rule sets **28** and weights. Next, workload compatibility is evaluated based the specified workload types **30** and input parameters. Finally, the overall compatibility scores are computed for each pair of systems **16**. Upon completion of the compatibility analysis, the results **20** are provided to the user. The results **20** include rule item and workload data snapshots, 1-to-1 compatibility score maps for each rule set **28** and workload type **30** as well as an overall score map. Analysis details for each map may also be provided.

As noted above, the differential rule sets **28** are used to evaluate the compatibility of systems as they relate to technical and business related constraints. The rule set **28** defines which settings are important for determining compatibility. The rule set **28** typically defines a set of rules which can be revised as necessary based on the specific environment **12**. The rule set **28** is thus preferably compiled according to the systems **16** being analysed and prior knowledge of what makes a system **16** compatible with another system **16** for a particular purpose. As will be discussed below, the rule sets **28** are a form of metadata **62**.

Further detail regarding the differential rules and differential rule sets **28** is now described making reference to FIG. 9. Additional detail regarding the differential rules and rule sets **28** is also described in co-pending U.S. patent application Ser. No. 11/535,308 filed on Sep. 26, 2006, and entitled "Method for Evaluating Computer Systems", the contents of which are incorporated herein by reference.

With respect to the following description of the rule sets **28** and the general application of the rule sets **28** for detecting system incompatibilities by evaluating differences between data parameters of systems **16**, the following alternative nomenclature may be used. A target system refers to a system being evaluated, and a baseline system is a system to which the target system is being compared. The baseline and target systems may be the same system **16** at different instances in time (baseline=prior, target=now) or may be different systems **16** being compared to each other. As such, a single system **16** can be evaluated against itself to indicate changes with respect to a datum as well as how it compares to its peers. It will be appreciated that the terms "source system" and "baseline system" are herein generally synonymous, whereby a source system is a type of baseline system.

FIG. 3(*a*) illustrates the relationships between system data **18** and the analysis program **10**. Data **18** is obtained from the source and target computer systems **16** and is used to analyze the compatibility between the systems **16**. In this example, the parameters are evaluated to determine system compatibilities for a consolidation strategy. A distinct data set **18** is preferably obtained for each system **16** (or instance in time for the same system **16** as required). Rule sets **28** are computer readable and storable so that they may be accessed by the program **10** and modified if necessary, for use in evaluating the computer systems **16**.

Rule sets **28** are groupings of rules that represent higher-level considerations such as business objectives or administrative concerns that are taken into account when reporting on or analysing the systems **16**. In FIG. 9, six rules **43**, A, B, C, D, E and F are grouped into three rule sets **28**, Rule Set **1**, **2** and **3**. It will be appreciated that there may be any number of rules in any number of rule sets **28** and those shown in FIG. 9 are for illustrative purposes only.

Rules evaluate data parameters according to rule definitions to determine incompatibilities due to differences (or contentious similarities) between the baseline and target systems. The rule definitions include penalty weights that indicate the importance of the incompatibility as they relate to the operation of the systems **16**. The penalty weights are applied during an evaluation if the incompatibility is detected. The evaluation may include the computation of a score or generation of other information indicative of nature of the incompatibilities between the baseline and target systems.

Rules comprised by a rule set **28** may reference common parameters but perform different tests to identify different forms of incompatibilities that may have different levels of importance. For example a version four operating system versus a version three operating system may be considered less costly to remedy and thus less detrimental than a version five operating system compared to a version one operating system. As can be seen, even though the operating systems are different in both cases, the nature of the difference can also be considered and different weights and/or remedies applied accordingly.

Rules can also test for similarities that indicate contentions which can result in incompatibilities between systems. For example, rules can check for name conflicts with respect to system names, database instance names, user names, etc.

The flow of data for applying exemplary rule sets **28** is shown in FIG. 9. In this example, the system data gathered from a pair of systems **16** are evaluated using three rule sets. A rule engine or similar device or program evaluates the data parameters of the systems **16** by applying rule sets **1**, **2** and **3** which comprise of the exemplary rules A, B, C, D, E and F. The evaluation of the rules results in compatibility scores and zero or more matched rule items for each rule set **28**. These results can be used for subsequent analyses, such as combining with workload compatibility results to obtain overall compatibility scores.

The system consolidation analysis computes the compatibility of a set of systems **16** based not only on technical and workload constraints as exemplified above, but also business constraints. The business constraints can be expressed in rule sets **28**, similar to the technical constraints discussed above.

It may be appreciated that basic and advanced rule sets **28** can be created. Where basic and advanced rule sets **28** are available for the same analysis program **10**, there are a number of options for providing compatibility. The rule set specification can be extended to include a property indicating the minimum required rule engine version that is compatible with the rule set. In addition, the basic rule sets can be automatically migrated to the advanced rule set format since the advanced specification provides a super set of functionality relative to the basic rule set specification. It will be appreciated that as new rules and rule formats are added, compatibility can be achieved in other ways so long as legacy issues are considered where older rule versions are important to the analysis.

An exemplary process flow for a rule-based compatibility analysis is shown in greater detail in FIGS. 10 and 11. When analyzing system compatibility, the list of target and source systems **16** are the same. The compatibility is evaluated in two directions, e.g. for a Server A and a Server B, migrating A to B is considered as well as migrating B to A.

Turning first to FIG. 10, for each rule set R (R=1 to M where M is the number of rule sets) and for each target system T (T=1 to N where N is the number of systems), the rule engine **90** first looks at each source system S (S=1 to N). If the source=target then the configuration compatibility score for that source is set to 100, no further analysis is required and the next pair is analyzed. If the source and target are different, the rules are evaluated against the source/target pair to compute the compatibility score, remediation cost and to compile the associated rule details. Estimated remediation costs are optionally specified with each rule item. As part of the rule evaluation and subsequent compatibility score calculation, if a rule is true, the corresponding cost to address the deficiency is added to the remediation cost for the pair of systems **16** being analysed.

The evaluation of the rules is shown in FIG. 11. The evaluation of the rules considers the snapshot data **18** for the source system and the target system, as well as the differential rule set **28** that being applied. For each rule in the set **28**, the data referenced by the rule is obtained for both the target and source. The data is evaluated by having the rule engine **90** compare the data. If the rule is not true (i.e. if the systems **16** are the compatible according to the rule definition) then the data **18** is not considered in the compatibility score and the next rule is evaluated. If the rule is true, the rule details are added to an intermediate result. The intermediate result includes all true rules.

Preferably, a suppression tag is included with each rule. As discussed above, the suppression tag indicates other rules that are not relevant if that rule is true. The suppression flag allows the program **10** to avoid unnecessary computations. A mutex flag is also preferably used to avoid unfairly reducing the score for each true rule when the rules are closely affected by each other.

Once each rule has been evaluated, a list of matched rules is created by removing suppressed rule entries from the intermediate results based on rule dependencies, which are defined by rule matching and suppression settings (e.g. match flags and suppression tags). The compatibility score for that particular source/target pair is then computed based on the matched rules, weights and mutex settings. Remediation costs are also calculated based on the cost of updating/upgrading etc. and the mutex settings.

Turning back to FIG. 10, the current target is then evaluated against all remaining sources and then the next target is evaluated. As a result, an N×N map **32** can be created that shows a compatibility score for each system against each other system. The map **32** can be sorted by grouping the most compatible systems. The sorted map **32** is comprised of every source/target combination and thus provides an organized view of the compatibilities of the systems **16**.

Preferably, configuration compatibility results are then generated for each rule set **28**, comprising the map **32** (e.g. FIG. 4) and for each source-target pair details available pertaining to the configuration compatibility scoring weights, remediation costs and applicable rules. The details can preferably be pulled for each source/target pair by selecting the appropriate cell **92**.

The workload compatibility analysis evaluates the compatibility of each source-target pair with respect to one or more workload data types **30**. The analysis employs a workload stacking model to combine the source workloads onto the target system. The combined workloads are then evaluated using threshold and a scoring algorithm to calculate a compatibility score for each workload type.

System workload constraints must be assessed when considering consolidation to avoid performance bottlenecks. Workload types representing particularly important system resources include % CPU utilization, memory usage, disk space used, disk I/O throughput and network I/O throughput. The types of workload analyzed can be extended to support additional performance metrics. Workload values can be represented as percentages (e.g. % CPU used) or absolute values (e.g. disk space used in MB, disk I/O in MB/sec).

The term workload benchmark refers to a measure of a system's capability that may correspond to one or more workload types. Workload benchmarks can be based on industry benchmarks (e.g. CINT2000 for processing power) or the maximum value of a system resource (e.g. total disk space, physical memory, network I/O bandwidth, maximum disk I/O rate). Benchmarks can be used to normalize workload types that are expressed as a percentage (e.g. % CPU used) to allow direct comparison of workloads between different systems **16**. Benchmarks can also be used to convert workload types **30** that are expressed as absolute values (e.g. disk space used in MB) to a percentage (e.g. % disk space used) for comparison against a threshold expressed as a percentage.

System benchmarks can normalize workloads as follows. For systems X and Y, with CPU benchmarks of 200 and 400 respectively (i.e. Y is 2× more powerful than X), if systems X and Y have average CPU utilizations of 10% and 15% respectively, the workloads can be normalized through the benchmarks as follows. To normalize X's workload to Y, multiply X's workload by the benchmark ratio X/Y, i.e. 10%×200/400=5%.

Stacking X onto Y would then yield a total workload of 5%+15%=20%. Conversely, stacking Y onto X would yield the following total workload: 10%+15%×400/200=40%.

As discussed above, workload data is collected for each system **16** through various mechanisms including agents, standard instrumentation (e.g. Windows Performance Monitor™, UNIX™ System Activity Reporter), custom scripts, third party performance monitoring tools, etc. Workload data is typically collected as discrete time series

data. Higher sample frequencies provide better accuracy for the analysis (5 minute interval is typical). The workload data values should represent the average values over the sample period rather than instantaneous values.

Data from different sources may need to be normalized to common workload data types **30** to ensure consistency with respect to what and how the data is measured. For example, CPU usage may be reported as Total % CPU utilization, % CPU idle, % CPU system, % CPU user, % CPU I/O, etc. Disk utilization may be expressed in different units such as KB, MB, blocks, etc.

The time series workload data can be summarized into hourly quartiles. Specifically, the minimum, 1st quartile, median, 3rd quartile, maximum, and average values are computed for each hour. The compatibility analysis for workload uses the hourly quartiles. These statistics allow the analysis to emphasize the primary operating range (e.g. 3rd quartile) while reducing sensitivity to outlier values.

Workload data is typically collected and stored in the workload data cache **58** for each system **16** for multiple days. At least one full day of workload data should be available for the analysis. When analyzing workloads, users can specify a date range to filter the workload data under consideration. A representative day is selected from this subset of workload data for the analysis. The criteria for selecting a representative day should be flexible. A preferable default assessment of the workload can select the worst day as the representative day based on average utilization. A less conservative assessment may consider the $N^{th}$ percentile (e.g. 95th) day to eliminate outliers. Preferably, the worst days (based on daily average) for each system and for each workload type are chosen as the representative days.

The data extraction process flow for the workload compatibility analysis is shown in FIG. 12. Preferably, the workload data cache **58** includes data obtained during one or more days. For each system **16** in the workload data set, for each workload data type **30**, get the workload data for the specified date range, determine the most representative day of data, (e.g. if it is the worst day) and save it in the workload data snapshot. In the result, a snapshot of a representative day of workload data is produced for each system **16**.

To evaluate the compatibility of one or more systems with respect to server consolidation, the workloads of the source systems are combined onto the target system. Some types of workload data are normalized for the target system. For example, the % CPU utilization is normalized using the ratio of target and source CPU processing power benchmarks. The consolidated workload for a specific hour in the representative day is approximated by combining the hourly quartile workloads.

There are two strategies for combining the workload quartiles, namely original and cascade. The original strategy simply adds like statistical values (i.e. maximum, third quartile, medians, etc.) of the source systems to the corresponding values of the target system. The cascade strategy processes the statistical values in descending order, starting with the highest statistical value (i.e. maximum value). The strategy adds like statistical values as with original, but may clip the resulting sum if they exceed a configurable limit and cascades a portion of the excess value to the next statistic (i.e. the excess of sum of the maximum values is cascaded to 3rd quartile).

Workload compatibility scores quantify the compatibility of consolidating one or more source systems onto a target system. The scores range from 0 to 100 with higher scores indicating better compatibility. The scores are computed separately for each workload type **30** and are combined with the system configuration and business-related compatibility scores to determine the overall compatibility scores for the systems **16**. The workload scores are based on the following: combined system workload statistics at like times and worst case, user-defined workload thresholds, penalty calculation, score weighting factors, and workload scoring formula.

Workloads are assessed separately for two scenarios: like-times and worst case. The like times scenario combines the workload of the systems at like times (i.e. same hours) for the representative day. This assumes that the workload patterns of the analyzed systems are constant. The worst case scenario time shifts the workloads for one or more systems **16** to determine the peak workloads. This simulates the case where the workload patterns of the analyzed systems may occur earlier or be delayed independently. The combined workload statistics (maximum, 3rd quartile, median, 1st quartile and minimum) are computed separately for each scenario.

For a specific analysis, workload thresholds are specified for each workload type. The workload scores are penalized as a function of the amount the combined workload exceeds the threshold. Through the workload type definition, the workload data and corresponding thresholds can be specified independently as percentages or absolute values. The workload data type **30** is specified through the unit property and the threshold data type is specified by the test as percent flag. The common workload/threshold data type permutations are handled as follows.

If the workload is expressed as a percentage and test as percent is true (e.g. % CPU), normalize workload percentage using the benchmark and compare as percentages.

If the workload is expressed as an absolute value and test as percent is true (e.g. disk space), convert the workload to a percentage using benchmark and compare as percentages.

If workload unit is expressed as an absolute value and test as percent if false (e.g. network I/O), compare workload value against threshold as absolute values.

A penalty value ranging from 0 to 1 can be calculated for each workload statistic and for each scenario as a function of the threshold and the clipping level. The penalty value is computed as follows:

If Workload        <= Threshold,
   Penalty = 0
If Workload        >= Clipping Level,
   Penalty = 1
If Threshold        < Workload     < Clipping Level,
   Penalty = (Workload Value − Threshold)/(Clipping level − Threshold)

The workload score is composed of the weighted penalty values. The weights are used to compute the workload score from the penalty values. If the sum of the weights exceeds 1, the weights should be normalized to 1. The actual score is computed for a workload type by subtracting the sum of the weighted penalties from 1 and multiplying the result by 100:
Score=100*(1−Sum(Weight*Penalty))

Using the previous example and assuming that the like times are the same as the worst times, the score is calculated as follows:

Score = 100 * (1 − (Weight$_{MaxWorst}$ * Penalty$_{MaxWorst}$ + Weight$_{MaxLike}$ *

Penalty$_{MaxLike}$ + Weight$_{Q3Worst}$ * Penalty$_{Q3Worst}$ + Weight$_{Q3Like}$ *

Penalty$_{Q2Like}$ + Weight$_{Q2Worst}$ * Penalty$_{Q2Worst}$ + Weight$_{Q2Like}$ * Penalty$_{Q2Like}$ +

Weight$_{Q1Worst}$ * Penalty$_{Q1Worst}$ + Weight$_{Q1Like}$ * Penalty$_{Q1Like}$ +

$\text{Weight}_{MinWorst} * \text{Penalty}_{MinWorst} + \text{Weight}_{MinLike} * \text{Penalty}_{MinLike}))$

$$= 100 * (1 - (0.1 * 1 + 0.2*1 + 0.3 * 0.5 + 0.4 * 0.5)$$

$$= 30$$

A flow chart illustrating a workload compatibility analysis is shown in FIG. 13. When analyzing 1-to-1 workload compatibility, the list of target and source systems **16** is the same. The compatibility is evaluated in two directions, e.g. for Server A and Server B, migrating A to B is considered as well as migrating B to A.

The workload analysis considers one or more workload types, e.g. CPU busy, the workload limits **94**, e.g. 75% of the CPU being busy, and the system benchmarks **96**, e.g. relative CPU power. Each system **16** in the workload data set is considered as a target (T=1 to N) and compared to each other system **16** in the data set **18** as the source (S=1 to N). The analysis engine **64** first determines if the source and target are the same. If yes, then the workload compatibility score is set to 100 and no additional analysis is required for that pair. If the source and target are different, the system benchmarks are then used to normalize the workloads (if required). The normalized source workload histogram is then stacked on the normalized target system.

System benchmarks can normalize workloads as follows. For systems X and Y, with CPU benchmarks of 200 and 400 respectively (i.e. Y is 2× more powerful than X), if systems X and Y have average CPU utilization of 10% and 15% respectively, the workloads can be normalized through the benchmarks as follows. To normalize X's workload to Y, multiply X's workload by the benchmark ratio X/Y, i.e. 10%×200/400=5%. Stacking X onto Y would then yield a total workload of 5%+15%=20%. Conversely, stacking Y onto X would yield the following total workload: 10%+15%×400/200=40%.

Using the stacked workload data, the workload compatibility score is then computed for each workload type as described above.

Each source is evaluated against the target, and each target is evaluated to produce an N×N map **32** of scores, which can be sorted to group compatible systems (e.g. see FIG. 4). Preferably, a workload compatibility results is generated that includes the map **32** and workload compatibility scoring details and normalized stacked workload histograms that can be viewed by selecting the appropriate cell **92**. The workload compatibility results are then combined with the rule-based compatibility results to produce the overall compatibility scores, described below.

FIGS. 14 to 17 illustrate a workload settings page **42** which can be used with the analysis program **10** in performing a workload analysis. FIG. 14 illustrates a date settings tab in the settings page **42**. The audit date range specification allows users to choose the appropriate range of workload data to be considered for the analysis. Users can choose data based on the last N days of available data, the last N calendar days, specific date ranges or all available data. An advanced settings page **44** can be launched from the workload settings page **42**. The advanced settings page **44** is shown in FIG. 15.

The advanced settings for workload selection allows users to filter specific days of the week or based on basic weekly or monthly patterns. The specification also lets users exclude outlier days using on percentiles based on the daily average or busiest average hour of the day. Users can also exclude specific hours of the day. After filtering undesired days of workload, users can finally choose a representative day based on the busiest, least busy, typical or average values. Users can also choose a predicted workload in the future based on an expected growth rate or based on projected trends to some date in the future.

FIG. 16 illustrates a limits tab accessed from the workload settings page **42**. The analysis program **10** allows user to specify workload limits when evaluating the workload types to be analyzed. These limits are used when computing the workload scores.

FIG. 17 illustrates a parameters tab accessed from the workload settings page **42**. The analysis program **10** allows users to specify workload type specific parameters. For example, the virtual CPU utilization can be used to model the virtualization overhead based on CPU utilization, disk I/O rates and network I/O rates. The confidence limit value can range between 0 and 100% and allows users to adjust the workload computation based on the probability of outcomes when combining the workload of multiple systems. A confidence limit of 100% indicates that the workload computation is based on the worst case scenario where the maximum values of every system **16** are assumed to coincide. A 99% confidence limit effectively discards 1% of the worst possible cases, resulting in less conservative workload stacking results. The strategy name specifies the workload scoring strategy to employ when computing the workload score. Pre-defined scoring strategies such as Peak and Sustained emphasize peak (maximum) and sustained (third quartile) workloads, respectively. Peak scoring is useful for performance sensitive applications whose performance should not be degraded. Sustained scoring is appropriate for less performance sensitive applications such as batch jobs where slight performance degradations may be acceptable.

The results of the rule and workload compatibility analyses are combined to compute an overall compatibility score for each server pair. These scores preferably range from 0 to 100, where higher scores indicate greater compatibility and 100 indicating complete or 100% compatibility.

As noted above, the analysis input can include importance factors. For each rule set **28** and workload type **30** included in the analysis, an importance factor **88** can be specified to adjust the relative contribution of the corresponding score to the overall score. The importance factor **88** is an integer, preferably ranging from 0 to 10. A value of 5 has a neutral effect on the contribution of the component score to the overall score. A value greater than 5 increase the importance whereas a value less than 5 decreases the contribution.

The overall compatibility score for the system pair is computed by combining the individual compatibility scores using a formula specified by an overlay algorithm which performs a mathematical operation such as multiply or average, and the score is recorded.

Given the individual rule and workload compatibility scores, the overall compatibility score can be calculated by using the importance factors as follows for a "multiply" overlay:

$O = 100 * 100 - ( 100 - S 1 ) * F 1 5 100 * 100 - ( 100 - S 2 ) * F 2 5 100 * \dots \ 100 - ( 100 - S n ) * F n 5 100$

where O is the overall compatibility score, n is the total number of rule sets **28** and workload types **30** included in the analysis, $S_i$ is the compatibility score of the $i^{th}$ rule set **28** or workload type **30** and $F_i$ is the importance factor of the $i^{th}$ rule set **28** or workload type **30**.

It can be appreciated that setting the importance factor **88** to zero eliminates the contribution of the corresponding score to the overall score. Also, setting the importance factor to a value less than 5 reduces the score penalty by 20% to %100 of its original value.

For example, a compatibility score of 90 implies a score penalty of 10 (i.e. 100−90=10). Given an importance factor of 1, the adjusted score is 98 (i.e. 100−10*1/5=100−2=98). On the other hand, setting the importance factor to a value greater than 5 increases the score penalty by 20% to 100% of its original value. Using the above example, given a score of 90 and an importance factor of 10, the adjusted score would be 80 (i.e. 100−10*10/5=100−20=80).

If more systems **16** are to be examined, the above process is repeated. When overall compatibility analysis scores for all server pairs have been computed, a map **32** is displayed graphically and each cell **92** is linked to a scorecard that provides further information. The further information can be viewed by selecting the cell **92**. A sorting

algorithm is then preferably executed to configure the map **32**. The maps **32** can be sorted in various ways to convey different information. For example, sorting algorithms such as a simple row sort, a simple column sort and a sorting by group can be used.

A simple row sort involves computing the total scores for each source system (by row), and subsequently sorting the rows by ascending total scores. In this arrangement, the highest total scores are indicative of source systems that are the best candidates to consolidate onto other systems. A simple column sort involves computing the total scores for each target system (by column) and subsequently sorting the columns by ascending total score. In this arrangement, the highest total scores are indicative of the best consolidation target systems. Sorting by group involves computing the difference between each system pair, and arranging the systems to minimize the total difference between each pair of adjacent systems in the map. The difference between a system pair can be computed by taking the square root of the sum of the squares of the difference of a pair's individual compatibility score against each other system in the analysis. In general, the smaller the total difference between two systems, the more similar the two systems with respect to their compatibility with the other systems. The group sort promotes the visualization of the logical breakdown of an environment by producing clusters of compatible systems **18** around the map diagonal. These clusters are indicative of compatible regions in the environment **12**. In virtualization analysis, these are often referred to as "affinity regions."

The high level process flow of the multi-dimensional compatibility analysis is illustrated in FIG. 18. In addition to the common compatibility analysis input, this analysis takes a consolidation solution as input. In contrast to the 1-to-1 compatibility analysis that evaluates the compatibility of each system pair, this multi-dimensional compatibility analysis evaluates the compatibility of each transfer set **23** specified in the consolidation solution.

The multi-dimensional compatibility analysis extends the original 1-to-1 compatibility analysis that assessed the transfer of a single source entity to a target. As with the 1-to-1 compatibility analysis, the multi-dimensional analysis produces an overall compatibility scorecard **98** based on technical, business and workload constraints. Technical and business compatibility are evaluated through one or more rule sets **28**. Workload compatibility is assessed through one or more workload types **30**.

This produces multi-dimensional compatibility analysis results, which includes multi-dimensional compatibility scores, maps and details based on the proposed transfer sets **23**.

For each transfer set **23**, a compatibility score is computed for each rule set **28** and workload type **30**. An overall compatibility score for the transfer set **23** is then derived from the individual scores.

In addition to evaluating the compatibility of the specified transfer sets, the compatibility analysis can evaluate the incremental effect of adding other source systems (specified in the analysis input) to the specified transfer sets. Similar to the 1-to-1 compatibility analysis, this analysis involves 4 stages. The first stage is gets the system data **18** required for the analysis to produce the analysis data snapshot. The second stage performs a multi-dimensional compatibility analysis for each rule set **28** for each transfer set **23**. Next, the workload compatibility analysis is performed for each workload type **30** for each transfer set **23**. Finally, these analysis results are combined to determine overall compatibility of each transfer set. The multi-dimensional rule-based compatibility analysis differs from the 1-to-1 compatibility analysis since a transfer set can include multiple sources (N) to be transferred to the target, the analysis may evaluate the compatibility of sources amongst each other (N-by-N) as well as each source against the target (N-to-1) as will be explained in greater detail below. The multi-dimensional workload and overall compatibility analysis algorithms are analogous to their 1-to-1 analysis counterparts.

To assess the compatibility of transferring multiple source entities (N) to a target (1), the rule-based analysis can compute a compatibility score based on a combination of N-to-1 and N-by-N compatibility analyses. An N-to-1 intercompatibility analysis assesses each source system against the target. An N-by-N intracompatibility analysis evaluates each source system against each of the other source systems. This is illustrated in a process flow diagram in FIG. 19.

Criteria used to choose when to employ an N-to-1, N-by-N or both compatibility analyses depend upon the target type (concrete or malleable), consolidation strategy (stacking or virtualization), and nature of the rule item.

Concrete target models are assumed to be rigid with respect to their configurations and attributes such that source entities to be consolidated are assumed to be required to conform **8** to the target. To assess transferring source entities onto a concrete target, the N-to-1 inter-compatibility analysis is performed. Alternatively, malleable target models are generally adjustable in accommodating source entities to be consolidated. To assess transferring source entities onto a malleable target, the N-to-1 inter-compatibility analysis can be limited to the aspects that are not malleable.

When stacking multiple source entities onto a target, the source entities and targets coexist in the same operating system environment. Because of this inherent sharing, there is little flexibility in accommodating individual application requirements, and thus the target is deemed to be concrete. As such, the multi-dimensional analysis considers the N-to-1 inter-compatibility between the source entities and the target as the primary analysis mechanism, but, depending on the rule sets in use, may also consider the N-by-N intra-compatibility of the source entities amongst each other.

When virtualizing multiple source entities onto a target, the source entities are often transferred as separate virtual images that run on the target. This means that there is high isolation between operating system-level parameters, and causes virtualization rule sets to generally ignore such items. What is relevant, however, is the affinity between systems at the hardware, storage and network level, and it is critical that the systems being combined are consistent in this regard. In general, this thus causes the multi-dimensional analysis to focus on the N-to-N compatibility within the source entities, although certain concrete aspects of the target systems (such as processor architecture) may still be subjected to (N-to-1) analysis.

N-to-1 intercompatibility scores reflect the compatibility between N source entities and a single target as defined by a transfer set **23** as shown in FIG. 20. This analysis is performed with respect to a given rule set and involves: 1) Separately evaluate each source entity against the target with the rule set to compile a list of the union of all matched rule items; 2) For each matched rule item, use the rule item's mutex (mutually exclusive) flag to determine whether to count duplicate matched rule items once or multiple times; and 3) Compute the score based on the product of all the penalty weights associated with the valid matched rule items:

$$S=100*(1-w_1)*(1-w_2)*(1-w_3)* \ldots (1-w_n);$$

where S is the score and $w_i$ is the penalty weight of the $i^{th}$ matched item.

N-by-N intracompatibility scores reflect the compatibility amongst N source entities with respect to a given rule set as shown in FIG. 21. This analysis involves: 1) Separately evaluate each source entity against the other source entities with the rule set to compile a list of the union of all matched rule items; 2) For each matched rule item, use the rule item's mutex (mutually exclusive) flag to determine whether to count duplicate matched rule items once or multiple times; and 3) Compute the score based on the product of all the penalty weights associated with the valid matched rule items:

$$S=100*(1-w_1)*(1-w_2)* \ldots (1-w_n);$$

where S is the score and $w_i$ is the penalty weight of the $i^{th}$ matched item.

A procedure for stacking the workload of multiple source systems on a target system is shown in FIG. 22. The multi-stacking procedure considers the workload limits that is specified using the program **150**, the per-system workload benchmarks (e.g. CPU power), and the data snapshot containing the workload data for the source and

target systems **16** that comprise the transfer sets **23** to analyze. The analysis may evaluate transfer sets **23** with any number of sources stacked on a target for more than one workload type **30**.

For each workload type **30**, each transfer set **23** is evaluated. For each source in the transfer set **23**, the system benchmarks are used to normalize the workloads as discussed above, and the source workload is stacked on the target system. Once every source in the set is stacked on the target system, the workload compatibility score is computed as discussed above. The above is repeated for each transfer set **23**. A multi-stack report may then be generated, which gives a workload compatibility scorecard for the transfer sets along with workload compatibility scoring details and normalized multi-stacked workload charts.

The consolidation analysis process flow is illustrated as D in FIG. 5. Using the common compatibility analysis input and additional auto fit inputs, this analysis seeks the consolidation solution that maximizes the number of transfers while still fulfilling the several pre-defined constraints. The consolidation analysis repeatedly employs the multi-dimensional compatibility analysis to assess potential transfer set candidates. The result of the consolidation analysis comprises of the consolidation solution and the corresponding multi-dimensional compatibility analysis.

A process flow of the consolidation analysis is shown in FIG. 23.

The auto fit input includes the following parameters: transfer type (e.g. virtualize or stacking), minimum allowable overall compatibility score for proposed transfer sets, minimum number of source entities to transfer per target, maximum number of source entities to transfer per target, and quick vs. detailed search for the best fit. Target systems can also be designated as malleable or concrete models.

As part of a compatibility analysis input specification, systems can be designated for consideration as a source only, as a target only or as either a source or a target. These designations serve as constraints when defining transfers in the context of a compatibility analysis. The analysis can be performed on an analysis with pre-existing source-target transfers. Analyses containing systems designated as source or target-only (and no source or target designations) are referred to as "directed analysis."

The same transfer type may be assumed for all automatically determined transfers within an analysis. The selected transfer type affects how the compatibility analysis is performed. The minimum overall compatibility score dictates the lowest allowable score (sensitivity) for the transfer sets to be included in the consolidation solution. Lowering the minimum allowable score permits a greater degree of consolidation and potentially more transfers. The minimum and maximum limits for source entities to be transferred per target (cardinality) define additional constraints on the consolidation solution. The quick search performs a simplified form of the auto fit calculation, whereas the detailed search performs a more exhaustive search for the optimal solution. This distinction is provided for quick assessments of analyses containing a large numbers of systems to be analyzed.

The transfer auto fit problem can be considered as a significantly more complex form of the classic bin packing problem. The bin packing problem involves packing objects of different volumes into a finite number of bins of varying volumes in a way that minimizes the number of bins used. The transfer auto fit problem involves transferring source entities onto a finite number of targets in a way that maximizes the number of transfers. The basis by which source entities are assessed to "fit" onto targets is based on the highly nonlinear compatibility scores of the transfer sets. As a further consideration, which can increase complexity, some entities may be either source or targets. The auto fit problem is a combinatorial optimization problem that is computationally expensive to solve through a brute force search of all possible transfer set permutations. Although straightforward to implement, this exhaustive algorithm is impractical due to its excessive computational and resource requirements for medium to large data sets. Consequently, this class of problem is most efficiently solved through heuristic algorithms that yield good but likely suboptimal solutions.

There are four variants of the heuristic auto fit algorithm that searches for the best consolidation solution:

Quick Stack—quick search for a stacking-based consolidation solution;

Detailed Stack—more comprehensive search for a stacking-based consolidation solution;

Quick Virtualization—quick search for a virtualization-based consolidation solution; and

Detailed Virtualization—more comprehensive search for a virtualization-based consolidation solution.

The auto fit algorithms are iterative and involve the following common phases:

The initial phase filters the source and target lists by eliminating invalid entity combinations based on the 1-to-1 compatibility scores that are less than the minimum allowable compatibility score. It also filters out entity combinations based on the source-only or target-only designations. The auto fit algorithm search parameters are then set up. The parameters can vary for each algorithm. Example search parameters include the order by which sources and targets are processed and the criteria for choosing the best transfer set **23**. The next phase compiles a collection of candidate transfer sets **23** from the available pool of sources and targets. The candidate transfer sets **23** fulfill the auto fit constraints (e.g. minimum allowable score, minimum transfers per target, maximum transfers per target). The collection of candidate transfer sets may not represent a consolidation solution (i.e. referenced sources and targets may not be mutually exclusive amongst transfer sets **23**). The algorithms vary in the criteria employed in composing the transfer sets. In general, the detailed search algorithms generate more candidate transfer sets than quick searches in order to assess more transfer permutations.

The next phase compares the candidate transfer sets **23** and chooses the "best" transfer set **23** amongst the candidates. The criteria employed to select the best transfer set **23** varies amongst the algorithms. Possible criteria include the number of transfers, the compatibility score, general compatibility of entities referenced by set and whether the transfer set target is a target-only.

Once a transfer set is chosen, it is added to the intermediate consolidation solution. The entities referenced by the transfer set are removed from the list of available sources and targets and the three preceding phases are repeated until the available sources or targets are consumed.

Once all the sources or targets are consumed or ruled out, the consolidation solution is considered complete and added to a list of candidate solutions. Additional consolidation solutions can be compiled by iterating from the second phase with variations to the auto fit parameters for compiling and choosing candidate transfer sets. The criteria used to stop compiling additional solutions can be based on detecting that the solution is converging on a pre-defined maximum number of iterations. Finally, the best candidate consolidation solution can be selected based on some criteria such as the largest reduction of systems with the highest average transfer set scores. The general algorithm is shown in the flow diagram depicted in FIG. 24.

Accordingly, the compatibility and consolidation analyses can be performed on a collection of system to 1) evaluate the 1-to-1 compatibility of every source-target pair, 2) evaluate the multi-dimensional compatibility of specific transfer sets, and 3) to determine the best consolidation solution based on various constraints including the compatibility scores of the transfer sets. Though these analyses share many common elements, they can be performed independently. These analyses are based on collected system data related to their technical configuration, business factors and workloads. Differential rule sets and workload compatibility algorithms are used to evaluate the compatibility of systems. The technical configuration, business and workload related compatibility results are combined to create an overall compatibility assessment. These results are visually represented using color coded scorecard maps.

It will be appreciated that although the system and workload analysis are performed in this example to contribute to the overall compatibility analyses, each analysis is suitable to be performed on its own and can be conducted separately for finer analyses. The finer analysis may be performed to focus on the remediation of only configuration settings at one time and spreading workload at another time. As such, each analysis and associated map may be generated on an individual basis without the need to perform the other analyses.

It will be appreciated that each analysis and associated map discussed above may instead be used for purposes other than consolidation such as capacity planning, regulatory compliance, change, inventory, optimization, administration etc. and any other purpose where compatibility of systems is useful for analyzing systems **16**. It will also be appreciated that the program **10** may also be configured to allow user-entered attributes (e.g. location) that are not available via the auditing process and can factor such attributes into the rules and subsequent analysis.

It will further be appreciated that although the examples provided above are in the context of a distributed system of computer servers, the principles and algorithms discusses are applicable to any system having a plurality of sub-systems where the sub-systems perform similar tasks and thus are capable theoretically of being consolidation. For example, a local network having a number of personal computers (PCs) could also benefit from a consolidation analysis.

Power Utilization Analysis

It has also been recognized that the analysis program **10** can be used to estimate the power utilization of existing source and proposed target servers to compare the power utilization before and after the transformation. This information can be very useful with the high cost of energy, more power hungry servers and the power and cooling constraints of data centers.

If no actual server power utilization data is available, the analysis program **10** estimates the power for each server based the server utilization level, the estimated power at idle and power at maximum utilization.

The power utilization of servers can be analyzed as a workload type. This is especially useful when comparing the aggregate power utilization of a set of servers before and after consolidation.

While some modern server models support the measurement of its power utilization, the majority of servers do not support its measurement. As a result, the analysis program must estimate power utilization. The power utilization is computed according to the server load, the power consumption at idle and maximum loads.

The server load can be approximated through server activity such as CPU, memory and disk activity. The power consumption at idle and maximum loads can be measured empirically or through various power calculators provided by server vendors.

When estimating the power utilization as a function of the server load, a simplifying assumption could be to assume a linear relationship between the server load and power consumption. Thus, if the server load is zero, the power consumption is equal to the estimated power level corresponding to idle load. Similarly, if the server load is at 100%, the power consumption is equal to the estimated power at maximum load. Finally, if the server load is between 0 and 100%, it is estimated based on a linear relationship between the idle and maximum power loads.
Estimated Power=Idle Power+Pct Server Load*(Max Power−Idle Power)

For example, assume the estimated power utilization of a server at idle and maximum loads are 300 and 600 watts, respectively. If the server is at 50% load, the power utilization would be estimated as 450 watts.
Power@50%=300+50%*(600−300)=450 watts
Transformational P2V Analytics Using Analysis Program

FIG. 25 provides further detail for the process **99** shown in FIG. 2 to illustrate conceptually the various steps that may be performed in designing the virtual environment **21**. In general, the analysis process **99** begins with the gathering of highly detailed configuration and workload data from systems **16** in an existing physical environment **12**. The systems **16** of interest for this data acquisition include the systems to be virtualized as well as those that may be converted to virtual hosts (target servers running hypervisor software) to form part of the new virtual environment **21**. The analysis program **20** can be used to automate the data collection from the systems **16**, using either agent-based or agentless means, in order to ensure that all analyses are based on up-to-date data. This data is combined with business attributes and process-related information related to the systems **16** to form a complete set of analysis inputs.

From this collected data, the current asset assessment **102** utilizes virtualization rule sets **11** to identify the physical systems **16** that can be converted into virtual hosts, allowing existing systems to be repurposed as virtual servers (e.g. ESX Servers for VMware®) without buying new hardware. The virtualization host system definition **104** can also estimate the aggregate resource capacity of the existing server hardware and compare it against the expected resource requirements of the virtual environment **21**. This allows analysts to specify hypothetical server models **125** (i.e. candidates for purchase) that can be used to make up the shortfall.

The analysis program **10** may then group the target system candidates based on live migration compatibility or other logical grouping criteria, which defines the clusterable pools of systems **16** from which the new virtual environment **21** will be constructed. The physical environment analysis **100**, as discussed above, evaluates technical, business and workload constraints against the systems **16** to be virtualized using advanced rule sets and workload algorithms. The constraints are combined to produce an overall system affinity map that indicates the systems which should be kept together and which ones should be separated when they are virtualized.

The virtual environment optimization **106** determines the optimal mapping of physical servers onto virtual environments and clusters, and allows for "what-if" analyses to determine the optimal cluster design that minimizes the server count while addressing the server and virtual machine compatibility constraints. The resulting analysis maps define the cluster memberships of the servers and virtual machines as well as affinity and anti-affinity rules (e.g. DRS in VMware™).

The automated generation of the cluster membership design accelerates the implementation of virtualized environments **21** while at the same time reducing risk in implementation and subsequent operation. After the virtualized environment **21** is deployed, the analysis program **10** and virtualization UI **13** can be used to provide decision support for ongoing management **15** by gathering configuration and workload data from the virtualization hosts and virtual machines on an ongoing basis and using this to both track the environments as well as enable further analysis and optimization as servers and constraints change over time. Further detail regarding the ongoing management **15** will be provided later.

As can be seen in FIG. 25, the physical environment analysis **100** comprises individual constraint analyses related to technical, business and workload constraints that affect virtualization and consolidation strategies and an overall combined constraint analysis using the individual constraint analyses.

A technical constraint analysis is performed by the analysis program **10** using technical constraint rulesets. Technical constraints are constraints that affect "what can go together", and typically include configuration-oriented elements such as version compatibilities, environmental settings, patch requirements, security configurations, etc. In a virtualization analysis, the technical constraint models employed typically focus on virtual host and live migration compatibilities, storage configurations, unsupported or non-standard hardware, network connectivity, and other considerations that may impact the viability of and/or path to virtualization. The technical analysis identifies the physical systems that can be virtualized by considering virtualized system constraints including guest operating system support, maximum limits on virtual processors, memory and swap. In addition, the analysis highlights constraints that can impact the compatibility of virtualized systems including unique legacy

devices, and uncommon network connectivity or storage requirements. The technical constraint analysis also evaluates the sameness of guest system images to assess the potential to take advantage of the virtualization package's transparent page sharing capabilities (if applicable). The resulting technical affinity map illustrates groups of systems that must be kept together or apart, as well as groups that are ideally kept together or apart.

In general, guest candidates (i.e. those being considered for conversion to virtual machines) must be physical systems **16** and not already virtual machines. The technical constraint analysis should check for potentially incompatible hardware such as fax boards, token ring cards etc. There are various technical constraints for guest candidates that are hypervisor-specific. For example: ensuring that the operating system is supported by the hypervisor; or constraints based on OS type, OS version, kernel bits and service pack/patch levels, e.g. Microsoft® Hyper-V 1.0 supports the following server operating systems as guests: Windows® Server 2008 x86 and x64, Windows® Server 2003 x86 and x64 SP2, Windows® Server 2000 SP4, and SUSE® Linux Enterprise Server 10 SP1/2 x64 and x86. Another constraint may be guest resource configuration limits such as maximum memory, virtual processors, number of network interfaces etc. Other hypervisor-specific constraints can be based on hypervisor-specific P2V rulesets, e.g. rulesets for VMware® ESX, Microsoft® Hyper-V and Citrix® XenServer.

There are also various server affinity considerations that should be made during the technical constraint analysis, including checking for network affinity (i.e. servers with common networking configurations are more suited to be clustered) and checking for network communications (i.e. servers that communicate with each other may be suited to run on the same host to take advantage of lower network latency).

A business constraint analysis is performed by the analysis program using business constraint rulesets. Business constraints are more concerned with "what should go together", both from a business and a process perspective. Criteria such as maintenance windows, system availability targets, application owners, locations, departments, and other non-technical criteria are analyzed to ensure that there is consistency in the virtual environment and to prevent any production problems post-virtualization. This analysis focuses on business factors that impact the compatibility of the source systems. Other factors considered may include such things as service chargeback models, service levels and regulatory requirements. As with the technical constraint analysis, the business affinity map can be generated that reflects groups of systems to keep together or apart. The business constraints are typically used to organize the guest virtual machines into affinity groups, e.g. group systems from the same department, service level, environment etc. It may be noted that the business constraints can also be used to disqualify certain systems, e.g. do not virtualize systems from specific locations, departments etc.

A workload constraint analysis is based on workload constraints, answers the question "what fits together", and looks at the utilization levels and patterns of servers to determine what the optimal combinations may be (both onto existing hardware as well as new servers). The workload analyses that can be performed by the analysis program **10** uses quartile-based representations of CPU, disk I/O, network I/O, memory utilization and disk utilization in order to build out a comprehensive scorecard-based view of the workload affinities in an environment. The workload analysis evaluates the combination of one or more source workloads onto the target servers to evaluate processor utilization, memory, disk I/O and network I/O. The analysis employs the workload normalization and virtualization overhead models described below to predict workloads with better accuracy. The workload analysis can consider sustained and peak system workloads at like times and at offset times to consider the normal and worst case scenarios. Workload analysis parameters can be specified to adjust the conservativeness or aggressiveness of the constraints. In general, systems with lower workloads are better virtualization candidates than those with very high workloads and resource requirements.

When analyzing workloads, an analyst can specify various configuration parameters including resource thresholds on target systems to define desired workload headroom; scoring strategies to emphasize the importance of peak vs. sustained workloads as well as analyzing workload based on like times or offset times; workload contention confidence limits allows analyst to adjust risk tolerance related to likelihood of peak workload contention among multiple systems; and workload data date range, filters, trends or assumed growth rates. In addition, the CPU utilization of the virtualized server can be better estimated with a virtualization overhead model based on measured physical CPU utilization, disk I/O and network I/O rates. CPU utilization can be normalized between different server models using processor benchmarks. Different processor benchmarks can be employed, depending on the personality of the system workload. Examples of processor benchmarks that may be employed include CINT2000 and CINT2006 rate from SPEC (Standard Performance Evaluation Corporation).

Capacity planning for high available clusters can be readily performed through a what-if workload analysis by adjusting the workload headroom thresholds or excluding target servers from the analysis to simulate host failures.

As discussed above, a compatibility analysis performed by the analysis program **10** can generate a compatibility map **32** as shown in FIG. 4. FIG. 30 illustrates a compatibility map **164** showing the result of applying a virtualization rule set **11** against a set of physical systems **16**. As per FIG. 4, the systems **16** are listed in the map **164** along the left side of the matrix as well as along the top of the matrix thus producing a cross-correlation of the compatibilities of the listed systems **16**. In this example, it can be appreciated that the similarly shaded regions comprising a score **36** of "100" and normally shaded **34** green (as identified by the circle **166** in FIG. 30), represent affinity regions where the systems **16** are generally self-consistent. Those regions showing as darker or lighter than those in the circle **166** (typically yellow, orange, red etc.), on the other hand, represent system combinations where important constraints may be violated if they are virtualized onto the same infrastructure. The set of four systems **16** to the far right and bottom in this example are hypothetical systems that the environment is being analyzed onto. Similar maps **164** can be generated for technical, business and workload constraints, which are then used to conduct a combined constraint analysis.

A combined constraint analysis looks at the net-effect combining the technical, business and workload constraints to provide an overall affinity map. The analysis program **10** can analyze multiple constraint maps using a 3-dimensional data structure as illustrated conceptually in FIG. 31 that enables simultaneous assessment of all constraints. The overall affinity map defines regions of compatible source systems that can be assigned to common clusters. The compatibility scores would then reflect the degree of compatibility/incompatibility between systems **16**.

Turning back to FIG. 25, the current asset assessment **102** generally comprises the steps of a server upgrade analysis and an aggregate server utilization analysis.

The server upgrade analysis assesses the viability of repurposing existing physical servers to serve as virtualization hosts (i.e. to run hypervisor software). This analysis can involve checking to see if hardware is compatible with specific hypervisor software (some hypervisors such as VMware® ESX support specific hardware server manufacturers and models) and checking whether a system **16** has sufficient resources (CPU, memory, network interfaces, etc.) to support virtualization software and guests. The analysis may assume that hardware in the existing system **16** can be upgraded to meet certain hardware requirements (e.g. memory, HBA, network interface cards). The upgrade analysis can be performed by creating an analysis comprised of virtualization host candidates and applying the applicable hypervisor-specific host compatibility rule set **11** (e.g. VMware® ESX Hardware Compatibility). In general, the host compatibility rule set rules out any servers that are fully incompatible (e.g. unsupported processor architecture, virtual machine, etc.), and applies varying penalty levels based on correctable and less severe incompatibilities (e.g. insufficient memory, number of network adapters, etc.). In addition, the upgrade analysis can validate the various target server and live migration requirements such as minimum CPU clock speeds, maximum RAM, maximum CPU cores and multiple GB Ethernet network interface cards.

FIG. 32 illustrates a target compatibility map **170** showing which systems **16** in the current physical environment **12** are candidates for upgrading to run as a target (with hypervisor software). The large region **172** shown in FIG. 32 identifies systems **16** that are unconditionally supported (with "100" and normally shaded green), and the lighter regions (normally yellow) show those systems **16** that can become target servers with some qualifications.

The aggregate server utilization analysis combines resource utilization data of physical server source candidates to obtain a high level estimate of aggregate resource requirements of the target server environment. This analysis also determines whether existing physical servers are sufficient to support virtualization resource

requirements or whether new servers need to be acquired to meet virtualization requirements; determines storage requirements (storage area networks—e.g. SAN); and determines network bandwidth requirements. Important system resources for sizing target servers are CPU and memory utilization, storage and disk and network I/O rates. The aggregate resource utilization of the source candidates is compared against the capacity of the target candidates to thus determine the additional server hardware, if any, that is required to support the planned virtualized environment **21**.

To accurately combine the processor utilization of the systems based on different processors, industry benchmarks can be employed by the analysis program **10** to normalize the CPU workload data. Processor benchmarks such as SPEC CINT2000 or SPEC CINT2006 rate are better suited than basic processor speeds (MHz) since benchmarks account for different processor architectures that affect performance significantly. The analysis program **10** can be configured to use a variety of comprehensive CPU benchmark tables to determine the appropriate benchmark value of the physical systems based on the server model, processors and type of workload (e.g. CPU intensive, web, Java application, database, etc.).

As an additional software layer, virtualization software such as VMware® often adds a performance overhead. As such, when modeling the resource utilization of physical systems in the virtualized target environment, a virtualization overhead is added to the source system workloads. The analysis program **10** can use an advanced virtualization overhead model to estimate CPU utilization of physical systems when virtualized on a virtualization host. The CPU overhead is modeled for each guest as a function of the CPU utilization, network I/O and disk I/O rates. Similarly, the memory overhead is comprised of the service console memory (e.g. default 272 MB, maximum 800 MB) and guest system contributions. The memory overhead of each guest system is affected by its memory allocation, the number of virtual CPUs, and whether it is a 32 or 64 bit operating system. It may be noted that the memory overhead of similar virtualized systems can be offset by the memory saved through features such as the transparent page sharing feature provided by VMware®.

By normalizing workloads and accounting for virtualization overhead, the projected resource requirements of the physical systems can be modeled with higher accuracy. The aggregate resource requirements are adjusted further to include the desired headroom to account for future growth and high availability requirements. Similarly, the aggregate resource capacity of the virtualization host candidates can be calculated by the analysis program **10**.

FIG. 33 illustrates an aggregate utilization UI **174**, showing the normalized utilization of an entire environment. Utilization is reported in this example as a rolled-up average **176** as well as a time-of-day curve **178** showing peak and sustained activity throughout the daily cycle. This can be an important measure of the consolidation potential of an environment, and gives an initial estimate of the CPU, I/O, disk and network capacity required in the virtualization host environment.

The virtualization host system definition **104** generally comprises a determination of hypothetical server models and live migration compatibilities.

Hypothetical servers can be used to model target servers that do not currently exist in the computing environment, which allows users to evaluate a wide range of scenarios. Predefined hypothetical servers are based on popular server models with typical hardware configurations (processor type, number of processors, memory, storage, network adapters). Analysts can define custom server models with specific hardware configurations. Hypothetical servers can be based on sparse models (hardware and operating systems configurations) and can also be based on more detailed models derived from existing servers. The projected aggregate workloads of the source and target systems are compared to determine whether additional computing resources are required. If there is insufficient capacity, the amount of hypothetical virtualization host hardware is estimated.

FIG. 27 illustrates an exemplary process flow diagram for determining initial high-level requirements regarding hypothetical server models **125**. It can be seen that the process begins with guest candidates **118, 120** (see also FIG. 26 to be explained below) and virtualization host candidates **122, 124**. At **132**, the aggregate system resource requirements are estimated based on the historical workload of the candidates **118, 120** thereby producing aggregate workload requirements at **134**. At **136**, the aggregate system capacity is estimated based on hardware configurations of the virtualization host candidates thereby producing a measure of aggregate workload capacity **138**. The aggregate workload requirements **134** and aggregate workload capacity **138** may then be compared at **140** to determine if there is sufficient capacity at **142** based on the proposed virtualization solution. If not, hypothetical server models are added at **144** to the virtualization host candidates to meet the workload requirements thereby generating the appropriate hypothetical server models **125**. If the capacity is sufficient to meet the requirements, the process ends at **146**.

Live migration compatibility can be assessed for hypervisors that support live migration of guest virtual machines between virtualization hosts that are part of the same cluster. Examples of live migration include VMotion for VMware® ESX and XenMotion for Citrix® XenServer®. This analysis assesses compatibility of existing and or hypothetical virtualization host candidates to determine which set of target hosts can be grouped into a cluster that supports live migration. An important aspect of live migration compatibility between virtualization hosts is processor architecture compatibility. The live migration analysis can be performed by creating an analysis comprised of the virtualization hosts only, and applying the appropriate VM migration compatibility map ruleset (e.g. VMotion® Compatibility Map). The resulting map defines regions of compatible virtualization hosts.

FIG. 34 illustrates a live migration compatibility map **180** showing the sets **182** (example identified by circle in FIG. 34) of servers that are compatible from a live migration perspective. This can be an important step in defining a go-forward environment since many incompatibilities exist between server platforms including those from the same manufacturer. Since clusters rely on the live migration software, the map **180** effectively sculpts out the pools of servers from which clusters can be built.

The virtual environment optimization **106** analyzes the virtualization candidates and virtualization hosts to determine recommended cluster configurations, cluster memberships of guest systems and affinity/anti-affinity rules. The analysis program **10** can be used to employ heuristic optimization algorithms (referred to above as the auto-fit process) to automatically determine the virtualization solution that eliminates the largest number of systems **16** with the highest set of compatibility scores. Additional what-if scenarios can be readily modeled by modifying constraints, adding systems etc. to the analysis. As can be seen in FIG. 25, the virtual environment optimization **106** performs a multi-dimensional analysis, e.g. according to the processes described in FIGS. 18 to 24.

The multi-dimensional analysis employs the auto-fit analysis to determine the optimal layout of the source systems onto the target systems based on the technical, business and workload constraints. The analysis considers the combined constraint and affinity analysis of the physical source systems with the existing and hypothetical target systems. If live migration is to be supported, the target systems included in the auto-fit analysis should be compatible with respect to live migration. The optimization criteria can be based on searching for a solution that minimizes the number of target servers required to accommodate the source systems, or a solution that attempts to balance the load across a specific number of target servers. An example of the virtual environment optimization **106** will be provided later.

The end result of the transformational P2V analysis **99** is the virtual environment design **110**, which provides the blueprint for creating a new virtual environment **21** or, as explained below, to refine or upgrade an existing virtual environment **21**. The virtual environment design **110** comprises a cluster membership design, an affinity rule design and avirtualization management framework API integration as shown in FIG. 25.

Most virtualization technologies support grouping of the target hosts into a cluster thus the implementation of a cluster membership design. Within a cluster, guest virtual machines may then be migrated between target hosts. The VM-cluster assignments can be constrained by the clusterability of the target servers, the affinity of the source systems, workload requirements of the source systems and resource capacities of the target servers. The virtual environment optimization **106** considers all these constraints and recommends the placement of the source systems on the set of clusterable targets. Additional considerations for defining clusters are: the maximum allowable servers per cluster, the sharing of common storage and networking in clusters, the similarity of hardware specifications among the servers in the cluster and sharing common resources (e.g. blade servers are suitable for this reason). The virtualization rule sets **11** enable the analysis program **10** to account for

many of the above considerations and the optimal cluster size is typically considered to decide between when to make a separate cluster and when to employ affinity and anti-affinity rules within a single cluster.

FIG. 39 shows a cluster-based view **204** of a set of guest OSs. In FIG. 39, the larger areas of non-zero scores (i.e. non-dark) represent recommended cluster membership and in this example, there are 5 distinct clusters **206** emerging from the analysis. The clusters **206** may be separated by different colours (not shown) to identify anti-affinity regions within a cluster and the appropriate rules can then be generated by the analysis program **10** to ensure that constraints are honoured at runtime.

The affinity rule design is performed to specify which systems should be assigned to the same clusters **206**. For virtualization technologies that support the migration of virtual machines among target hosts, there are cases where it is better to keep certain virtual machines together or apart. For example, a virtual machine that serves an active backup/failover for another virtual machine should not be deployed on the same target host (anti-affinity). Similarly, there are cases when virtual machines that transfer a high volume of data with each other may be optimally deployed on the same target host to reduce network latency in their communications (affinity). The affinity and anti-affinity rules are based on the technical and business compatibility scores among the source systems. In general, systems with high compatibility scores can co-exist on the same target host while systems with very poor compatibility scores should be kept apart.

Most virtualization technologies support varying levels of integration with third-party applications to improve the management of the virtual environment. Some virtualization technologies support a mechanism to balance the load among virtualization hosts in a cluster. This is accomplished monitoring the current workload of the virtual machines and respective hosts and automatically moving virtual machines from heavily loaded hosts to less busy hosts as required. For example, VMware® Virtual Center supports DRS which provides such functionality. VMware® DRS also supports affinity and anti-affinity rules that allow users to define which virtual machines should be kept together and apart when virtual machines are automatically migrated. Based on the VM affinity rule design described earlier, DRS affinity and anti-affinity rules can be programmatically defined in the VMware® Virtual Center application.

FIG. 40 illustrates a rule-programming interface **208**, in this example configured for DRS rule programming. FIG. 40 shows anti-affinity rules that have been automatically derived from an analysis map. By using threshold-based generation of rules, both affinity and anti-affinity rules can be established and maintained. A settings box **210** can be used to enable anti-affinity and affinity rules as well as to set thresholds.

Administrators can choose to synchronize the affinity rules directly with a central service, e.g. Virtual Center. For VMware®, the API-level integration can be made bi-directional and all cluster membership information and manually programmed rules can be automatically synchronized with the DRS to enable long-term management of virtual environments. As well, the synchronization operation ensures that there are no rule conflicts prior to applying the new rules. FIG. 41 shows an example user interface **208** that directly integrates with VMware® Virtual Center. From this UI, users can synchronize affinity and anti-affinity rules between the analysis program and the third-party application, in this example through a selectable list of entries **212**.

Turning now to FIG. 26 an example process flow is shown that utilizes various capabilities of the analysis program **10**, details of which have been described above and are shown in FIGS. 3 to 24. The physical environment analysis **100**, as discussed above, obtains data from the existing physical servers **16** and uses virtualization rule sets **11** to evaluate the compatibility of those systems **16** in the physical environment **12** with respect to their candidacy for being virtualized. In this example, the physical environment analysis **102** uses a guest VM compatibility rule set **11** *a* and performs a 1-to-1 compatibility analysis **116** of the systems **16** to determine guest VM candidates **118**. It will be appreciated that the 1-to-1 compatibility analysis **116** can be performed according to the principles discussed above, i.e. using the analysis program **10**, and as shown in FIGS. 7 to 11 and thus further detail thereof need not be reiterated. This allows the analyst to filter out unsuitable candidates for the optimization stage, which utilizes the more comprehensive multi-dimensional compatibility and consolidation analysis **126**. To further filter the candidates **118**, another 1-to-1 compatibility analysis **116** can be performed using a guest VM affinity rule set **11** *b*, which enables a more finely filtered set of guest VM candidates or sources **120** to be defined.

The current asset assessment **102** also utilizes data obtain from the existing physical servers **16** and in this example utilizes a virtualization host hardware compatibility rule set **11** *c* to generate a first set of virtualization host candidates **122**. The virtualization host system definition process **104** is then performed on the first set of host candidates **122** by performing another 1-to-1 compatibility analysis **116** according to a VM migration compatibility rule set **11** *d* to generate a more refined set of virtualization hosts or targets **124**, which would be grouped into clusters. It may be noted that at this stage, if there are insufficient hardware resources for virtualization hosts from the existing physical environment **12**, additional servers may be acquired and modeled using hypothetical server models **125** as exemplified in greater detail in FIG. 27 (and discussed above). As can be appreciated from FIG. 26, the hypothetical server models **125** can be introduced not only at the virtualization host system definition **104** stage but also during the multi-dimensional compatibility and consolidation analysis **126** to fine tune the aggregate sizing estimate.

The virtualization environment optimization **106** can then be performed using the set of sources **120** and the set of targets **124**. The optimization **106** uses technical and business constraint rule sets **28** *a* and workload types and parameters **28** *b* to determine guest VM candidates and placements **128** as well as VM affinity rules **130** for the virtual environment design **110**. It will be appreciated that the multi-dimensional compatibility and consolidation analysis **126** can be performed using the analysis program **10** as discussed above and shown in FIGS. 18 to 24 which includes the application of a transfer auto-fit routine. The multi-dimensional compatibility and consolidation analysis **126** is performed separately for each group of guest VM candidates **120** and cluster of virtualization host candidates **224**.

FIGS. 28, **29** and **35** to **38** illustrate example screen shots that can be provided by the virtualization user interface **13** to enable an analyst to perform the transformational P2V process **99**. FIG. 28 shows a main or general tab **152** for an analysis editor **150**, which provides a mechanism for the analyst to choose settings and generate a set of results that can be used to provide a virtual environment design **110**. The description field **154** allows the user to specify a detailed description of the purpose of the analysis. The Dashboard specification **156** allows the user to choose the appropriate dashboard for presenting the analysis results. The Tracking specification **158** allows the user to specify whether multiple versions of the analysis results are to be automatically maintained.

FIG. 29 shows the workload tab **160** in the analysis editor **150**, which is used to select the desired workload types **162** to evaluate in the analysis. In this example, CPU utilization with virtualization overhead, the disk I/O rate in bytes/second, the memory utilization and network I/O in bytes/second are to be evaluated.

FIG. 35 shows the transfer auto-fit tab **184** in the analysis editor **150** which is used, once the initial compatibility analyses have been conducted and the source and target sets **120**, **124** chosen, to apply the auto-fit routine. When performing the transfer auto-fit analysis, users can specify the transfer analysis mode and transfer type **186**. The transfer analysis mode defines the manner in which the multi-dimensional compatibility analysis is performed. The possible modes are affinity, compatibility or both. The affinity mode involves comparing the source systems against the other source systems involved in transfers to a common target. The compatibility mode compares each source systems against their target. The "both" mode applies both the affinity and compatibility comparisons. The transfer type specifies the type of transformation being analyzed—this includes Physical to Virtual (P2V), Virtual to Virtual (V2V), OS Stacking and Application Stacking. The auto-fit algorithm specification **188** allows users to choose between a quick and a comprehensive search for the optimal consolidation solution. The auto-fit limits **190** specify the constraints for the auto-fit solution search. The auto-fit update options **192** allow users to specify whether the auto-fit is performed automatically and whether existing transfers should be removed when the auto-fit is executed.

Upon executing the auto-fit routine, a dashboard summary **194** of the transformational P2V analysis **99** results can be generated and displayed as shown in FIG. 36. A consolidation summary **196** is displayed, which summarizes the number of systems **16** before and after the consolidation and the total number of transfers involved. An aggregate workload summary is also displayed, which shows in this example CPU utilization over the course of a day at minimum/maximum and sustained activity levels

both before and after consolidation. The transfers can be displayed in greater detail as shown in FIG. 37 wherein in this example, three target system data sets **200** *a*, **200** *b* and **200** *c* are shown that provide details regarding each target and the transfers involved for virtualization.

A detailed map **202** of the transfers can then be displayed as shown in FIG. 38. This example analysis map **202** shows the P2V transfers based on an auto-fit. In this example, all source systems are placed onto four (4) target systems.

Ongoing Management

After the virtual environment **21** is deployed, the analysis program **10** can be used to collect detailed configuration and workload data from the virtualization hosts and virtual machines (sources) for virtual environment tracking. The data collected from the virtual environment **21** is analyzed to detect outliers and non-compliant guest and virtualization host settings such as the installation of tools on guest systems, service console security settings, etc. The support for live migration between specific virtualization hosts and virtual machines is to be evaluated on an ongoing basis by considering the network and storage dependencies, live migration CPU compatibility, and relevant guest configuration settings (e.g. CPU affinity, connected drives, raw device mappings, internal virtual switch connections). It is typically important that compatibility between servers be maintained to maximize the reliability and optimal operation of the virtualized environment. As the virtual environment changes over time, the analysis program **10** and virtualization UI **13** can be used to re-analyze the environment based on latest configuration, business and workload data to determine actions to improve compatibility and load balancing. Recommended actions may be to move existing virtual machines and/or virtualization hosts to different clusters, update affinity or anti-affinity rules, or update virtual machine resource reservations. When introducing new virtualization host servers and/or virtual machines to the virtualized environment, an optimization analysis **106** can performed to determine the recommended assignments based on the compatibility and workload constraints.

Turning now to FIG. 42, a process flow for implementing the ongoing monitoring **15** to achieve the above is shown. After all or part of the physical environment **12** has been transformed, the ongoing analysis involves the management and maintenance of the new virtual environment **21**. Specifically, the analyses can be performed and scheduled to assist in governing, optimizing and planning the placements of virtual machines in the virtual environment. The ongoing management **15** as depicted in FIG. 42 comprises ongoing data acquisition **220**, placement governance **222**, placement optimization **224**, placement planning **226**, and user notifications **285** which is repeated at periodic or predetermined intervals on an ongoing basis. The analysis program can be configured to automatically notify the analyst of key results from the schedule tasks and analyses. Notifications can come in the form of dashboards or be forwarded to the analysts through various mechanisms such as email.

To manage the virtual machines and virtualization hosts, up-to-date data is collected on an ongoing basis, this involves host data collection **228**, guest data collection **230** and virtualization management framework data collection **231**. The majority of the data regarding the virtual machines is collected directly from the virtual machines. Specifically, detailed system configuration information such as operating system configuration, installed applications and workload are collected from the virtual machine. Data regarding the virtualization hosts, current placement of virtual machines and the configuration of the virtual environment such as cluster memberships is collected from the virtualization hosts and/or the virtualization management framework. Examples of virtualization management frameworks include Virtual Center for VMware® VI3, System Center Virtual Machine Manager for Microsoft® Hyper-V or XenCenter for Citrix® XenServer. Some performance data such CPU utilization of VMs is collected from the virtualization host or management framework since the CPU utilization measurements from inside the virtual machine can be inaccurate. Virtualization hosts and management frameworks typically provide APIs to collect the required configuration and workload data (e.g. VI3 SDK for VMware®, WMI for Microsoft® Hyper-V, Xen API for XenServer, etc.).

The placement governance **222** comprises affinity rule design and updates **232** and VM placement validation **234**. As aspects of the virtual machines change over time, the affinity and anti-affinity rules may need to be updated to reflect the latest conditions. When appropriate, these updated rules should be applied to the virtualization management framework (e.g. VMware® DRS).

The placements of virtual machines often need to be updated over time to reflect changes in the technical, business and workload constraints. The placement validation **234** involves re-analyzing the guest systems based on their current placements on the target hosts using the latest available data. If one or more guests are found to be deployed on inappropriate hosts, the VM layout may be adjusted by migrating VMs as required. Further detail concerning the placement validation **234** is shown in FIG. 43.

As can be seen in FIG. 43, the set of source systems **120** and target systems **124** that have been deployed are input to a multi-dimensional compatibility and consolidation analysis **126** as before, utilizing the technical and business constraints rule sets **28** *a* and the workload types and parameters **28** *b*. Also input to the analysis **126** is a VM placement validation rule set **240**, which forces guest virtual machines (sources) to remain on their current host (target) by applying a significant penalty if it moves from it current placement. The analysis **126** performs the consolidation auto-fit analysis and generates analysis scores **242** based on the current VM placements. If the analysis results find that all source systems can be placed on their current virtualization hosts, this indicates that the guest VMs continue to meet the technical, business and workload constraints. If the analysis results find that one or more source systems are unplaced, it implies that the constraints are not met with the current placements and that some action is required to ensure operations at the desired levels for performance and risks Possible actions can include relaxing constraints, moving guest VMs to a different hosts, not running some guest VMs or adding more virtualization hosts to the pool.

Turning back to FIG. 42, the placement optimization **224** comprises the processes of VM rebalancing **236** and whitespace management **237**. VM rebalancing involves analyzing technical, business and workload constraints of virtual machines and hosts to determine the optimal placement of the virtual machines on an ongoing basis. The frequency of the rebalancing analysis can vary, depending on the volatility of the system workloads and changes in technical and business constraints. There are several variants for the VM rebalancing analysis. One variant places no considerations on the current placements of the virtual machines. This type of analysis searches for the optimal VM placements and assumes virtually no cost in moving the VMs from their current placements. This analysis is applicable for initial VM placements where the environment is being restarted. Another variant considers the current placement of the virtual machines and attempts to eliminate migrations that provide limited benefits. This is accomplished by employing the "VM stickiness" rule set **244** (see FIG. 44) that penalizes any VM move, ensuring that a move is proposed only if there are significant benefits. FIG. 44 shows further detail of the rebalancing step **236**, which is similar to the placement validation **234** but as noted, uses the VM placement stickiness rule set **244** to determine proposed VM placements **246** and VM affinity rules **248** rather than only analysis scores. It may be noted that by performing the placement validation **234** and rebalancing **236** separately, the validation **234** can be used to indicate whether any of the current VM placements do not meet the analysis constraints and the rebalancing **236** used to indicate where to move VM to enhance load balancing, etc.

Whitespace management tracks the historical and recent server utilization levels against the VM placement constraints to determine if the available host capacity exceeds or falls short of application demands. This analysis can be effectively performed through consolidation analyses on one or more groups of servers in the existing virtual environment. If the analysis results find that the guests do not fit on the existing set of hosts, it indicates that there is a shortfall of capacity. Alternatively, if the analysis results find that there are unused host servers, it indicates a possible excess in capacity.

The placement planning **226** comprises a process of future VM placement validation **238** and planning **239**. Based on historical workload patterns, a model can be defined to predict future workload operation cycles, patterns and trends. For example, when analyzing workload data, analysts can choose to validate current VM placements against these predicted trends to identify potential risks or inefficiencies. The placement planning comprises enabling the generation of future VM placement plans based on predicted operational patterns and trends.

FIGS. 45 to 56 illustrate a series of screen shots provided by the virtualization UI **13** to enable an analyst to perform the placement validation **234** and rebalancing **236** processes. In FIGS. 45 to 51, like elements with respect to FIGS. 28, **29** and **35** are given like numerals with a single prime ('). In FIGS. 52 to 56, like elements with respect to FIGS. 28, **29** and **35** are given like numerals with a double prime (") and like elements with respect to FIGS. 45 to 51 are given like numerals with a single prime (').

In FIG. 45, it can be seen that when performing placement validation **234**, a similar analysis editor program **150'** is used wherein the dashboard settings **156'** are set to VM rebalancing since, in this example, the placement validation and **234** and rebalancing **236** utilize the same dashboard.

FIG. 46 shows a systems tab **250** in the analysis editor **150'**, which lists the available systems in a left pane **252** and list what is included in the analysis in a right pane **254**. The right hand pane **254** lists the source and target systems included in the analysis. In this example, the source systems correspond to the guest VMS and the targets are the virtualization hosts.

FIG. 47 shows a rule sets selection tab **256**, which provides a tree mechanism **258** for selecting applicable rule sets. In this example, the static VM placement ruleset is selected to perform the VM placement validation analysis.

FIG. 48 shows the workload tab **160'** when used during the placement validation **234**. In this example, the selected workload types **162** reflect the key resources for analyzing the utilization constraints on the virtualization hosts.

FIG. 49 is a placement validation dashboard page **260** which summarizes the results of the analysis. This page is displayed after the analysis is run and provides an overall status of the analysis and lists various metrics such as the number of source and target systems requiring rebalancing, number of unplaced sources and the number of unused targets **262**. If no actions are required, these metrics should all be zero. In this example, two (2) source systems are found to not fit on their current target host. FIG. 50 shows a page **264** listing the source systems that do not fit on their current host. FIG. 51 shows the analysis results in the form of an analysis map **266**. In the map **266**, the two (2) source systems are shown to be un-transferred and their lower scores of "68" are below the specific auto-fit score limit of "75".

FIGS. 52 to 56 illustrate yet another similar analysis editor **150'** when used for performing the rebalancing, which can be used in manner similar to FIGS. 45 to 51 thus many details thereof need not be reiterated. However, it may be noted that in FIG. 53, the VM Rebalancing Stickiness ruleset **258** is used in place of the Static VM Placement ruleset. In FIG. 54, the analysis results **262** indicate that all source systems have been placed, but that one source system was moved to a different target host to meet the auto-fit analysis score constraints. The specific source system that required a transfer is listed in a table **264** in FIG. 56.

It will be appreciated that although the configuration and workload analyses are performed in this example to contribute to the overall compatibility analyses, each analysis is suitable to be performed on its own and can be conducted separately for finer analyses at any time using the analysis program **10**. The finer analysis may be performed to focus on the remediation of only configuration settings at one time and spreading workload at another time. As such, each analysis and associated map may be generated on an individual basis without the need to perform the other analyses.

It will also be appreciated that each analysis and associated map discussed above may instead be used for purposes other than consolidation such as capacity planning, regulatory compliance, change, inventory, optimization, administration etc. and any other purpose where compatibility of systems is useful for analyzing systems **16**. It will also be appreciated that the program **10** may also be configured to allow user-entered attributes (e.g. location) that are not available via the auditing process and can factor such attributes into the rules and subsequent analysis.

It will further be appreciated that although the examples provided above are in the context of a distributed system of computer servers, the principles and algorithms discusses are applicable to any system having a plurality of sub-systems where the sub-systems perform similar tasks and thus are capable theoretically of being consolidated and/or virtualized. For example, a local network having a number of personal computers (PCs) could also benefit from a consolidation analysis.

## Patent Citations (30)

Although the invention has been described with reference to certain specific embodiments, various modifications thereof will be apparent to those skilled in the art as outlined in the claims appended hereto.

| Publication number | Priority date | Publication date | Assignee | Title |
|---|---|---|---|---|
| US6138078A | 1996-08-22 | 2000-10-24 | Csi Technology, Inc. | Machine monitor with tethered sensors |
| US6148335A | 1997-11-25 | 2000-11-14 | International Business Machines Corporation | Performance/capacity management framework over many servers |
| CA2382017A1 | 1999-09-28 | 2001-04-05 | International Business Machines Corporation | Workload management in a computing environment |
| WO2003009140A2 | 2001-07-20 | 2003-01-30 | Altaworks Corporation | System and method for adaptive threshold determination for performance metrics |
| CA2420076A1 | 2000-08-25 | 2003-02-19 | Shikoku Electric Power Co., Inc. | Remote control server, center server, and system constructed of them |
| US20030084157A1 * | 2001-10-26 | 2003-05-01 | Hewlett Packard Company | Tailorable optimization using model descriptions of services and servers in a computing environment |
| US6564174B1 * | 1999-09-29 | 2003-05-13 | Bmc Software, Inc. | Enterprise management system and method which indicates chaotic behavior in system resource usage for more accurate modeling and prediction |
| US20040107125A1 * | 1999-05-27 | 2004-06-03 | Accenture Llp | Business alliance identification in a web architecture |
| WO2004084083A1 | 2003-03-19 | 2004-09-30 | Unisys Corporation | Server consolidation analysis |
| US20040236971A1 * | 2003-05-21 | 2004-11-25 | Kopley Thomas E. | Method and apparatus for defining an input state vector that achieves low power consumption in a digital circuit in an idle state |
| US20050027466A1 | 2003-07-29 | 2005-02-03 | Jay Steinmetz | Wireless collection of battery performance metrics system, method, and computer program product |
| US20060010176A1 * | 2004-06-16 | 2006-01-12 | Armington John P | Systems and methods for migrating a server from one physical platform to a different physical platform |
| US20060020924A1 | 2004-06-15 | 2006-01-26 | K5 Systems Inc. | System and method for monitoring performance of groupings of network infrastructure and applications using statistical analysis |
| CA2486103A1 | 2004-10-26 | 2006-04-26 | Platespin Ltd. | System and method for autonomic optimization of physical and virtual resource use in a data center |

| CA2583582A1 | 2004-11-01 | 2006-05-11 | Electronic Data Systems Corporation | Reporting of abnormal computer resource utilization data |
| US7080221B1 * | 2003-04-23 | 2006-07-18 | Emc Corporation | Method and apparatus for managing migration of data in a clustered computer system environment |
| US20060167665A1 * | 1998-05-13 | 2006-07-27 | Ata Nabil A A | Automated system and method for service and cost architectural modeling of enterprise systems |
| US20060230407A1 * | 2005-04-07 | 2006-10-12 | International Business Machines Corporation | Method and apparatus for using virtual machine technology for managing parallel communicating applications |
| US20070006218A1 * | 2005-06-29 | 2007-01-04 | Microsoft Corporation | Model-based virtual system provisioning |
| US20070079308A1 * | 2005-09-30 | 2007-04-05 | Computer Associates Think, Inc. | Managing virtual machines |
| US20070094375A1 | 2005-10-24 | 2007-04-26 | Snyder Marc E | Dynamic Server Consolidation and Rationalization Modeling Tool |
| US20070106769A1 | 2005-11-04 | 2007-05-10 | Lei Liu | Performance management in a virtual computing environment |
| US20070250615A1 | 2006-04-21 | 2007-10-25 | Hillier Andrew D | Method and System For Determining Compatibility of Computer Systems |
| US20070250621A1 | 2006-04-21 | 2007-10-25 | Hillier Andrew D | Method For Evaluating Computer Systems |
| US20070250829A1 | 2006-04-21 | 2007-10-25 | Hillier Andrew D | Method and system for determining compatibility of computer systems |
| US20080011569A1 | 2006-06-23 | 2008-01-17 | Hillier Andrew D | Method and system for determining parameter distribution, variance, outliers and trends in computer systems |
| US20080256530A1 | 2007-04-16 | 2008-10-16 | William Joseph Armstrong | System and Method for Determining Firmware Compatibility for Migrating Logical Partitions |
| US7577722B1 * | 2002-04-05 | 2009-08-18 | Vmware, Inc. | Provisioning of computer systems using virtual machines |
| US7647516B2 * | 2005-09-22 | 2010-01-12 | Hewlett-Packard Development Company, L.P. | Power consumption management among compute nodes |
| US7886293B2 * | 2004-07-07 | 2011-02-08 | Intel Corporation | Optimizing system behavior in a virtual machine environment |
| Family To Family Citations | | | | |

\* Cited by examiner, † Cited by third party

## Non-Patent Citations (10)

| Title |
| --- |
| "A Blueprint for Better Management from the Desktop to the Data Center"; White Paper; Feb. 2007; Novell. |
| "Building the Virtualized Enterprise with VMware Infrastructure"; White Paper; 2006; VMware. |
| "Virtualization: Architectural Considerations and Other Evaluation Criteria"; White Paper; 2005; VMware. |
| Hillier, Andrew; "A Quantitative and Analytical Approach to Server Consolidation" dated Jan. 2006, published at least as early as Feb. 3, 2006; CiRBA Inc.; Technical Whitepaper. |
| Hillier, Andrew; "Data Center Intelligence" dated Mar. 2006, published at least as early as Apr. 1, 2006; CiRBA Inc.; Technical Whitepaper. |
| Hillier, Andrew; "Large Scale Production Virtualization: Managing the Transformation"; White Paper; Oct. 2006; CiRBA Inc. |
| Hillier, Andrew; "Transformational Analytics: Virtualizing IT Environments"; White Paper; Apr. 2008; CiRBA Inc. |
| Matheson, Leigh; Search Report from corresponding PCT Application No. PCT/CA2008/001522; Dec. 3, 2008. |
| Spellman, Amy et al.; "Server Consolidation Using Performance Modeling"; IT Professional; Sep./Oct. 2003; pp. 31-36; vol. 5, No. 5. |
| Tanenbaum, Andrew S. et al; Distributed Systems: Principles and Paradigms; US Ed edition; Jan. 15, 2002; pp. 22-42, 326-336; Prentice Hall. |

\* Cited by examiner, † Cited by third party

## Cited By (156)

| Publication number | Priority date | Publication date | Assignee | Title |
| --- | --- | --- | --- | --- |
| US20090300173A1 * | 2008-02-29 | 2009-12-03 | Alexander Bakman | Method, System and Apparatus for Managing, Modeling, Predicting, Allocating and Utilizing Resources and Bottlenecks in a Computer Network |
| US20090307591A1 * | 2008-03-07 | 2009-12-10 | Alexander Bakman | Unified management platform in a computer network |

| | | | | |
|---|---|---|---|---|
| US20100088082A1 * | 2008-10-06 | 2010-04-08 | Schlumberger Technology Corporation | Multidimensional data repository for modeling oilfield operations |
| US20100251255A1 * | 2009-03-30 | 2010-09-30 | Fujitsu Limited | Server device, computer system, recording medium and virtual computer moving method |
| US20110093849A1 * | 2009-10-20 | 2011-04-21 | Dell Products, Lp | System and Method for Reconfigurable Network Services in Dynamic Virtualization Environments |
| US20110131569A1 * | 2009-11-30 | 2011-06-02 | Itamar Heim | Mechanism for Load Balancing in a Memory-Constrained Virtualization System |
| US20110131570A1 * | 2009-11-30 | 2011-06-02 | Itamar Heim | Mechanism for Target Host Optimization in a Load Balancing Host and Virtual Machine (VM) Selection Algorithm |
| US20110131571A1 * | 2009-11-30 | 2011-06-02 | Itamar Heim | Mechanism for Shared Memory History Optimization in a Host Selection Algorithm for Virtual Machine Placement |
| US20110209042A1 * | 2010-02-25 | 2011-08-25 | International Business Machines Corporation | Information Technology Standard Inventory Utility |
| US20110271146A1 * | 2010-04-30 | 2011-11-03 | Mitre Corporation | Anomaly Detecting for Database Systems |
| US20120036515A1 * | 2010-08-06 | 2012-02-09 | Itamar Heim | Mechanism for System-Wide Target Host Optimization in Load Balancing Virtualization Systems |
| US20120084583A1 * | 2010-09-30 | 2012-04-05 | International Business Machines Corporation | Data transform method and data transformer |
| US20120081395A1 * | 2010-09-30 | 2012-04-05 | International Business Machines Corporation | Designing and building virtual images using semantically rich composable software image bundles |
| US20120144325A1 * | 2010-12-01 | 2012-06-07 | Microsoft Corporation | Proposing visual display components for processing data |
| US20120272234A1 * | 2011-04-20 | 2012-10-25 | Cisco Technology, Inc. | Scoring of Computing Equipment for Virtualized Computing Environments |
| US20130097464A1 * | 2011-10-13 | 2013-04-18 | Vmware, Inc. | Software application placement based on failure correlation |
| US20130311967A1 * | 2012-05-16 | 2013-11-21 | Wellpoint, Inc. | Method and System for Collapsing Functional Similarities and Consolidating Functionally Similar, Interacting Systems |
| US20140068445A1 * | 2012-09-06 | 2014-03-06 | Sap Ag | Systems and Methods for Mobile Access to Enterprise Work Area Information |
| US8738972B1 | 2011-02-04 | 2014-05-27 | Dell Software Inc. | Systems and methods for real-time monitoring of virtualized environments |
| US20140181305A1 * | 2012-12-26 | 2014-06-26 | Microsoft Corporation | Schedule based execution with extensible continuation based actions |
| US8782242B2 | 2011-10-13 | 2014-07-15 | Vmware, Inc. | Software application placement using computing resource containers |
| US20140380308A1 * | 2013-06-25 | 2014-12-25 | Vmware, Inc. | Methods and apparatus to generate a customized application blueprint |
| US9223568B2 | 2008-09-12 | 2015-12-29 | International Business Machines Corporation | Designing and cross-configuring software |
| US9495222B1 | 2011-08-26 | 2016-11-15 | Dell Software Inc. | Systems and methods for performance indexing |
| US9519513B2 | 2013-12-03 | 2016-12-13 | Vmware, Inc. | Methods and apparatus to automatically configure monitoring of a virtual machine |
| US9569249B1 | 2015-09-08 | 2017-02-14 | International Business Machines Corporation | Pattern design for heterogeneous environments |
| US9678731B2 | 2014-02-26 | 2017-06-13 | Vmware, Inc. | Methods and apparatus to generate a customized application blueprint |
| US9792144B2 | 2014-06-30 | 2017-10-17 | Vmware, Inc. | Methods and apparatus to manage monitoring agents |
| US9778571B1 * | 2016-10-28 | 2017-10-24 | International Business Machines Corporation | System and method for optimizing provisioning time by dynamically customizing a shared virtual machine |
| US9866626B2 | 2015-09-08 | 2018-01-09 | International Business Machines Corporation | Domain-specific pattern design |
| US10073683B2 * | 2015-09-01 | 2018-09-11 | Oracle International Corporation | System and method for providing software build violation detection and self-healing |
| US10091072B2 | 2014-04-09 | 2018-10-02 | International Business Machines Corporation | Management of virtual machine placement in computing environments |
| US10129106B2 | 2014-04-09 | 2018-11-13 | International Business Machines Corporation | Management of virtual machine resources in computing environments |
| US10180807B2 | 2011-10-12 | 2019-01-15 | Tata Consultancy Services Limited | Method and system for consolidating a plurality of heterogeneous storage systems in a data center |
| US10198282B2 * | 2014-03-12 | 2019-02-05 | Huawei Technologies | Controlling a VM migration to a destination host based on resource availability and |

| | | | Co., Ltd. | a type of application running on the VM |
|---|---|---|---|---|
| US10310932B2 | 2017-01-13 | 2019-06-04 | Bank Of America Corporation | Using a concentration risk of a computing resource to define affinity and anti-affinity workloads |

Family To Family Citations

| | | | | |
|---|---|---|---|---|
| EP2360589B1 * | 2005-03-16 | 2017-10-04 | III Holdings 12, LLC | Automatic workload transfer to an on-demand center |
| US9015324B2 | 2005-03-16 | 2015-04-21 | Adaptive Computing Enterprises, Inc. | System and method of brokering cloud computing resources |
| US9231886B2 | 2005-03-16 | 2016-01-05 | Adaptive Computing Enterprises, Inc. | Simple integration of an on-demand compute environment |
| CA2603577A1 | 2005-04-07 | 2006-10-12 | Cluster Resources, Inc. | On-demand access to compute resources |
| US8782120B2 | 2005-04-07 | 2014-07-15 | Adaptive Computing Enterprises, Inc. | Elastic management of compute resources between a web server and an on-demand compute environment |
| US7792941B2 * | 2007-03-21 | 2010-09-07 | International Business Machines Corporation | Method and apparatus to determine hardware and software compatibility related to mobility of virtual servers |
| US8095929B1 | 2007-04-16 | 2012-01-10 | Vmware, Inc. | Method and system for determining a cost-benefit metric for potential virtual machine migrations |
| US8429645B2 * | 2007-08-14 | 2013-04-23 | International Business Machines Corporation | Method for optimizing migration of software applications to address needs |
| US8606610B2 * | 2007-12-20 | 2013-12-10 | Ncr Corporation | Business process simulation testing for bank branches using avatars |
| JP4488072B2 * | 2008-01-18 | 2010-06-23 | 日本電気株式会社 | Server system, and power reduction method of the server system |
| JP4976337B2 * | 2008-05-19 | 2012-07-18 | 株式会社日立製作所 | Program distribution apparatus and method |
| US7970905B2 * | 2008-07-03 | 2011-06-28 | International Business Machines Corporation | Method, system and computer program product for server selection, application placement and consolidation planning of information technology systems |
| US8065714B2 * | 2008-09-12 | 2011-11-22 | Hytrust, Inc. | Methods and systems for securely managing virtualization platform |
| US8392928B1 * | 2008-10-28 | 2013-03-05 | Hewlett-Packard Development Company, L.P. | Automated workload placement recommendations for a data center |
| US8594955B2 * | 2008-12-03 | 2013-11-26 | International Business Machines Corporation | Establishing a power profile for generating electrical ratings |
| US8046468B2 | 2009-01-26 | 2011-10-25 | Vmware, Inc. | Process demand prediction for distributed power and resource management |
| US7904540B2 * | 2009-03-24 | 2011-03-08 | International Business Machines Corporation | System and method for deploying virtual machines in a computing environment |
| US8359374B2 * | 2009-09-09 | 2013-01-22 | Vmware, Inc. | Fast determination of compatibility of virtual machines and hosts |
| US8935500B1 * | 2009-09-24 | 2015-01-13 | Vmware, Inc. | Distributed storage resource scheduler and load balancer |
| US8914598B2 * | 2009-09-24 | 2014-12-16 | Vmware, Inc. | Distributed storage resource scheduler and load balancer |
| US20110078510A1 * | 2009-09-30 | 2011-03-31 | Virtera | Computer Software and Hardware Evaluation System and Device |
| US8640139B2 * | 2009-10-29 | 2014-01-28 | Nec Corporation | System deployment determination system, system deployment determination method, and program |
| US8627413B2 * | 2009-11-23 | 2014-01-07 | Symantec Corporation | System and method for authorization and management of connections and attachment of resources |
| US8327060B2 * | 2009-11-30 | 2012-12-04 | Red Hat Israel, Ltd. | Mechanism for live migration of virtual machines with memory optimizations |
| US8631405B2 * | 2010-02-26 | 2014-01-14 | Red Hat Israel, Ltd. | Identification and placement of new virtual machines based on similarity of software configurations with hosted virtual machines |
| US8650563B2 * | 2010-02-26 | 2014-02-11 | Red Hat Israel, Ltd. | Identification and placement of new virtual machines to reduce memory consumption based on shared images with hosted virtual machines |
| US8429449B2 * | 2010-03-01 | 2013-04-23 | International Business Machines Corporation | Optimized placement of virtual machines in a network environment |
| US9626206B2 * | 2010-03-18 | 2017-04-18 | Microsoft Technology Licensing, Llc | Virtual machine homogenization to enable migration across heterogeneous computers |
| JP5585140B2 * | 2010-03-18 | 2014-09-10 | 富士通株式会社 | Management program of the virtual computer system, the management apparatus and management method |
| US8255508B2 * | 2010-03-24 | 2012-08-28 | International Business Machines Corporation | Administration of virtual machine affinity in a data center |

| US20110246627A1 * | 2010-04-01 | 2011-10-06 | International Business Machines Corporation | Data Center Affinity Of Virtual Machines In A Cloud Computing Environment |
| US9367362B2 * | 2010-04-01 | 2016-06-14 | International Business Machines Corporation | Administration of virtual machine affinity in a cloud computing environment |
| US8572612B2 | 2010-04-14 | 2013-10-29 | International Business Machines Corporation | Autonomic scaling of virtual machines in a cloud computing environment |
| US8423998B2 | 2010-06-04 | 2013-04-16 | International Business Machines Corporation | System and method for virtual machine multiplexing for resource provisioning in compute clouds |
| US8352415B2 * | 2010-06-15 | 2013-01-08 | International Business Machines Corporation | Converting images in virtual environments |
| WO2011162746A1 | 2010-06-22 | 2011-12-29 | Hewlett-Packard Development Company, L.P. | A method and system for determining a deployment of applications |
| CN102959506B | 2010-06-22 | 2017-04-26 | 慧与发展有限责任合伙企业 | Methods used to plan the deployment of applications and systems |
| US8707300B2 * | 2010-07-26 | 2014-04-22 | Microsoft Corporation | Workload interference estimation and performance optimization |
| US8904395B2 | 2010-07-26 | 2014-12-02 | International Business Machines Corporation | Scheduling events in a virtualized computing environment based on a cost of updating scheduling times or mapping resources to the event |
| US20120042054A1 * | 2010-08-13 | 2012-02-16 | Dell Products, Lp | System and Method for Virtual Switch Architecture to Enable Heterogeneous Network Interface Cards within a Server Domain |
| US8745232B2 * | 2010-08-18 | 2014-06-03 | Dell Products L.P. | System and method to dynamically allocate electronic mailboxes |
| US8510521B2 * | 2010-09-16 | 2013-08-13 | Apple Inc. | Reordering in the memory controller |
| US8314807B2 | 2010-09-16 | 2012-11-20 | Apple Inc. | Memory controller with QoS-aware scheduling |
| US8631213B2 | 2010-09-16 | 2014-01-14 | Apple Inc. | Dynamic QoS upgrading |
| US8402119B2 | 2010-09-30 | 2013-03-19 | Microsoft Corporation | Real-load tuning of database applications |
| CN102232282B * | 2010-10-29 | 2014-03-26 | 华为技术有限公司 | Method and apparatus for realizing load balance of resources in data center |
| US9442771B2 | 2010-11-24 | 2016-09-13 | Red Hat, Inc. | Generating configurable subscription parameters |
| US9606831B2 * | 2010-11-30 | 2017-03-28 | Red Hat, Inc. | Migrating virtual machine operations |
| US20120137278A1 | 2010-11-30 | 2012-05-31 | International Business Machines Corporation | Generating a customized set of tasks for migration of a deployed software solution |
| US9563479B2 * | 2010-11-30 | 2017-02-07 | Red Hat, Inc. | Brokering optimized resource supply costs in host cloud-based network using predictive workloads |
| US8516495B2 * | 2010-12-09 | 2013-08-20 | International Business Machines Corporation | Domain management and integration in a virtualized computing environment |
| US9009719B2 * | 2010-12-16 | 2015-04-14 | Hewlett-Packard Development Company, L.P. | Computer workload capacity estimation using proximity tables |
| WO2012093469A1 * | 2011-01-06 | 2012-07-12 | 日本電気株式会社 | Performance evaluation device and performance evaluation method |
| US8667019B2 * | 2011-04-01 | 2014-03-04 | Microsoft Corporation | Placement goal-based database instance consolidation |
| US8667020B2 * | 2011-04-01 | 2014-03-04 | Microsoft Corporation | Placement goal-based database instance dynamic consolidation |
| CN103443762B * | 2011-04-07 | 2019-02-05 | 企业服务发展公司有限责任合伙企业 | Method and apparatus for moving software object |
| US8806484B2 | 2011-04-18 | 2014-08-12 | Vmware, Inc. | Host selection for virtual machine placement |
| WO2012151132A1 * | 2011-04-30 | 2012-11-08 | Vmware, Inc. | Dynamic management of groups for entitlement and provisioning of computer resources |
| US8701107B2 * | 2011-06-14 | 2014-04-15 | Vmware, Inc. | Decentralized management of virtualized hosts |
| US9026630B2 | 2011-06-14 | 2015-05-05 | Vmware, Inc. | Managing resources in a distributed system using dynamic clusters |
| US8856784B2 | 2011-06-14 | 2014-10-07 | Vmware, Inc. | Decentralized management of virtualized hosts |
| US9286182B2 * | 2011-06-17 | 2016-03-15 | Microsoft Technology Licensing, Llc | Virtual machine snapshotting and analysis |
| CN102227121B * | 2011-06-21 | 2013-10-09 | 中国科学院软件研究所 | Distributed buffer memory strategy adaptive switching method based on machine learning and system thereof |

7/15/2019          US9209687B2 - Method and System for Efficient Virtualization of Inline Transparent Computer Networks - Google Patents

Case 1:19-cv-00742-LPS   Document 91   Filed 07/16/19   Page 59 of 102 PageID #: 4632

| US9176638B2 * | 2011-08-26 | 2015-11-03 | Citrix Systems, Inc. | User interface for large scale system monitoring |
| US8797914B2 | 2011-09-12 | 2014-08-05 | Microsoft Corporation | Unified policy management for extensible virtual switches |
| US9116803B1 * | 2011-09-30 | 2015-08-25 | Symantec Corporation | Placement of virtual machines based on page commonality |
| DE102012217202A1 * | 2011-10-12 | 2013-04-18 | International Business Machines Corporation | Method and system for optimizing the placement of virtual machines in cloud computing environments |
| US8850442B2 * | 2011-10-27 | 2014-09-30 | Verizon Patent And Licensing Inc. | Virtual machine allocation in a computing on-demand system |
| US9195488B2 * | 2011-11-21 | 2015-11-24 | International Business Machines Corporation | Image deployment in a cloud environment |
| US9081787B2 | 2011-11-21 | 2015-07-14 | International Business Machines Corporation | Customizable file-type aware cache mechanism |
| US9612812B2 * | 2011-12-21 | 2017-04-04 | Excalibur Ip, Llc | Method and system for distributed application stack test certification |
| US8856303B2 | 2012-01-04 | 2014-10-07 | International Business Machines Corporation | Server virtualization |
| US8930542B2 * | 2012-01-23 | 2015-01-06 | International Business Machines Corporation | Dynamically building a set of compute nodes to host the user's workload |
| US9038065B2 * | 2012-01-30 | 2015-05-19 | International Business Machines Corporation | Integrated virtual infrastructure system |
| JP5834999B2 * | 2012-02-27 | 2015-12-24 | 富士通株式会社 | Data collection methods, information processing systems and programs |
| WO2013131186A1 * | 2012-03-01 | 2013-09-12 | Cirba Inc. | System and method for providing a capacity reservation system for a virtual or cloud computing environment |
| US9645851B1 * | 2012-03-14 | 2017-05-09 | EMC IP Holding Company, LLC | Automated application protection and reuse using an affinity module |
| US8959523B2 | 2012-03-30 | 2015-02-17 | International Business Machines Corporation | Automated virtual machine placement planning using different placement solutions at different hierarchical tree levels |
| NL2008622C2 * | 2012-04-11 | 2013-03-25 | Binck Bank N V | Compartmentalised computer system. |
| US9348927B2 * | 2012-05-07 | 2016-05-24 | Smart Security Systems Llc | Systems and methods for detecting, identifying and categorizing intermediate nodes |
| CN103516620B * | 2012-06-21 | 2016-10-05 | 华为技术有限公司 | A method for vm migration, system and server |
| US9164791B2 | 2012-07-02 | 2015-10-20 | International Business Machines Corporation | Hierarchical thresholds-based virtual machine configuration |
| US9176762B2 | 2012-07-02 | 2015-11-03 | International Business Machines Corporation | Hierarchical thresholds-based virtual machine configuration |
| US20140019964A1 * | 2012-07-13 | 2014-01-16 | Douglas M. Neuse | System and method for automated assignment of virtual machines and physical machines to hosts using interval analysis |
| US9043787B2 * | 2012-07-13 | 2015-05-26 | Ca, Inc. | System and method for automated assignment of virtual machines and physical machines to hosts |
| US9135040B2 * | 2012-08-03 | 2015-09-15 | International Business Machines Corporation | Selecting provisioning targets for new virtual machine instances |
| US8850434B1 * | 2012-09-14 | 2014-09-30 | Adaptive Computing Enterprises, Inc. | System and method of constraining auto live migration of virtual machines using group tags |
| US9081598B2 * | 2012-11-30 | 2015-07-14 | Telefonaktiebolaget L M Ericsson (Publ) | Ensuring hardware redundancy in a virtualized environment |
| US9053058B2 | 2012-12-20 | 2015-06-09 | Apple Inc. | QoS inband upgrade |
| US9229896B2 | 2012-12-21 | 2016-01-05 | Apple Inc. | Systems and methods for maintaining an order of read and write transactions in a computing system |
| CN103136469A * | 2013-03-04 | 2013-06-05 | 浪潮电子信息产业股份有限公司 | Efficient secure virtualization application method based on ZFS (zettabyte file system) server |
| CN104050008B | 2013-03-15 | 2018-01-23 | 中兴通讯股份有限公司 | A memory-super-distribution management system and method |
| US20140289198A1 * | 2013-03-19 | 2014-09-25 | Ramya Malangi Chikkalingaiah | Tracking and maintaining affinity of machines migrating across hosts or clouds |
| US9584364B2 | 2013-05-21 | 2017-02-28 | Amazon Technologies, Inc. | Reporting performance capabilities of a computer resource service |

| US9419917B2 | 2013-09-17 | 2016-08-16 | Google Inc. | System and method of semantically modelling and monitoring applications and software architecture hosted by an IaaS provider |
| US20150081400A1 * | 2013-09-19 | 2015-03-19 | Infosys Limited | Watching ARM |
| US9110699B2 | 2013-09-19 | 2015-08-18 | International Business Machines Corporation | Determining optimal methods for creating virtual machines |
| US10324754B2 * | 2013-11-07 | 2019-06-18 | International Business Machines Corporation | Managing virtual machine patterns |
| US9870568B2 * | 2013-11-19 | 2018-01-16 | Xerox Corporation | Methods and systems to price customized virtual machines |
| US20150149450A1 * | 2013-11-27 | 2015-05-28 | International Business Machines Corporation | Determining problem resolutions within a networked computing environment |
| US9584372B2 | 2014-01-07 | 2017-02-28 | International Business Machines Corporation | Discovering resources of a distributed computing environment |
| US9935865B2 * | 2014-06-23 | 2018-04-03 | Infosys Limited | System and method for detecting and preventing service level agreement violation in a virtualized environment |
| US9450985B2 * | 2014-08-04 | 2016-09-20 | International Business Machines Corporation | Server validation with dynamic assembly of scripts |
| WO2016090485A1 * | 2014-12-09 | 2016-06-16 | Cirba Ip Inc. | System and method for routing computing workloads based on proximity |
| US9912741B2 | 2015-01-20 | 2018-03-06 | International Business Machines Corporation | Optimization of computer system logical partition migrations in a multiple computer system environment |
| US9880885B2 * | 2015-02-04 | 2018-01-30 | Telefonaktiebolaget Lm Ericsson (Publ) | Method and system to rebalance constrained services in a cloud using a genetic algorithm |
| US9766919B2 | 2015-03-05 | 2017-09-19 | Vmware, Inc. | Methods and apparatus to select virtualization environments during deployment |
| US9710304B2 * | 2015-03-05 | 2017-07-18 | Vmware, Inc. | Methods and apparatus to select virtualization environments for migration |
| WO2016141305A1 * | 2015-03-05 | 2016-09-09 | Vmware, Inc. | Methods and apparatus to select virtualization environments for migration |
| US9864601B2 * | 2015-03-31 | 2018-01-09 | Vmware, Inc. | Resource management in distributed computer systems using dispersion rules |
| US9727366B2 * | 2015-04-23 | 2017-08-08 | International Business Machines Corporation | Machine learning for virtual machine migration plan generation |
| US9946564B2 * | 2015-06-23 | 2018-04-17 | International Business Machines Corporation | Adjusting virtual machine migration plans based on alert conditions related to future migrations |
| US9785474B2 | 2015-07-23 | 2017-10-10 | International Business Machines Corporation | Managing a shared pool of configurable computing resources using a set of scaling factors and a set of workload resource data |
| US10169086B2 * | 2015-09-13 | 2019-01-01 | International Business Machines Corporation | Configuration management for a shared pool of configurable computing resources |
| US10255136B2 * | 2015-09-21 | 2019-04-09 | International Business Machines Corporation | Data backup management during workload migration |
| US9928099B1 * | 2015-09-21 | 2018-03-27 | Amazon Technologies, Inc. | Fingerprint-based capacity management of physical hosts |
| US20170230419A1 | 2016-02-08 | 2017-08-10 | Hytrust, Inc. | Harmonized governance system for heterogeneous agile information technology environments |
| US20170315838A1 * | 2016-04-29 | 2017-11-02 | Hewlett Packard Enterprise Development Lp | Migration of virtual machines |
| US10185720B2 * | 2016-05-10 | 2019-01-22 | International Business Machines Corporation | Rule generation in a data governance framework |
| US20190116237A1 * | 2017-10-18 | 2019-04-18 | Hewlett Packard Enterprise Development Lp | Allocations of arbitrary workloads among hyperconverged nodes |

* Cited by examiner, † Cited by third party, ‡ Family to family citation

## Similar Documents

| Publication | Publication Date | Title |
| --- | --- | --- |
| Delimitrou et al. | 2014 | Quasar: resource-efficient and QoS-aware cluster management |
| Khanna et al. | 2006 | Application performance management in virtualized server environments |

| US8805970B2 | 2014-08-12 | Automatic management of configuration parameters and parameter management engine |
| US8638674B2 | 2014-01-28 | System and method for cloud computing |
| US8627309B2 | 2014-01-07 | Automated deployment and servicing of distributed applications |
| Ganapathi et al. | 2010 | Statistics-driven workload modeling for the cloud |
| AU2010276368B2 | 2016-02-25 | Techniques for power analysis |
| US9805322B2 | 2017-10-31 | Application blueprint and deployment model for dynamic business service management (BSM) |
| US9110727B2 | 2015-08-18 | Automatic replication of virtual machines |
| US7757214B1 | 2010-07-13 | Automated concurrency configuration of multi-threaded programs |
| US8661182B2 | 2014-02-25 | Capacity and load analysis using storage attributes |
| US9501124B2 | 2016-11-22 | Virtual machine placement based on power calculations |
| Barroso et al. | 2009 | The datacenter as a computer: An introduction to the design of warehouse-scale machines |
| US8121966B2 | 2012-02-21 | Method and system for automated integrated server-network-storage disaster recovery planning |
| US9444762B2 | 2016-09-13 | Computer network systems to manage computer network virtualization environments |
| US8903983B2 | 2014-12-02 | Method, system and apparatus for managing, modeling, predicting, allocating and utilizing resources and bottlenecks in a computer network |
| US8909785B2 | 2014-12-09 | Smart cloud workload balancer |
| RU2605473C2 | 2016-12-20 | Automated resource usage profiling |
| JP5568776B2 | 2014-08-13 | Monitoring system and method of monitoring computer |
| Gulati et al. | 2011 | Cloud Scale Resource Management: Challenges and Techniques. |
| US8935701B2 | 2015-01-13 | Unified management platform in a computer network |
| US9772886B2 | 2017-09-26 | Optimizing execution and resource usage in large scale computing |
| US20110004564A1 | 2011-01-06 | Model Based Deployment Of Computer Based Business Process On Dedicated Hardware |
| US20070079308A1 | 2007-04-05 | Managing virtual machines |
| US8108855B2 | 2012-01-31 | Method and apparatus for deploying a set of virtual software resource templates to a set of nodes |

## Priority And Related Applications

### Priority Applications (2)

| Application | Priority date | Filing date | Title |
|---|---|---|---|
| US96934407P | 2007-08-31 | 2007-08-31 | *US Provisional Application* |
| US12/201,323 | 2007-08-31 | 2008-08-29 | Method and system for evaluating virtualized environments |

### Applications Claiming Priority (1)

| Application | Filing date | Title |
|---|---|---|
| US12/201,323 | 2008-08-29 | Method and system for evaluating virtualized environments |

## Legal Events

| Date | Code | Title | Description |
|---|---|---|---|
| 2009-02-04 | AS | Assignment | **Owner name:** CIRBA INC., CANADA<br>**Free format text:** ASSIGNMENT OF ASSIGNORS INTEREST;ASSIGNORS:YUYITUNG, TOM SILANGAN;HILLIER, ANDREW DEREK;REEL/FRAME:022206/0713<br>**Effective date:** 20080922 |
| 2012-06-06 | STCF | Information on status: patent grant | **Free format text:** PATENTED CASE |

| 2015-03-24 | CC | Certificate of correction | |
| 2015-12-28 | FPAY | Fee payment | **Year of fee payment**: 4 |
| 2016-03-23 | AS | Assignment | **Owner name**: CIRBA IP INC., CANADA |
| | | | **Free format text**: ASSIGNMENT OF ASSIGNORS INTEREST;ASSIGNOR:CIRBA INC.;REEL/FRAME:038080/0582 |
| | | | **Effective date**: 20160321 |

Data provided by IFI CLAIMS Patent Services

About    Send Feedback    Public Datasets    Terms    Privacy Policy

# Exhibit C

# REMARKS

Claims 1-26 remain pending in the application.  Claims 1, 7, 10, 16 and 19 have been amended.  No claims have been canceled or added.

Applicant notes with appreciation that, in the Office action dated October 31, 2016, claim 7 (and presumably claim 16) was indicated as being relatively close to allowance.  However, claims 1-6, 8-15 and 17-26 were rejected under 35 U.S.C. §101 as allegedly directed to non-statutory subject matter.  In addition, claims 1-26 were rejected under 35 U.S.C. §112.  Lastly, claims 1-6, 8-15 and 17-26 were rejected under 35 U.S.C. §103 as allegedly being unpatentable over Yuyitung et al. (U.S. Pat. App. Pub. No. 2009/0070771 A1, hereinafter "Yuyitung") in view of Bakman (U.S. Pat. App. Pub. No. 2009/030173 A1).

## A.  Claim Rejections Based on 35 U.S.C. § 101

Claims 1-6, 8-15 and 17-26 were rejected under 35 U.S.C. §101 as allegedly directed to non-statutory subject matter.  For claims 19-26, the Office action states that "the language is drawn to a computer program which is **neither executed by a computer**, nor stored on a physical structure."  For claims 1-6, 8-15 and 17-26 (presumably), the Office action states that "[t]he claimed invention is not directed to patent eligible subject matter" because claims 1, 10 and 19 are determined to be directed to an abstract idea.

With respect to claims 19-26, Applicant has amended the independent claim 19 to recite "*memory*" and "*processor*," which is configured to execute various operations.  Thus, the language of claims 19-26 specifies that a computer, i.e., memory and processor, executes the claimed operations.  As such, Applicant respectfully requests that these Section 101 rejections of claim 19-26 be withdrawn.

With respect to claims 1-6, 8-15 and 17-26, Applicant has amended the independent claims 1, 11 and 19 to provide language that define the claimed "*dispersion rule*" and "*dispersion score*."  Support for these claim amendments can be found at least in paragraphs [0027] and [0036] of the current application.  As amended, Applicant respectfully asserts that claims 1-6, 8-15 and 17-26 are directed to patent eligible subject matter for at least the reasons explained below.  As such, Applicant respectfully requests that the rejections of claims 1-6, 8-15 and 17-26 under 35 U.S.C. 101 be withdrawn.

B975

The amended independent claim 1 recites:

*"A method for performing resource management operations in a distributed computer system, the method comprising:*

*creating a dispersion rule for a group of clients, the dispersion rule specifying the group of clients to be dispersed among host computers in a cluster of host computers in the distributed computer system;*

*computing a dispersion score for the dispersion rule for at least one candidate distribution of the clients in the cluster of host computers in the distributed computer system, the dispersion score representing how dispersed the clients will be for the at least one candidate distribution of the clients;*

*selecting a particular candidate distribution of the clients in the cluster of host computers based at least partly on the dispersion score of the particular candidate distribution; and*

*placing at least one of the clients in one of the host computers in the cluster in accordance with the particular possible distribution of the clients in the host computers."*

Applicant respectfully submits that the amended independent claim 1 recites a series of acts for performing resource management operations for a distributed computer system. Thus, the amended independent claim 1 is directed to a process, which is one of the statutory categories of invention. In addition, the claimed invention of claim 1 relates to computer technology for performing resource management operations for a distributed computer system. In particular, the independent claim 1 is directed towards specific acts of creating a dispersion rule for a group of clients, the dispersion rule specifying the group of clients to be dispersed among host computers in a cluster of host computers in the distributed computer system, computing a dispersion score for the dispersion rule for at least one candidate distribution of the clients in the cluster of host computers in the distributed computer system, the dispersion score representing how dispersed the clients will be for the at least one candidate distribution of the clients, selecting a particular candidate distribution of the clients in the cluster of host computers based at least partly on the dispersion score of the particular candidate distribution and placing at least one of the clients in one of the host computers in the cluster in accordance with the particular possible distribution of the clients in the host computers. As such, the invention recited in the amended independent claim 1 involves <u>specific computer resource allocation techniques</u>, which are necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer resource management. Accordingly, the claimed steps of the amended independent claim 1 do not recite an abstract idea, nor do they implicate any other judicial exception.

9

Accordingly, Applicant respectfully submits that the amended independent claim 1 is not directed to any judicial exception.

Applicant notes that the amended independent claims 10 and 19 recite subject matter that is similar to the subject matter recited in the amended independent claim 1. Thus, for reasons similar to the above reasons presented for claim 1, Applicant respectfully asserts that the amended independent claims 10 and 19 are also not directed to an abstract idea. In addition, the dependent claims 2-9, 11-18 and 20-26 recite additional specific resource management limitations, which support the conclusion that the claimed invention is not directed to an abstract idea. Accordingly, Applicant respectfully asserts that claims 1-6, 8-15 and 17-26 are not directed to any judicial exception. As such, Applicant respectfully requests that the rejections of claims 1-6, 8-15 and 17-26 under 35 U.S.C. 101 be withdrawn.

In addition, Applicant respectfully asserts that even if claims 1-6, 8-15 and 17-26 are directed to an abstract idea, claims 1-6, 8-15 and 17-26 amount to significantly more than the abstract idea itself. As such, Applicant respectfully requests that the rejections of claims 1-6, 8-15 and 17-26 under 35 U.S.C. 101 be withdrawn.

In particular, claims 1-6, 8-15 and 17-26 describe a computer technology for performing a resource management operations in a distributed computer system, which at least includes specific techniques for placing clients in host computers in a cluster of host computers in the distributed computer system in accordance with a particular selected distribution of the clients in the host computer based on a dispersion score, where the clients are specified by a dispersion rule to be dispersed among the host computers in the cluster, which is not disclosed in any prior art, and thus is not well-understood, routine and conventional in the field, as explained below.

In addition, claims 1-6, 8-15 and 17-26 describe a computer technology for performing a resource management operations in a distributed computer system, which can be used to ensure that resource contentions between resource-consuming clients, such as virtual machines (VMs), are minimized. Thus, the technology for performing a resource management operations in a distributed computer system described in claims 1-6, 8-15 and 17-26 can improve resource management efficiency in a distributed computer system environment so as to improve the performance of the distributed computer system. Consequently, the specific techniques of claims 1-6, 8-15 and 17-26 can be used <u>to improve the performance of a computer system</u>. Thus, even if claims 1-6, 8-15 and 17-26 are directed to an abstract idea, claims 1-6, 8-15

10

B975

and 17-26, as a whole, amount to significantly more than the abstract idea itself. Accordingly, Applicant respectfully asserts that the rejections of claims 1-6, 8-15 and 17-26 under 35 U.S.C. § 101 should be withdrawn.

### B.  Claim Rejections Based on 35 U.S.C. § 112

Claims 1-18 were rejected under 35 U.S.C. §112(a) as allegedly failing to comply with the written description requirement with respect to the computation of the claimed "*dispersion score*."  In response, Applicant has amended the independent claims 1, 10 and 19 to further define the claimed "*dispersion score*," which ultimately limits how the dispersion score is computed.  Support for these claim amendments can be found at least in paragraph [0036] of the current application.  As such, Applicant respectfully requests that the rejections of claims 1-18 under 35 U.S.C. § 112(a) be withdrawn.

Claims 1-26 were rejected under 35 U.S.C. §112(b) as allegedly being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor regard as the invention with respect to the claimed "*dispersion rule*" and "*dispersion score*."  Support for these claim amendments can be found at least in paragraphs [0027] and [0036] of the current application.  Applicant has amended the independent claims 1, 10 and 19 to further define the claimed "*dispersion rule*" and "*dispersion score*."  As such, Applicant respectfully requests that the rejections of claims 1-26 under 35 U.S.C. § 112(b) be withdrawn.

Claim 7 was rejected under 35 U.S.C. §112(b) as allegedly being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor regard as the invention with respect to the claimed "*acceptable alternative*."  In response, Applicant has amended claim 7 (and claim 16 that recites similar subject matter) to replace the term "*acceptable alternative*" with "*predefined alternative*."  Support for these claim amendments can be found at least in paragraphs [0045] and [0046] of the current application.  As such, Applicant respectfully requests that the rejection of claim 7 under 35 U.S.C. § 112(b) be withdrawn.

Claim 19 was apparently rejected under 35 U.S.C. §112, second paragraph.  In addition, the Office action has apparently invoked 35 U.S.C. §112, sixth paragraph, for some of the elements recited in claim 19.  In response, Applicant has amended

11

claim 19 to recite "*memory*" and "*a processor*". As such, Applicant respectfully asserts that 35 U.S.C. §112, sixth paragraph, is not applicable to the amended claim 19, and requests that the rejection of claim 19 under 35 U.S.C. § 112, second paragraph, be withdrawn.

### C. Claim Rejections Based on 35 U.S.C. § 103(a)

Claims 1-6, 8-15 and 17-26 were rejected under 35 U.S.C. §103(a) as allegedly being unpatentable over Yuyitung in view of Bakman. However, as noted above, the independent claims 1, 10 and 19 have been amended. As amended, Applicant respectfully asserts that the independent claims 1, 10 and 19, as well as the dependent claims 2-9, 11-18 and 20-26, are patentable over Yuyitung in view of Bakman, as explained below. In view of the claim amendments and the following remarks, Applicant respectfully requests that claims 1-26 be allowed.

### 1. Patentability of Amended Independent Claims 1, 10 and 19

The independent claims 1, 10 and 19 were rejected under 35 U.S.C. §103(a) as allegedly being unpatentable over Yuyitung in view of Bakman. These claims recite similar limitations, and have been similarly amended. Thus, the amended independent claim 1 will be used as a representative claim to show that the amended independent claims 1, 10 and 19 are not obvious over Yuyitung in view of Bakman.

As amended, the independent claim 1 recites:

*"A method for performing resource management operations in a distributed computer system, the method comprising:*

*creating a dispersion rule for a group of clients, the dispersion rule specifying the group of clients to be dispersed among host computers in a cluster of host computers in the distributed computer system;*

*computing a dispersion score for the dispersion rule for at least one candidate distribution of the clients in the cluster of host computers in the distributed computer system, the dispersion score representing how dispersed the clients will be for the at least one candidate distribution of the clients;*

*selecting a particular candidate distribution of the clients in the cluster of host computers based at least partly on the dispersion score of the particular candidate distribution; and*

*placing at least one of the clients in one of the host computers in the cluster in accordance with the particular possible distribution of the clients in the host computers."*

B975

Applicant respectfully asserts that neither Yuyitung nor Bakman teaches at least the claimed elements of (1) *"creating a dispersion rule for a group of clients, the dispersion rule specifying the group of clients to be dispersed among host computers in a cluster of host computers in the distributed computer system"* and (2) *"computing a dispersion score for the dispersion rule for at least one candidate distribution of the clients in the cluster of host computers in the distributed computer system, the dispersion score representing how dispersed the clients will be for the at least one candidate distribution of the clients."* Therefore, even if the teachings of Yuyitung and Bakman are combined, the resulting combination fails to teach all the material elements of the amended independent claim 1. Thus, the amended independent claim 1 is not obvious over Yuyitung in view of Bakman.

### a. Neither Yuyitung nor Bakman teaches the amended *"creating"* element

The Office action on page 7 alleges that Yuyitung in paragraphs [0086]-[0090] and [0113]-[0117] teaches the *"creating"* element of the original claim 1. Regardless of whether Yuyitung teaches the *"creating"* element of the original claim 1, Yuyitung fails to teach the element of *"creating a dispersion rule for a group of clients, the dispersion rule specifying the group of clients to be dispersed among host computers in a cluster of host computers in the distributed computer system,"* as recited in the amended independent claim 1.

The Office action on page 7 states Yuyitung in paragraphs [0086]-[0090] teaches that "system evaluates clients and determines how to map them to targets." These paragraphs of Yuyitung describe consolidation of applications and/or data from source systems to target systems. However, these paragraphs of Yuyitung fail to teach creating a rule for a group of applications that specify that the applications in the group are to be dispersed among different systems. In fact, the consolidation of applications described in Yuyitung is the opposite of dispersion of clients being recited in the *"creating"* element of the amended claim 1. Although consolidation described in Yuyitung may involve mapping between source and target system, such mapping does not involve dispersing applications among target systems. Thus, these paragraphs of Yuyitung fail to teach the claimed element of *"creating a dispersion rule for a group of clients, the dispersion rule specifying the group of clients to be*

B975

*dispersed among host computers in a cluster of host computers in the distributed computer system,*" as recited in the amended independent claim 1.

The Office action on page 7 further states Yuyitung in paragraphs [0113]-[0117] teaches that "system evaluates exemplary rule sets to determine compatibility scores." These paragraphs of Yuyitung do describe rule sets to determine compatibility between source and target systems. However, the rule sets described in Yuyitung does not include a rule for a group of applications that specify that the applications in the group are to be dispersed among different systems. In fact, there is no mention of any concept of dispersion in the entire disclosure of Yuyitung. Thus, these paragraphs of Yuyitung also fail to teach the claimed element of "*creating a dispersion rule for a group of clients, the dispersion rule specifying the group of clients to be dispersed among host computers in a cluster of host computers in the distributed computer system,*" as recited in the amended independent claim 1.

The cited reference of Bakman also fails to teach the "*creating*" element of the amended claim 1. In fact, there is no mention or discussion regarding dispersion of clients in the entire disclosure of Bakman.

Since neither Yuyitung nor Bakman teaches the claimed "*creating*" element, even if the teachings of Yuyitung and Bakman are combined, the resulting combination fails to teach the "*creating*" element of the amended independent claim 1. Thus, the amended independent claim 1 is not obvious over Yuyitung in view of Bakman.

### b.   Neither Yuyitung nor Bakman teaches the amended "*computing*" element

The Office action on page 7 alleges that Yuyitung in paragraphs [0093], [0101] and [0139] teaches the "*computing*" element of the original claim 1. Regardless of whether Yuyitung teaches the "*computing*" element of the original claim 1, Yuyitung fails to teach the element of "*computing a dispersion score for the dispersion rule for at least one candidate distribution of the clients in the cluster of host computers in the distributed computer system, the dispersion score representing how dispersed the clients will be for the at least one candidate distribution of the clients,*" as recited in the amended independent claim 1.

The Office action on page 7 states Yuyitung in paragraphs [0093] and [0139] teaches that "system determines a compatibility score of devices." These paragraphs

14

of Yuyitung do describe compatibility scores of systems, including workload compatibility scores that "quantify the compatibility of consolidating one or more source systems onto a target system," as stated in paragraph [0139]. However, none of these scores represent how dispersed applications will be for a distribution. Thus, these paragraphs of Yuyitung fail to teach the claimed element of "*computing a dispersion score for the dispersion rule for at least one candidate distribution of the clients in the cluster of host computers in the distributed computer system, the dispersion score representing how dispersed the clients will be for the at least one candidate distribution of the clients,*" as recited in the amended independent claim 1.

The Office action on page 7 further states Yuyitung in paragraph [0101] teaches that "system searches for best consolidation that fulfills the rules." Again, these rules described in Yuyitung do not include a rule that represents how dispersed applications will be for a distribution. In fact, this paragraph highlights the fact that the disclosure of Yuyitung is directed to consolidation, not dispersion. Thus, this paragraph of Yuyitung also fails to teach the claimed element of "*computing a dispersion score for the dispersion rule for at least one candidate distribution of the clients in the cluster of host computers in the distributed computer system, the dispersion score representing how dispersed the clients will be for the at least one candidate distribution of the clients,*" as recited in the amended independent claim 1.

The cited reference of Bakman also fails to teach the "*computing*" element of the amended claim 1. As noted above, there is no mention or discussion regarding dispersion of clients in the entire disclosure of Bakman. Thus, there is no mention or discussion regarding any dispersion scores.

### c.  Conclusion

As explained above, neither Yuyitung nor Bakman teaches at least the claimed elements of (1) "*creating a dispersion rule for a group of clients, the dispersion rule specifying the group of clients to be dispersed among host computers in a cluster of host computers in the distributed computer system*" and (2) "*computing a dispersion score for the dispersion rule for at least one candidate distribution of the clients in the cluster of host computers in the distributed computer system, the dispersion score representing how dispersed the clients will be for the at least one candidate distribution of the clients,*" as recited in the amended independent claim 1. Consequently, even if the teachings of Yuyitung and Bakman are combined, the

B975

resulting combination fails to teach all the material elements of the amended independent claim 1.  Thus, the amended independent claim 1 is not obvious over Yuyitung in view of Bakman.  As such, Applicant respectfully requests that the amended independent claim 1 be allowed.

As noted above, the amended independent claims 10 and 19 recite elements similar to the amended independent claim 1.  Consequently, the above remarks with respect to the amended independent claim 1 are also applicable to the amended independent claims 10 and 19.  Thus, the amended independent claims 10 and 19 are also not obvious over Yuyitung in view of Bakman.  As such, Applicant respectfully requests that the amended independent claims 10 and 19 be allowed as well.

## 2.   Patentability of Dependent Claims 2-9, 11-18 and 20-26

The dependent claims 2-6, 8, 9, 11-15, 17, 18, 20-26 were rejected under 35 U.S.C. §103 as allegedly being unpatentable over Yuyitung in view of Bakman. Since each of the dependent claims 2-6, 8, 9, 11-15, 17, 18, 20-26 depends on one of the amended independent claims 1, 10 and 19, these dependent claims include all the features of their respective base claims.  Therefore, Applicant submits that these dependent claims, including claims 7 and 16, are allowable for at least the same reasons as the amended independent claims 1, 10 and 19, and may be allowable for additional reasons.

Generally, in this Amendment, Applicant has not raised all possible grounds for (a) traversing the rejections of the Office action or (b) patentably distinguishing any new or currently amended claims (i.e., over the cited references or otherwise). Applicant however, reserves the right to explicate and expand on any ground already raised and/or to raise other grounds for traversing and/or for distinguishing, including, without limitation, by explaining and/or distinguishing the subject matter of the Application and/or any cited reference at a later time (e.g., in the event that this Application does not proceed to issue with the current pending claims, or in the context of a continuing application).  Applicant submits that nothing herein is, or should be deemed to be, a disclaimer of any rights, acquiescence in any rejection, or a waiver of any arguments that might have been raised but were not raised herein, or otherwise in the prosecution of this Application, whether as to the original claims or as to any of the new or amended claims, or otherwise.

16

B975

Applicant respectfully requests reconsideration of the claims in view of the amendments and remarks made herein.  A notice of allowance is earnestly solicited. If considered beneficial, the Examiner is invited to call Thomas Ham at (925) 249-1300.

Respectfully submitted on behalf of:

VMware, Inc.

Date: January 30, 2017

By: /thomas h. ham/
Thomas H. Ham
Registration No. 43,654
Telephone: (925) 249-1300

17

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

---

**SRI INTERNATIONAL, INC.,**
*Plaintiff-Appellee*

**v.**

**CISCO SYSTEMS, INC.,**
*Defendant-Appellant*

---

2017-2223

---

Appeal from the United States District Court for the District of Delaware in No. 1:13-cv-01534-SLR-SRF, Judge Sue L. Robinson.

---

OPINION ISSUED: March 20, 2019
OPINION MODIFIED: July 12, 2019*

---

FRANK SCHERKENBACH, Fish & Richardson, PC, Boston, MA, argued for plaintiff-appellee.  Also represented by PROSHANTO MUKHERJI; DAVID MICHAEL HOFFMAN, Austin, TX; HOWARD G. POLLACK, Redwood City, CA; FRANCIS J. ALBERT, JOHN WINSTON THORNBURGH, San Diego, CA.

---

\*   This opinion has been modified and reissued following a petition for rehearing filed by Defendant-Appellant.

WILLIAM F. LEE, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, argued for defendant-appellant. Also represented by ANDREW J. DANFORD, LAUREN B. FLETCHER, LOUIS W. TOMPROS.

———————————

Before LOURIE, O'MALLEY, and STOLL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* STOLL.

Dissenting opinion filed by *Circuit Judge* LOURIE.

STOLL, *Circuit Judge*.

This is an appeal from a final judgment in a patent case. Cisco Systems, Inc. ("Cisco") appeals the district court's (1) denial of Cisco's motion for summary judgment of patent ineligibility under § 101, (2) construction of the claim term "network traffic data," (3) grant of summary judgment of no anticipation, and (4) denial of judgment as a matter of law of no willful infringement. Cisco also appeals the district court's grant of enhanced damages, attorneys' fees, and ongoing royalties.

We affirm the district court's denial of summary judgment of ineligibility, adopt its construction of "network traffic data," and affirm its summary judgment of no anticipation. We vacate and remand the district court's denial of judgment as a matter of law of no willful infringement, and therefore vacate and remand the district court's enhancement of damages and award of attorneys' fees. Finally, we affirm the district court's award of ongoing royalties on post-verdict sales of products that were actually found to infringe or are not colorably different. Accordingly, we affirm-in-part, vacate-in-part, and remand for further proceedings consistent with this opinion.

BACKGROUND

I

While the interconnectivity of computer networks facilitates access for authorized users, it also increases a network's susceptibility to attacks from hackers, malware, and other security threats.  Some of these security threats can only be detected with information from multiple sources.  For instance, a hacker may try logging in to several computers or monitors in a network.  The number of login attempts for each computer may be below the threshold to trigger an alert, making it difficult to detect such an attack by looking at only a single monitor location in the network.  In an attempt to solve this problem, SRI developed the inventions claimed in U.S. Patent Nos. 6,484,203 and 6,711,615.  The '615 patent (titled "Network Surveillance") is a continuation of the '203 patent (titled "Hierarchical Event Monitoring and Analysis").

II

SRI had performed considerable research and development on network intrusion detection prior to filing the patents-in-suit.  In fact, SRI's Event Monitoring Enabling Responses to Anomalous Live Disturbances ("EMERALD") project had attracted considerable attention in this field.  The Department of Defense's Defense Advanced Research Projects Agency, which helped fund EMERALD, called it a "gem in the world of cyber defense" and "a quantum leap improvement over" previous technology.   J.A. 1272–73 at 272:16–17, 273:7–9.  In October 1997, SRI presented a paper entitled "EMERALD: Event Monitoring Enabling Responses to Anomalous Live Disturbances" ("EMERALD 1997") at the 20th National Information Systems Security Conference.

EMERALD 1997 is a conceptual overview of the EMERALD system.  It describes in detail SRI's early research in intrusion detection technology and outlines the

development of next generation technology for detecting network anomalies. *SRI Int'l Inc. v. Internet Sec. Sys., Inc.*, 647 F. Supp. 2d 323, 334 (D. Del. 2009). The parties do not dispute that EMERALD 1997 constitutes prior art under 35 U.S.C. § 102(b). EMERALD 1997 is listed as a reference on the face of the '615 patent.

### III

The patents share a nearly identical specification and a priority date of November 9, 1998. At the summary judgment stage, SRI asserted claims 1–4, 14–16, and 18 of the '615 patent and claims 1–4, 12–15, and 17 of the '203 patent. By the time of trial, SRI had narrowed the asserted claims to claims 1, 2, 12, and 13 of the '203 patent and claims 1, 2, 13, and 14 of the '615 patent. The jury considered only this narrower set of claims.

The parties identify different representative claims. Cisco proposes claim 1 of the '203 patent, while SRI proposes claim 1 of the '615 patent. The claims are substantially similar, as the minor differences between them are not material to any issue on appeal. As such, we adopt SRI's proposal and use '615 patent claim 1 as the representative claim.[1] It reads:

> 1. A computer-automated method of hierarchical event monitoring and analysis within an enterprise network comprising:

---

[1] The minor differences between the two claims are in the *detecting* clause—claim 1 of the '615 patent allows for network traffic data selected from "*one or more of*" the enumerated categories, and includes two extra categories in its list: "network connection acknowledgements" and "network packets indicative of well-known network-service protocols." *Compare* '203 patent col. 14 ll. 19–35 (claim 1), *with* '615 patent col. 15 ll. 2–21 (claim 1).

> deploying a plurality of network monitors in the enterprise network;
>
> detecting, by the network monitors, suspicious network activity based on analysis of network traffic data selected from one or more of the following categories: {network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection requests, network connection denials, error codes included in a network packet, network connection acknowledgements, and network packets indicative of well-known network-service protocols};
>
> generating, by the monitors, reports of said suspicious activity; and
>
> automatically receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors.

'615 patent col. 15 ll. 2–21.

After SRI sued Cisco for infringement of the '615 patent and the '203 patent, Cisco unsuccessfully moved for summary judgment on several issues, including that the claims are ineligible and that the EMERALD 1997 reference anticipates the claims.[2] *SRI Int'l, Inc. v. Cisco Sys.,*

---

[2]   The patents previously survived multiple anticipation challenges based on the EMERALD 1997 reference. The Patent Office considered EMERALD 1997 during the original prosecution and issued the patents over it. J.A. 32734 ¶ 47; J.A. 32814–15 ¶ 207. In addition, during the two reexaminations, the Patent Office again considered the validity of the asserted claims over EMERALD 1997 and again found the claims valid. J.A. 32734 ¶ 47. Additionally, in *SRI International Inc. v. Internet Security*

6                              SRI INT'L, INC. v. CISCO SYS., INC.

*Inc.*, 179 F. Supp. 3d 339 (D. Del. Apr. 11, 2016) ("*Summary Judgment Op.*"). The district court denied Cisco's motions and instead sua sponte granted summary judgment of no anticipation in SRI's favor.[3]  *Id.* at 369.

The court then held a jury trial on infringement, validity, and willful infringement of claims 1, 2, 13, and 14 of the '615 patent and claims 1, 2, 12, and 13 of the '203 patent, as well as damages. The jury found that Cisco intrusion protection system ("IPS") products, Cisco remote management services, Cisco IPS services, Sourcefire[4] IPS products, and Sourcefire professional services directly and indirectly infringed the asserted claims. The jury awarded SRI a 3.5% reasonable royalty for a total of $23,660,000 in compensatory damages. The jury also found by clear and convincing evidence that Cisco's infringement was willful.

After post-trial briefing, the district court denied Cisco's renewed motion for JMOL of no willfulness. *SRI*

––––––––––––––––––

*Systems, Inc.*, a jury found the patents not anticipated by EMERALD 1997. 647 F. Supp. 2d at 350. The district court denied JMOL, concluding that the verdict was supported by expert testimony that EMERALD 1997 failed to disclose the claim limitation at issue. *Id.* We affirmed without opinion. *SRI Int'l Inc. v. Internet Sec. Sys., Inc.*, 401 F. App'x 530 (Fed. Cir. 2010).

[3]  The parties disputed only whether EMERALD 1997 discloses detection of any of the network traffic data categories listed in claim 1 of the '203 and '615 patents and whether EMERALD 1997 is enabled. One of the claimed categories of network traffic is "network connection requests," which Cisco asserts is disclosed by EMERALD 1997.

[4]  "Sourcefire" is a network security company that Cisco acquired in 2013. J.A. 2467–68. Cisco now markets network security products and services under the Sourcefire name.

*Int'l, Inc. v. Cisco Sys., Inc.*, 254 F. Supp. 3d 680, 717 (D. Del. 2017) ("*Post-Trial Motions Op.*").  Based on the willfulness verdict, the district court determined that "some enhancement is appropriate given Cisco's litigation conduct," the "fact that Cisco lost on all issues during summary judgment," and "its apparent disdain for SRI and its business model."  *Id.* at 723.  The court then doubled the damages award.  It also granted SRI's motion for attorneys' fees, compulsory license, and prejudgment interest.

Cisco appeals the district court's claim construction and denial of summary judgment of ineligibility,[5] as well as its grant of summary judgment of no anticipation, enhanced damages, attorneys' fees, and ongoing royalties. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

I

We review de novo whether a claim is drawn to patent-eligible subject matter.  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) (citing *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017)).  Section 101 defines patent-eligible

---

[5]    We may review this denial of summary judgment because "a denial of a motion for summary judgment may be appealed, even after a final judgment at trial, if the motion involved a purely legal question and the factual disputes resolved at trial do not affect the resolution of that legal question."  *United Techs. Corp. v. Chromalloy Gas Turbine Corp.*, 189 F.3d 1338, 1344 (Fed. Cir. 1999) (citing *Wolfgang v. Mid-Am. Motorsports, Inc.*, 111 F.3d 1515, 1521 (10th Cir. 1997); *Rekhi v. Wildwood Indus., Inc.*, 61 F.3d 1313, 1318 (7th Cir. 1995)).  Neither party contends that fact issues arise in the patent-eligibility analysis in this case.  Therefore, we may review the purely legal question of patent eligibility.

subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. Laws of nature, natural phenomena, and abstract ideas, however, are not patentable. *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70–71 (2012) (citing *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)).

To determine whether a patent claims ineligible subject matter, the Supreme Court has established a two-step framework. First, we must determine whether the claims at issue are directed to a patent-ineligible concept such as an abstract idea. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). Second, if the claims are directed to an abstract idea, we must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 566 U.S. at 79). To transform an abstract idea into a patent-eligible application, the claims must do "more than simply stat[e] the abstract idea while adding the words 'apply it.'" *Id.* at 221 (quoting *Mayo*, 566 U.S. at 72 (internal alterations omitted)).

We resolve the eligibility issue at *Alice* step one and conclude that claim 1 is not directed to an abstract idea. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016). The district court concluded that the claims are more complex than merely reciting the performance of a known business practice on the Internet and are better understood as being necessarily rooted in computer technology in order to solve a specific problem in the realm of computer networks. *Summary Judgment Op.*, 179 F. Supp. 3d at 353–54 (citing '203 patent col. 1 ll. 37–40; *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014)). We agree. The claims are directed to using a specific technique—using a plurality of network monitors that each analyze specific types of data on the network and integrating reports from the monitors—to

solve a technological problem arising in computer net-
works: identifying hackers or potential intruders into the
network.

Contrary to Cisco's assertion, the claims are not di-
rected to just analyzing data from multiple sources to de-
tect suspicious activity. Instead, the claims are directed to
an improvement in computer network technology. Indeed,
representative claim 1 recites using network monitors to
detect suspicious network activity based on analysis of net-
work traffic data, generating reports of that suspicious ac-
tivity, and integrating those reports using hierarchical
monitors. '615 patent col. 15 ll. 2–21. The "focus of the
claims is on the specific asserted improvement in computer
capabilities"—that is, providing a network defense system
that monitors network traffic in real-time to automatically
detect large-scale attacks. *Enfish*, 822 F.3d at 1335–36.

The specification bolsters our conclusion that the
claims are directed to a technological solution to a techno-
logical problem. The specification explains that, while
computer networks "offer users ease and efficiency in ex-
changing information," '615 patent col. 1 ll. 28–29, "the
very interoperability and sophisticated integration of tech-
nology that make networks such valuable assets also make
them vulnerable to attack, and make dependence on net-
works a potential liability." *Id.* at col. 1 ll. 36–39. The
specification further teaches that, in conventional net-
works, seemingly localized triggering events can have glob-
ally disastrous effects on widely distributed systems—like
the 1980 ARPAnet collapse and the 1990 AT&T collapse.
*See id.* at col. 1 ll. 43–47. The specification explains that
the claimed invention is directed to solving these weak-
nesses in conventional networks and provides "a frame-
work for the recognition of more global threats to
interdomain connectivity, including coordinated attempts
to infiltrate or destroy connectivity across an entire net-
work enterprise." *Id.* at col. 3 ll. 44–48.

Cisco argues that the claims are directed to an abstract idea for three primary reasons. First, Cisco argues that the claims are analogous to those in *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), and are simply directed to generic steps required to collect and analyze data. We disagree. The *Electric Power* claims were drawn to using computers as tools to solve a power grid problem, rather than improving the functionality of computers and computer networks themselves. *Id.* at 1354. We conclude that the claims are more like the patent-eligible claims in *DDR Holdings*. In *DDR*, we emphasized that the claims were directed to more than an abstract idea that merely required a "computer network operating in its normal, expected manner." 773 F.3d at 1258. Here, the claims actually prevent the normal, expected operation of a conventional computer network. Like the claims in *DDR*, the claimed technology "overrides the routine and conventional sequence of events" by detecting suspicious network activity, generating reports of suspicious activity, and receiving and integrating the reports using one or more hierarchical monitors. *Id.*

Second, Cisco argues that the invention does not involve "an improvement to computer functionality itself." *Enfish*, 822 F.3d at 1336. In *Alice*, the Supreme Court advised that claims directed to independently abstract ideas that use computers as tools are still abstract. 573 U.S. at 222–23. However, the claims here are not directed to using a computer as a tool—that is, automating a conventional idea on a computer. Rather, the representative claim improves the technical functioning of the computer and computer networks by reciting a specific technique for improving computer network security.

Cisco also submits that the asserted claims are so general that they encompass steps that people can "go through in their minds," allegedly confirming that they are directed to an abstract concept. Appellant Br. 27–28 (citing *Capital One*, 850 F.3d at 1340; *Intellectual Ventures I LLC v.*

*Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011)). We disagree. This is not the type of human activity that § 101 is meant to exclude. Indeed, we tend to agree with SRI that the human mind is not equipped to detect suspicious activity by using network monitors and analyzing network packets as recited by the claims.

Because we conclude that the claims are not directed to an abstract idea under step one of the *Alice* analysis, we need not reach step two. *See Enfish*, 822 F.3d at 1339. Accordingly, we affirm the district court's summary judgment that the claims are patent-eligible.

## II

A district court's claim construction based solely on intrinsic evidence is a legal question that we review de novo. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). Claim construction seeks to ascribe the "ordinary and customary meaning" to claim terms as a person of ordinary skill in the art would have understood them at the time of invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. In addition, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

The district court construed "[n]etwork traffic data" to mean "data obtained from direct examination of network packets." *SRI Int'l, Inc. v. Dell Inc.*, No. CV13-1534-SLR, 2015 WL 2265756, at *1–2 (D. Del. May 14, 2015). After reviewing the parties' pleadings on summary judgment, the district court determined that its construction would

benefit from clarification.  The district court explained that "[t]o say that the data 'is obtained from direct examination of network packets' means to differentiate the original source of the data, not how or where the data is analyzed. . . .  The fact that the data may be stored before analysis is performed on the data does not detract from its lineage." *Summary Judgment Op.*, 179 F. Supp. 3d at 363. The district court explicitly rejected the opinion of Cisco's expert, Dr. Clark, that the court's claim construction should require that the analysis of data obtained from network packets take place without any further manipulation whatsoever.  *Id.*

On appeal, Cisco offers a more nuanced construction, asserting that term should instead be construed as "detecting suspicious network activity based on 'direct examination of network packets,' where such 'direct examination' does not include merely examining data that has been obtained, generated, or gleaned from network packets."  Appellant Br. 42.  According to Cisco, based on SRI's express prosecution disclaimer during reexamination, the claims require detecting suspicious activity based on "direct examination" of network packets, not data "generated" or "gleaned" from packets.  Cisco would thus construe the term to exclude a process that decodes the network packet.

We conclude that Cisco's proposed construction goes too far in limiting the amount of preprocessing encompassed by the claim.  The specification shows that preprocessing is a contemplated and expected part of the claimed invention.  Indeed, the specification specifically mentions different forms of preprocessing network packets prior to examination, including decryption ('615 patent col. 3 ll. 61–63), parsing (*id.* at col. 8 ll. 10–12), and decoding (*id.* at col. 8 ll. 7–9).

Cisco's argument that SRI disclaimed preprocessing during reexamination of its patents is also not persuasive.  To invoke argument-based estoppel, "the prosecution

history must evince a 'clear and unmistakable surrender'" of this kind of preprocessing. *Deering Precision Instruments v. Vector Distrib. Sys.*, 347 F.3d 1314, 1326 (Fed. Cir. 2003) (quoting *Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1316 (Fed. Cir. 2002)); *see also Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1267 (Fed. Cir. 2012) (applying prosecution history disclaimer from reexamination proceedings). Here, SRI's statements during reexamination reflect that SRI drew the line between what does and does not comprise "direct examination" by excluding information derived from network packet data (for example, network traffic measures and network traffic statistics). At the same time, SRI explained that "direct examination" includes the data from which the network traffic measures and network traffic statistics are derived (that is, the data in the network packets). For example, SRI explained that the specification:

> [D]emonstrates that the term "network traffic data" requires information obtained by direct packet examination by using the distinctly different terms "network traffic measures" and "network traffic statistics" when discussing information <u>derived</u> from network traffic observation, as compared to the data from which the measures and statistics are derived.

Brief for the Patentee on Appeal at 7, *In re Porras*, Reexam No. 90/008,125 (B.P.A.I. Jan. 14, 2010) (citing '203 patent col. 4 ll. 55–60 (discussing "network traffic statistics") and col. 5 ll. 28–30 (discussing "network traffic measures")).

We read SRI's statements during reexamination as simply explaining that "network traffic statistics," such as number of packets and number of kilobytes transferred, are statistics *derived* from the network packet data—not the underlying data itself. SRI did not argue that the actual data underlying the measures and statistics—the data in the network packets—could not be subject to direct

examination. Nor did SRI take the position that "direct examination" must take place before any or all processing. SRI did not mention processing at all during reexamination. Moreover, as the specification makes clear, the system may need to decrypt, parse, or decode the data packets—all forms of preprocessing—in order to directly examine the network packet data underlying the network traffic statistics.

We hold that SRI's statements in the prosecution history do not invoke a clear and unmistakable surrender of all preprocessing, including decryption, decoding, and parsing. Accordingly, we agree with the district court's construction of "network traffic data" to mean "data obtained from direct examination of network packets."

### III

We also hold that the district court did not err in granting summary judgment that the asserted claims are not anticipated by SRI's own EMERALD 1997 reference. We review the district court's summary judgment of no anticipation under regional circuit law. *See MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc.*, 816 F.3d 1374, 1376 (Fed. Cir. 2016). The Third Circuit reviews a grant of summary judgment de novo, applying the same standard as the district court. *See Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 257 (3d Cir. 2012). Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Anticipation requires that a single prior art reference disclose each and every limitation of the claimed invention, either expressly or inherently. *See Verdegaal Bros. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987).

EMERALD 1997 discloses a tool for tracking malicious activity across large networks. The question before us is

whether the district court erred in concluding on summary judgment that EMERALD 1997 does not disclose detection of any of the network traffic data categories listed in claim 1 of the '203 and '615 patents. The Patent Office considered EMERALD 1997 during the original examination of the '615 patent, and the patentability of the claims over the reference was confirmed in multiple reexamination and litigation proceedings. Indeed, during reexamination, the Patent Office accepted SRI's argument that the claim limitation requires detecting suspicious activity based on "direct examination" of network packets to distinguish EMERALD 1997. J.A. 26402 ("[T]he closest prior art of record, Emerald 1997, fails to teach direct examination of packet data."); J.A. 27101 (same).

EMERALD 1997 describes detecting a DNS/NFS attack in "real-time." J.A. 5004. To achieve this, EMERALD 1997 explains:

> The subscription list field is an important facility for gaining visibility into malicious or anomalous activity outside the immediate environment of an EMERALD monitor. The most obvious examples where relationships are important involve interdependencies among network services that make local policy decisions. Consider, for example, the interdependencies between access checks performed during network file system ["NFS"] mounting and the IP mapping of the DNS service. An unexpected mount monitored by the network file system service may be responded to differently if the DNS monitor informs the network file system monitor of suspicious updates to the mount requester's DNS mapping.

J.A. 5008. EMERALD 1997 further explains that:

> Above the service layer, signature engines scan the aggregate of intrusion reports from service monitors in an attempt to detect more global

> coordinated attack scenarios or scenarios that ex-
> ploit interdependencies among network services.
> The DNS/NFS attack discussed [above] is one such
> example of an aggregate attack scenario.

J.A. 5010.

Cisco's expert submitted a report concluding that a per-
son of ordinary skill in the art would understand from this
disclosure that "monitoring specific network services, such
as HTTP, FTP, network file systems, finger, Kerberos, and
SNMP would *require* detecting and analyzing packets in-
dicative of those well-known network service protocols, one
of the enumerated categories in claim 1 of the '615 patent."
J.A. 30347 (emphasis added). During deposition, however,
Cisco's expert retreated from this position, admitting that
a person of ordinary skill reading EMERALD 1997 would
have understood that it was not necessary to directly ex-
amine the packets, although that would be "one very good
way" to prevent attacks. J.A. 50040 at 159:12–21.

On this record, we conclude that summary judgment
was appropriate. EMERALD 1997 does not expressly dis-
close directly examining network packets as required by
the claims—especially not to obtain data about network
connection requests. Nor does Cisco's expert testimony cre-
ate a genuine issue of fact on this issue. Rather, we agree
with the district court that Cisco's expert's testimony is
both inconsistent and "based on [] multiple layers of suppo-
sition." *Summary Judgment Op.*, 179 F. Supp. 3d at 358.
Because the evidence does not support express or inherent
disclosure of direct examination of packet data, we con-
clude that the district court did not err in holding that
there was no genuine issue of fact regarding whether
EMERALD 1997 disclosed analyzing the specific enumer-
ated types of network traffic data recited in the claims.

Cisco next argues that the district court erred by grant-
ing summary judgment for SRI sua sponte despite SRI's
failure to move for such relief. We disagree. Under Third

Circuit law, a district court may properly enter summary judgment sua sponte "so long as the losing party was on notice that she had to come forward with all of her evidence." *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 222 (3d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)). By filing its own motion for summary judgment, Cisco was on notice that anticipation was before the court, and Cisco had the opportunity to put forth its best evidence. Additionally, SRI did argue, in opposition to Cisco's summary judgment motion, that the district court should outright reject Cisco's assertion of invalidity. J.A. 31650 ("Cisco's assertion of invalidity should be rejected . . . ."). Indeed, SRI expressly took the position that EMERALD 1997 "does not anticipate any claim of the '203 or '615 patents." J.A. 31678. Thus, any notice requirement was satisfied because Cisco itself indicated that the issue was ripe for summary adjudication and SRI took the position that the claims were not anticipated. Accordingly, we see no error in the sua sponte nature of the district court's order and we affirm the summary judgment of no anticipation.

IV

Cisco also appeals the district court's denial of JMOL that it did not willfully infringe the asserted patents because the jury's willfulness finding is not supported by substantial evidence. We agree that the jury's finding that Cisco willfully infringed the patents-in-suit prior to receiving notice thereof is not supported by substantial evidence and therefore vacate and remand.

We review decisions on motions for JMOL under the law of the regional circuit. *Energy Transp. Grp. Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1350 (Fed. Cir. 2012). The Third Circuit reviews district court decisions on such motions de novo. *Acumed LLC v. Adv. Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009) (citing *Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006)).

In the Third Circuit, a "court may grant a judgment as a matter of law contrary to the verdict only if 'the record is critically deficient of the minimum quantum of evidence' to sustain the verdict." *Id.* (citing *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995)). The court should grant JMOL "sparingly" and "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (quoting *Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 545 n.8 (3d Cir. 2007)).

As the Supreme Court stated in *Halo*, "[t]he sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). While district courts have discretion in deciding whether or not behavior rises to that standard, such findings "are generally reserved for egregious cases of culpable behavior." *Id.* Indeed, as Justice Breyer emphasized in his concurrence, it is the *circumstances* that transform simple "intentional or knowing" infringement into egregious, sanctionable behavior, and that makes all the difference. *Id.* at 1936 (Breyer, J., concurring). A patentee need only show by a preponderance of the evidence the facts that support a finding of willful infringement. *Id.* at 1934.

In denying Cisco's motion for JMOL on willfulness, the district court concluded that the jury's willfulness determination was supported by two evidentiary bases. First, the court identified evidence that "key Cisco employees did not read the patents-in-suit until their depositions." *Post-Trial Motions Op.*, 254 F. Supp. 3d at 717. Second, the court identified evidence that Cisco designed the products and services in an infringing manner and that Cisco instructed

its customers to use the products and services in an infringing manner. Based on these two facts, the district court denied Cisco's renewed motion for JMOL on willfulness, stating that "[v]iewing the record in the light most favorable to SRI, substantial evidence supports the jury's subjective willfulness verdict." *Id.*

On appeal, SRI identifies additional evidence that purportedly supports the jury's willfulness verdict. Specifically, SRI presented evidence that Cisco expressed interest in the patented technology and met with SRI's inventor in 2000 before developing its infringing products. J.A. 1484–86; J.A. 5027. Additionally, SRI submitted evidence that Cisco received a notice letter from SRI's licensing consultant on May 8, 2012, informing Cisco of the asserted patents (a year before SRI filed the complaint). Finally, like the district court, SRI makes much of the fact that "key engineers" did not look at SRI's patents until SRI took their depositions during this litigation. In particular, Cisco engineers Martin Roesch and James Kasper did not look at the patent until their depositions in 2015.

Even accepting this evidence as true and weighing all inferences in SRI's favor, we conclude that the record is insufficient to establish that Cisco's conduct rose to the level of wanton, malicious, and bad-faith behavior required for willful infringement. First, it is undisputed that the Cisco employees who did not read the patents-in-suit until their depositions were engineers without legal training. Given Cisco's size and resources, it was unremarkable that the engineers—as opposed to Cisco's in-house or outside counsel—did not analyze the patents-in-suit themselves. The other rationale offered by the district court—that Cisco designed the products and services in an infringing manner and that Cisco instructed its customers to use the products and services in an infringing manner—is nothing more than proof that Cisco directly infringed and induced others to infringe the patents-in-suit.

It is undisputed that Cisco did not know of SRI's patent until May 8, 2012, when SRI sent its notice letter to Cisco. Oral Arg. at 23:46, *available at* http://oralarguments.cafc. uscourts.gov/default.aspx?fl=2017-2223.mp3.  It is also undisputed that this notice letter was sent years after Cisco independently developed the accused systems and first sold them in 2005 (Cisco) and 2007 (Sourcefire).  As SRI admits, the patents had not issued when the parties met in May 2000.  Indeed, the patent application for the parent '203 patent was not even filed until several months after the parties met.  Thus, Cisco could not have been aware of the patent application.

While the jury heard evidence that Cisco was aware of the patents in May 2012, before filing of the lawsuit, we do not see how the record supports a willfulness finding going back to 2000.  As the Supreme Court recently observed, "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct." *Halo*, 136 S. Ct. at 1933.  Similarly, Cisco's allegedly aggressive litigation tactics cannot support a finding of willful infringement going back to 2000, especially when the litigation did not start until 2012.  Finally, Cisco's decision not to seek an advice-of-counsel defense is legally irrelevant under 35 U.S.C. § 298.

Viewing the record in the light most favorable to SRI, the jury's verdict of willful infringement before May 8, 2012 is not supported by substantial evidence.  Given the general verdict form, we presume the jury also found that Cisco willfully infringed after May 8, 2012.  When reviewing a denial of JMOL, "where there is a black box jury verdict, as is the case here, we presume the jury resolved underlying factual disputes in favor of the verdict winner and leave those presumed findings undisturbed if supported by substantial evidence." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1358 (Fed. Cir. 2017), (citing *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1326 (Fed. Cir. 2016)), *cert. denied*, 139 S. Ct. 143

(2018).  We leave it to the district court to decide in the first instance whether the jury's presumed finding of willful infringement after May 8, 2012 is supported by substantial evidence.[6]  In so doing, the court should bear in mind the standard for willful infringement, as well as the above analysis regarding SRI's evidence of willfulness.  Accordingly, we vacate and remand the district court's denial of Cisco's renewed motion for JMOL of no willful infringement.

Cisco also argues that the district court abused its discretion by doubling damages.  Enhanced damages under § 284 are predicated on a finding of willful infringement.  Because we conclude that the jury's finding of willfulness before 2012 was not supported by substantial evidence, we do not reach the propriety of the district court's award of enhanced damages.  Instead, we vacate the award of enhanced damages and remand for further consideration along with willfulness.

## V

We next turn to the district court's award of attorneys' fees under § 285, which we vacate and remand for further consideration.  Under § 285, a "court in exceptional cases may award reasonable attorney fees to the prevailing

---

[6]  We recognize that, ideally, it should not fall to the district court to determine when, if ever, willful infringement began through the mechanism of JMOL.  Rather, the question of when willful infringement began is a fact issue that would have been best presented to the jury in a special verdict form with appropriate jury instructions.  Better yet, perhaps SRI could have recognized the shortcomings in its case and presented a more limited case of willful infringement from 2012 onwards.  Or perhaps Cisco could have filed a motion for summary judgment of no willful infringement prior to May 8, 2012.

party."   An "exceptional" case under § 285 is "one that
stands out from others with respect to the substantive
strength of a party's litigating position (considering both
the governing law and the facts of the case) or the unrea-
sonable manner in which the case was litigated." *Octane
Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545,
554 (2014).   The party seeking fees must prove that the
case is exceptional by a preponderance of the evidence, and
the district court makes the exceptional case determination
on a case-by-case basis considering the totality of the cir-
cumstances.   *See id.* at 554, 557.

We review a district court's grant or denial of attorneys'
fees for an abuse of discretion, which is a highly deferential
standard of review.   *Highmark Inc. v. Allcare Health Mgmt.
Sys., Inc.*, 572 U.S. 559, 564 (2014); *Bayer CropScience AG
v. Dow AgroSciences LLC*, 851 F.3d 1302, 1306 (Fed. Cir.
2017) (citing *Mentor Graphics Corp. v. Quickturn Design
Sys., Inc.*, 150 F.3d 1374, 1377 (Fed. Cir. 1998)).   To meet
the abuse-of-discretion standard, the appellant must show
that the district court made "a clear error of judgment in
weighing relevant factors or in basing its decision on an er-
ror of law or on clearly erroneous factual findings." *Bayer*,
851 F.3d at 1306 (quoting *Mentor Graphics*, 150 F.3d
at 1377); *see also Highmark*, 572 U.S. at 563 n.2.

We see no such error in the district court's determina-
tion that this was an exceptional case.   The district court
found:

> There can be no doubt from even a cursory review
> of the record that Cisco pursued litigation about as
> aggressively as the court has seen in its judicial ex-
> perience.   While defending a client aggressively is
> understandable, if not laudable, in the case at bar,
> Cisco crossed the line in several regards.

*Post-Trial Motions Op.*, 254 F. Supp. 3d at 722.

The district court further explained that "Cisco's litigation strategies in the case at bar created a substantial amount of work for both SRI and the court, much of which work was needlessly repetitive or irrelevant or frivolous." *Id.* at 723 (footnotes omitted). Indeed, the district court inventoried Cisco's aggressive tactics, including maintaining nineteen invalidity theories until the eve of trial but only presenting two at trial and pursuing defenses at trial that were contrary to the court's rulings or Cisco's internal documents. *Id.* at 722. Nevertheless, the district court relied in part on the fact that the jury found that Cisco's infringement was willful in its determination to exercise its discretion pursuant to § 285 to award SRI its attorneys' fees and costs. *Id.* at 723. Accordingly, we vacate the district court's award of attorneys' fees and remand for further consideration along with willfulness.

We take no issue with the district court's award of attorneys' fees at the attorneys' billing rates without adjusting them to Delaware rates. At the same time, however, the district court erred in granting all of SRI's fees. Section 285 permits a prevailing party to recover reasonable attorneys' fees, but not fees for hours expended by counsel that were "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). We accordingly conclude that the district court should have reduced SRI's total hours to eliminate clear mistakes. For example, one billing entry reads "DON'T RELEASE, CLIENT MATTER NEEDS TO BE CHANGED." J.A. 32384. Accordingly, should the district court award attorneys' fees on remand, it must remove attorney hours clearly included by mistake in its calculation of reasonable attorneys' fees.

## VI

We review for abuse of discretion a district court's grant of an ongoing royalty. *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 35 (Fed. Cir. 2012). Here, the

24                                    SRI INT'L, INC. v. CISCO SYS., INC.

district court did not abuse its discretion in awarding "a 3.5% compulsory license for all post-verdict sales." *Post-Trial Motions Op.*, 254 F. Supp. 3d at 724. The district court's ongoing royalty rate equals the rate found by the jury and the base is limited to the "accused products and services." J.A. 182.

On appeal, Cisco argues that the district court abused its discretion in awarding the 3.5% ongoing royalty on "all post-verdict sales" without considering Cisco's design-arounds. According to Cisco, the court was obligated to assess whether Cisco's redesigned products and services were more than colorably different from those products and services adjudicated at trial, and if not, whether those redesigned products and services infringe. To this end, Cisco moved to supplement its post-trial briefing with declarations describing its redesign efforts. Cisco argues that the district court abused its discretion by denying its motion to supplement.[7] We disagree. The district court properly exercised its discretion in denying Cisco's motion to supplement the record regarding alleged post-verdict design-around activity. Cisco did not redesign its products until after trial, and Cisco did not file its motion to supplement until after completion of post-trial briefing. Given the

_____

[7]    Finally, Cisco argues that, in the same order in which the court stated that "[t]here are no post-verdict royalties," the court awarded a post-verdict royalty—an internal inconsistency. J.A. 175. We do not ascribe weight to the apparent clerical error creating the inconsistency. The district court's final judgment order is clear that "Cisco shall pay a 3.5% compulsory license on all post-verdict sales of the accused products and services." J.A. 182. To the extent that clear statement conflicts with the single sentence in the memorandum opinion, we think the court made its intentions clear in its final judgment and we see no error by the district court.

stage of the proceedings and SRI's opposition, the trial court acted within its discretion when denying Cisco's motion to supplement.

To the extent the district court's order is unclear—and we think it is not—we reconfirm that the ongoing royalty on post-verdict sales is limited to products that were actually found to infringe and products that are not colorably different.  We discern no error in the district court's determination that Cisco's submissions were untimely.  Nevertheless, we acknowledge that the district court has not yet determined whether products and services that were not accused (that is, changed after the jury verdict) are colorably different for purposes of ongoing royalty calculations.  Such an issue could be resolved in a future proceeding.

CONCLUSION

For the reasons above, we affirm the district court's denial of summary judgment that the asserted claims are patent-ineligible.  We also agree with the district court's construction of "network traffic data" and affirm the district court's grant of summary judgment of no anticipation.  We vacate and remand the district court's denial of Cisco's renewed motion for judgment as a matter of law that Cisco did not willfully infringe the asserted claims.  Accordingly, we vacate and remand the district court's awards of enhanced damages and attorneys' fees.  Finally, we affirm the district court's orders granting enhanced damages and ongoing royalties.

**AFFIRMED-IN-PART, VACATED-IN-PART,
AND REMANDED**

COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**SRI INTERNATIONAL, INC.,**
*Plaintiff-Appellee*

**v.**

**CISCO SYSTEMS, INC.,**
*Defendant-Appellant*

---

2017-2223

---

Appeal from the United States District Court for the District of Delaware in No. 1:13-cv-01534-SLR-SRF, Judge Sue L. Robinson.

---

LOURIE, *Circuit Judge*, dissenting.

I respectfully dissent from the majority's decision upholding the eligibility of the claims. In my view, they are clearly abstract. In fact, they differ very little from the claims in *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016), where we found the claims to be abstract.

The majority opinion focuses on claim 1 of U.S. Patent 6,711,615 ("the '615 patent"), which recites:

1. A computer-automated method of hierarchical event monitoring and analysis within an enterprise network comprising:

deploying a plurality of network monitors in the enterprise network;

detecting, by the network monitors, suspicious network activity based on analysis of network traffic data selected from one or more of the following categories: {network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection requests, network connection denials, error codes included in a network packet, network connection acknowledgements, and network packets indicative of well-known network-service protocols};

generating, by the monitors, reports of said suspicious activity; and

automatically receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors.

Similarly, the claim we reviewed in *Electric Power Group* recited "[a] method of detecting events on an interconnected electric power grid in real time over a wide area and automatically analyzing the events on the interconnected electric power grid," with the method comprising eight steps, including "receiving data," "detecting and analyzing events in real time," "displaying the event analysis results and diagnoses of events," "accumulating and updating measurements," and "deriving a composite indicator of reliability."  830 F.3d at 1351–52.

While that claim was lengthy, with eight steps, it merely described selecting information by content or source for collection, analysis, and display.  *Id.* at 1351.  In finding the claim directed to an abstract idea, we reasoned that "collecting information, including when limited to particular content (which does not change its character as

information)" was an abstract idea. *Id.* at 1353. Limiting the claim to a particular technological environment—power-grid monitoring—was insufficient to transform it into a patent-eligible application of the abstract idea at its core. *Id.* at 1354. The claim was rooted in computer technology only to the extent that the broadly-recited steps required a computer. At step two, we noted that the claim did not require an "inventive set of components or methods . . . that would generate new data," and did not "invoke any assertedly inventive programming." *Id.* at 1355.

This case is hardly distinguishable from *Electric Power Group*. The claims in that case are said in the majority opinion to only be drawn to using computers as tools to solve a problem, rather than improving the functionality of computers and computer networks.

The claims here recite nothing more than deploying network monitors, detecting suspicious network activity, and generating and handling reports. The detecting of the suspicious activity is based on "analysis" of traffic data, but the claims add nothing concerning specific means for doing so. The claims only recite the moving of information. The computer is used as a tool, and no improvement in computer technology is shown or claimed. There is no specific technique described for improving computer network security.

I would find the claims directed to the abstract idea of monitoring network security and proceed to step two of *Alice*. As in *Electric Power Group*, however, "[n]othing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology . . . ." 830 F.3d at 1355. The claims recite "types of information and information sources," *id.*, but such selection of information by content or source does not provide an inventive concept. *Id.* The specification further makes clear that the claims only rely on generic computer components, including a computer,

memory, processor, and mass storage device. *See* '615 patent, col. 14 ll. 50–57. Indeed, the specification even deems the relevant memory bus and peripheral bus "customary components." *Id.* col. 14 l. 55.

Finally, the majority opinion quotes from and paraphrases language from the specification that only recites results, not means for accomplishing them. *See, e.g., Majority Op.* at 9. The claims as written, however, do not recite a *specific way* of enabling a computer to monitor network activity. As we noted in *Electric Power Group*, result-focused, functional claims that effectively cover any solution to an identified problem, like those at issue here, frequently run afoul of *Alice*. 830 F.3d at 1356.

Thus, I would find the claims to be directed to an abstract idea at *Alice* step one, without an inventive concept at step two, and reverse the district court's finding of eligibility. Because I would find the claims at issue to be ineligible, I would not reach the remaining issues in the case.