# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CIRBA INC. (d/b/a DENSIFY) and CIRBA IP, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> VMWARE, INC., <br><br> *Defendant*. | C.A. No. 19-742-LPS |

## VMWARE'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW ON TRADEMARK CLAIMS

Dated: January 20, 2020

OF COUNSEL:

Arturo J. González
Michael A. Jacobs
Richard S. J. Hung
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
agonzalez@mofo.com
mjacobs@mofo.com
rhung@mofo.com

Bita Rahebi
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5200
brahebi@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202-5638
(303) 592-2204
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for VMware, Inc.*

ny-1851518

## INTRODUCTION

Cirba has failed to show that "densify" is a legally protectable mark, or that VMware's use of "densify," "densification," or "densifying" are likely to cause confusion. Because the jury does not have sufficient evidence to find for Cirba, the Court should dismiss its trademark claims.

## ARGUMENT

### I. CIRBA HAS NOT PROVEN ITS MARK IS INHERENTLY DISTINCTIVE

Cirba has failed to meet its burden of proving that "densify" is a protectable trademark. *See E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008). A protectable mark "must either be suggestive, arbitrary, or fanciful, or must be descriptive with a demonstration of secondary meaning." *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 222 (3d Cir. 2000) (citation omitted). The parties dispute whether the word "densify" suggests or describes a function of Cirba's software.[1] Cirba argues it is not descriptive because "the concept of densifying is a physical analogy for a complex set of computer processes, that only in part relate to putting more VMs on the same number of servers." (D.I. 502 at 5.) But "[i]t is not necessary that a term describe *all* of the purposes, functions, characteristics, or features of a product to be considered merely descriptive; it is enough if the term describes one significant function, attribute, or property." T.M.E.P. § 1209.01(b) (emphasis added); *accord Network Automation, Inc. v. Hewlett-Packard Co.*, 2009 WL 5908719, at *6-7 (C.D. Cal. Sept. 14, 2009) ("network automation" descriptive of a software function). Accordingly, Cirba's descriptive mark does not become suggestive just because its software does something more than densifying.

---

[1] Cirba's claim that "the common definition of 'densify' is not descriptive of computer software" (D.I. 502 at 4) conflates descriptiveness and genericness. Descriptive marks describe characteristics, features, functions, and uses while generic terms identify a product genus, like computer software. *See E.T. Browne*, 538 F.3d at 192.

Cirba also admits that "densify" means "to make more dense." (Opp. at 4.) The word "dense," in turn, means "marked by compactness or crowding together of parts."[2] It is consistent with Mr. Hillier's description of Cirba's software. Referring to the Tetris analogy, he agreed that Cirba's software makes everything "fit more compactly and efficiently" and "may make them denser." (Trial Transcript ("Tr.") at 391:16-24.) Cirba uses the same word to contrast with VMware's products—VMware has "lots of use of the word 'densification,'" but "can't actually 'densify' (play Tetris) – can only shuffle VMs between clusters." (DTX-4012 at 8, 12.)[3] As Mr. Hillier explained during a presentation: "We like to use the word densification. We're trying to ***drive up the density*** safely and drive down the unit cost of using that infrastructure." (DTX-5328 at 0:04:52-0:05:02) (emphasis added). Hillier also testified that Citibank, a Cirba customer, focused on addressing "density and software control." (Tr. at 408:20-409:1.)

Cirba further cannot dispute that a function of its software is to densify. Cirba's documents repeatedly use this term to describe its software: "Designed to densify your environment and automate actions safely" (DTX-4112); "Increase utilization, densification while respecting SLA's for performance" (PTX-1220 at 6); "ML-Driven Workload Densification" (DTX-4012 at 19); "Automated rebalancing of VMs for densification" (*id.*); "dovetail workloads in a way that is analogous to the game of Tetris, to safely densify infrastructure by an average of 48 percent in virtual and cloud hosting environments" (PTX-1943 at 2); and "optimize[s] VM

---

[2] VMware requests judicial notice of the Merriam-Webster Dictionary definition of "dense," "densify," and "density," attached as Ex. 12. *See* Fed. R. Evid. 201 (permitting judicial notice of facts that are "not subject to reasonable dispute" when they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Taza Systems, LLC v. Taza 21 Co., LLC*, 2013 WL 5145859, at *10 (W.D. Pa. Sept. 13, 2013); *Azoplate Corp. v. Silverlith, Inc.*, 367 F. Supp. 711, 731 (D. Del. 1973), *aff'd*, 506 F.2d 1050 (3d Cir. 1974).

[3] All trial exhibits are attached to the Declaration of Joyce Liou filed concurrently herewith.

density," offers "Advanced Densification & Risk Avoidance," and "predictively models workload patterns to drive density and prevent workload contention before it occurs" (DTX-4008 at 4, 6).

Recognizing that these descriptive uses would diminish any future trademark claim, Cirba's SVP of marketing implored employees that "Densify must no longer be used as a verb and derivatives of the word, ie [sic] densification, must not be used in our marketing and product materials," further stating that "we must prepare for our rebranding effort by scrubbing all externally facing materials of the use of Densify as a verb and its derivatives."[4] (DTX-4069 at 2.) Thus, Cirba would "file for the TM" only after "we are confident we have scrubbed the materials." (*Id.*) Yet, Cirba's officers disregarded this guidance, complaining it was "such a stupid limitation to try and work around," and continued to publish materials using "densify" in contravention of the advice. *Id.* at 1; *see supra*, discussion of PTX-1943 (published April 12, 2016) and DTX-4012 (published January 14, 2019). No reasonable jury could conclude that "densify" is inherently distinctive when Cirba itself continues to use it in a descriptive fashion.

## II. CIRBA HAS NOT PROVEN ITS MARK OBTAINED SECONDARY MEANING

Because a reasonable jury can only conclude that the asserted mark is descriptive, Cirba must also prove that it obtained (a) secondary meaning, namely that consumers will interpret the terms "not only [as] an identification of the product or services, but also [as] a representation of the *origin* of those products or services," (b) "at the time and place that the defendant began use of the mark." *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) (emphasis added). Secondary meaning is a "new and additional meaning that

---

[4] If an "inferential leap" were required to associate "densify" with Cirba's software that densifies, as Cirba claims (D.I. 502 at 6), Cirba would have no need to scrub documents of uses of "densify" as a verb. But, unlike "penguin" for freezers, "oracle" for software, and "venus" for a salon, *no* mental leap is required to determine what Cirba's software does—it densifies workloads on VMs, by "optimizing public cloud and on-premise virtual infrastructure." (*Id.*)

3

attaches to a word or symbol that is not inherently distinctive."[5] *E.T. Browne*, 538 F.3d at 198. The Third Circuit rejected evidence in *E.T. Browne* that "at first blush" seemed to support secondary meaning but in fact had "serious flaws," and held that the defendant was entitled to summary judgment on the basis that the plaintiff offered no consumer survey or evidence of the independent strength of its mark. *Id.* at 199-201. Here, Cirba adduced insufficient evidence of secondary meaning in the word "densify" for a reasonable jury to find that "densify" had a "new and additional meaning" before VMware allegedly began infringing that mark.

### A.   Cirba's Limited Length of Use of "Densify" Is Insufficient

Cirba claims VMware's infringement began in March 2018. (D.I. 502 at 9.) Thus, Cirba must prove that "densify" obtained secondary meaning before March 2018. Cirba did not begin using "densify" as a source identifier until July 2017—a mere eight months before VMware's alleged infringement. (Tr. at 1058:14-15, DTX-4560 at 1 (first use: "at least as early as 07/00/2017"); PTX-1943.) Such limited length of use is insufficient for a reasonable jury to find that "densify" obtained secondary meaning. *See Ride the Ducks, L.L.C. v. Duck Boat Tours, Inc.*, 2005 WL 670302, 1276 (E.D. Pa. Mar. 21, 2005) (eleven months "not [] a sufficient amount of time to establish secondary meaning"). Cirba's heavy burden is underscored by the PTO's requirement that an applicant aver continuous trademark use for "*five* years before the date on which the claim of [acquired] distinctiveness is made." *See* T.M.E.P. § 1212 (emphasis added); *accord Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 232 (3d Cir. 2017) (affirming summary judgment for defendant that plaintiff's mark lacked secondary meaning after fifty years of use). Cirba's continued use of the Cirba name (Tr. at 1105:24-1106:1) only increases its burden.

---

[5] Factors relevant to determining secondary meaning are: extent of sales and advertising leading to buyer association, length of use, exclusivity of use, copying, surveys, customer testimony, trade journal use, company size, number of sales and customers, and actual confusion. *Id.*

4

### B. There Is No Evidence of Prevalent Advertising and Revenue Growth to Raise Inference of Secondary Meaning

While an inference of secondary meaning may be raised through evidence of a "prevalent advertising campaign" and "revenue growth simultaneous with such marketing," *E.T. Browne*, 538 F.3d at 200, there is insufficient evidence of either in the record. Cirba's proffered evidence fails to demonstrate secondary meaning in the relevant period or market (*see* D.I. 502 at 6-7), as there is no evidence that Cirba's NASCAR sponsorship or the photographed trade show occurred between July 2017 and March 2018, or that any U.S. customer saw the "Densify" signage on Cirba's Toronto building headquarters in Canada. (PTX-3433 (*see* D.I. 503); PTX-3444 (*see* D.I. 503); PTX-3445 (*see* D.I. 503); Tr. at 1059:20-25.) Notably, Cirba assessed its own PR efforts as poor. Cirba's chief marketing officer complained that he was "not very impressed" with its PR firm months shortly after the rebranding, noting that it does "nothing that would explode and make Densify stand out in the market." (DTX-4954.)

Cirba further relies on vague statements from its witnesses, but, as with *E.T. Browne*, 538 F.3d at 199-201, that evidence has serious flaws. It claims to attend "dozens of industry tradeshows" (D.I. 502 at 7), but there is no evidence that any took place between July 2017 and March 2018—nor did Cirba identify their locations, their overall attendance, or what efforts Cirba made to promote its Densify software.[6] It also claims that Cirba is "covered in a wide variety of trade publications" (D.I. 502 at 7), but there is no evidence of such coverage between July 2017 and March 2018. All three Gartner reports in the record pre-date Cirba's July 2017 rebranding, and identify the company as Cirba. (*See* PTX-1386 (2011), PTX-1686 (2012), and PTX-1943 (2016).) Finally, Cirba claims to spend "significant money in promoting its name" (D.I. 502 at 7),

---

[6] Similarly, Mr. Smith testified about "big booths with Densify," "marketing tchotchkes," t-shirts, and web advertising (Tr., Vol. E at 1058:2-7), but said nothing about the relevant time period.

5

but the cited testimony is not evidence of secondary meaning before March 2018; it covered a *different* time period—"since 2017" to now (1058:22-24).  There is no evidence of how or where the money was spent, or what portion was spent before March 2018.  *See, e.g.*, *AcademyOne, Inc. v. CollegeSource, Inc.*, 2009 WL 5184491, at *11-12 (E.D. Pa. Dec. 21, 2009) (no indication how much marketing preceded infringement).  And even if Cirba had shown that the entire $3 million was spent in the U.S. between July 2017 and March 2018, it would not be sufficient for a reasonable jury to conclude "densify" had acquired secondary meaning in eight months.  *See E.T. Browne*, 538 F.3d at 199 ("substantial amounts of money" spent on advertising over 20 years did not mean plaintiff "succeeded in creating secondary meaning").

### C. There Is No Evidence Cirba's Marks Are Extensively Featured in Trade Journals, Media, and Publications

As described above, although Cirba claims to be "covered in a wide variety of trade publications" (D.I. 502 at 7) there are only three Gartner reports in the record, and they do not even refer to Cirba as Densify.  (*See* PTX-1386, PTX-1686, and PTX-1943.)  This is not sufficient for a reasonable jury to find secondary meaning.

### D. Cirba's Small Market Share Does Not Raise an Inference of Secondary Meaning

"The larger a company and the greater its sales . . . the greater the number of people who may associate [its] symbol with a company or source with which they should be familiarized."  *Parks*, 863 F.3d at 235 (citation omitted).  Cirba has only 87 customers in a market of at least 500,000 companies.  (Tr. at 659:9-11.)  No reasonable jury could conclude from this that "densify" obtained secondary meaning among a significant number of consumers.  *See Parks*, 863 F.3d at 235 (plaintiff's 1.3% market share not "large enough to indicate secondary meaning").

### E. There Is No Evidence on the Remaining Factors

Cirba failed to present evidence on the remaining secondary meaning factors. Although a survey is not required, the absence of one is particularly telling here. *See E.T. Browne*, 538 F.3d at 201 (absence of survey leaves plaintiff without direct evidence of secondary meaning); *AcademyOne*, 2009 WL 5184491, at *15-16 (absent survey, jury would have to make "leap of faith"). There is simply insufficient evidence for a reasonable jury to find that "densify" developed secondary meaning between July 2017 and March 2018.

### III. CIRBA HAS NOT PROVEN VMWARE'S ALLEGED USES CREATE A LIKELIHOOD OF CONFUSION

Cirba has not proven by a preponderance of evidence that VMware used the words "densify," "densification," or "densifying" in a manner likely to cause confusion. *See A&H Sportswear*, 237 F.3d at 211 (test is whether "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark" (citation omitted)). While the analysis considers a multi-factored *Lapp* test, "[n]ot all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting." *Id.* at 215-16.

### A. Cirba Has Failed to Prove Any Mark Similarity

As an initial matter, Cirba must point to evidence of the *commercial impression* of VMware's alleged uses in the marketplace. *A & H Sportswear*, 166 F.3d at 216-18. It has not done so. Cirba cites (a) its witnesses' hearsay testimony that VMware is "telling" customers that they have "Densify technology" and using "the word densify, densification, [and] densifying" (D.I. 502 at 9); (b) two internal VMware emails that do not involve any customer (*id.* at 8); and (c) a VMware whitepaper that was not admitted into evidence (DTX-5056 (*see* D.I. 503)). But Cirba has not shown that VMware used the asserted mark as a source-identifier for any product.

Furthermore, the mere allegation that VMware used the same "words" as Cirba to describe its products is not sufficient to establish mark similarity.[7] *See Int'l Data Grp., Inc. v. Ziff Davis Media, Inc.*, 145 F. Supp. 2d 422, 435 (D. Del. 2001) (textual similarity insufficient, as context and appearance of other elements are relevant to commercial impression); *accord Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 470 n.14 (E.D. Pa. 2012), *aff'd*, 490 F. App'x 491 (3d Cir. 2013) (likelihood of confusion "substantially and further diminished" with defendant's house mark); *Koninklijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, 2017 WL 3719468, at *23 (D.N.J. Aug. 29, 2017) (no likelihood of confusion based on descriptive fair uses in ads).

### B. Cirba's and VMware's Consumers are Highly Sophisticated

Cirba ignores that the parties' customers are highly sophisticated. The more sophisticated a consumer, the less likely she will be confused as to source. *See, e.g., Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 285-86 (3d Cir. 2001) (confusion unlikely based on consumers' technical skill and products' high cost); *Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713, 718-19 (Fed. Cir. 1992) (confusion unlikely where services were "expensive and are purchased *only* by experienced corporate officials after significant study and contractual negotiation"); *Nat'l Data Corp. v. Computer Sys. Eng'g, Inc.*, 940 F.2d 676, at *1-2 (Fed. Cir. 1991) (confusion unlikely where consumers were large businesses); *Primepoint, L.L.C. v. Primepay, Inc.*, 2009 WL 1884369, at *9–10 (D.N.J. June 30, 2009), *aff'd*, 401 F. App'x 663 (3d Cir. 2010) (confusion unlikely where companies had knowledge of competing products).

Here, Cirba counts the likes of Bank of America, Cigna, Citibank, Citizens Bank, FedEx, Disney, and Kaiser among its target customers. (Tr. at 655:1-3, 667:18-19.) Cirba's president

---

[7] Even if DTX-5056 had been properly admitted, no reasonable jury could conclude that this VMware marketing material could cause confusion based on its commercial impression. The "VMware" name appears nearly fifty times, VMware's logo is prominently displayed, and the word "densification" appears as a descriptive term *once* within a sentence.

testified that Cirba's top 15 customers have spent in excess of $85 million on Cirba's software. (*Id*. at 655:5-7.) The record shows that the parties' software is not purchased on a whim, that customers are particular and careful, and that sales result from prolonged negotiation process. (DTX-4012; DTX-4529.) Cirba's president testified that these purchases are so significant that "the majority of customers that I personally deal with . . . actually have VMware people on staff at the customer," and that they involve "very, very complicated," "really technical," and "enormously complex" software. (Tr. at 659:20-23, 655:16, 656:5, 1121:10-14. Accordingly, no reasonable jury could conclude that either party's customers would be confused as to source.

### C. Cirba's Mark Is Conceptually and Commercially Weak

As discussed in Section II, Cirba's asserted mark is weak because "densify" describes a function of Cirba's software, and has not acquired secondary meaning over its limited period of use. But even if Cirba proved that the mark is suggestive—and it has not—it would still be presumed weak. *See* 4 McCarthy on Trademarks &Unfair Competition § 23:48 (5th ed.) (stating a highly suggestive mark is "weak," and if "the common element in the conflicting marks is suggestive or descriptive of the goods or services, this lessens the likelihood of confusion"). Thus even under Cirba's view of the strength of its mark, this factor favors VMware.

### D. Cirba Offers No Evidence of Actual Confusion

Cirba's CEO testified that he was unaware of a single instance of consumer confusion. (Tr. at 1109:25-1110:9.) Cirba's president also testified that customers have switched back and forth between VMware and Cirba—underscoring their awareness that the parties offer different products. (*Id.* at 678:22-679:12.) The lack of confusion over eighteen months raises an inference that there is no likelihood of confusion. *See Checkpoint Sys.,* 269 F.3d at 291 ("If a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future.").

9

### E. The Parties' Marketing Channels Are Immaterial

Cirba also failed to show that the parties' products are "marketed through the same channels of trade and advertised through the same media" in a manner likely to cause confusion. *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 473 (3d Cir. 2005). That both companies' products are promoted through online advertising is immaterial. *See, e.g., Kinbook*, 866 F. Supp. 2d at 470 n.14 ("That the goods or services of the parties are both found on the Internet proves little, if anything, about the likelihood that consumers will confuse similar marks used on such goods or services." (citation omitted)). The fact that both parties rely on salespeople and trade shows to market their products also eliminates any confusion. *See Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989) (consumers will not be confused when products are marketed by "knowledgeable" salespeople and "technically trained personnel").

### F. There is No Evidence of VMware's Intent to Confuse

Finally, there is no evidence that VMware intended to confuse customers into thinking it was affiliated with Cirba based on its use of the words "densify," "densifying," or "densification," or that it timed such uses with an "aggressive foray into Densify's space" in August 2018. (D.I. 502 at 9.) To the contrary, Cirba's evidence indicates that VMware was using the word "densify" internally, and merely to describe capacity capabilities of vROps software, as early as October 2017. (PTX-1197.) Cirba failed to adduce any intent to deceive from VMware's witness in its case-in-chief, and its own witnesses' hearsay testimony cannot bear on VMware's intent.

### CONCLUSION

The Court should enter judgment as a matter of law for VMware on Cirba's Count III for unfair competition under the Lanham Act, Count IV for deceptive trade practices under Delaware law, and Count V for common law trademark infringement.

10

Dated: January 20, 2020

OF COUNSEL:

Arturo J. González
Michael A. Jacobs
Richard S. J. Hung
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
agonzalez@mofo.com
mjacobs@mofo.com
rhung@mofo.com

Bita Rahebi
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5200
brahebi@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202-5638
(303) 592-2204
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for VMware, Inc.*

## CERTIFICATE OF SERVICE

I, Anne Shea Gaza, hereby certify that on January 20, 2020, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Kenneth L. Dorsney, Esquire
> Morris James LLP
> 500 Delaware Avenue, Suite 1500
> Wilmington, DE 19801
> *kdorsney@morrisjames.com*
>
> *Attorney for Plaintiffs/Counter-Defendants*

I further certify that on January 20, 2020, I caused the foregoing document to be served via electronic mail upon the above-listed counsel and on the following:

> Courtland L. Reichman, Esquire
> Shawna L. Ballard, Esquire
> Jennifer Estremera, Esquire
> Michael G. Flanigan, Esquire
> Joachim B. Steinberg, Esquire
> Kate Falkenstien, Esquire
> Ariel C. Green, Esquire
> Reichman Jorgensen LLP
> 100 Marine Parkway, Suite 300
> Redwood Shores, CA  94065
>
> Sarah O. Jorgensen, Esquire
> Reichman Jorgensen LLP
> 1201 West Peachtree Street, Suite 2300
> Atlanta, GA 30309
>
> Christine E. Lehman, Esquire
> Reichman Jorgensen LLP
> 818 Connecticut Ave., N.W., Suite 850
> Washington, DC 20006

24585493.1

        Jaime F. Cardenas-Navia, Esquire
        Wesley Lanier White, Esquire
        Khue V. Hoang, Esquire
        Reichman Jorgensen LLP
        100 Park Avenue, Suite 1600
        New York, NY 10017

        *RJ_densify@reichmanjorgensen.com*

        Gary J. Toman, Esquire
        Weinberg Wheeler Hudgins Gunn & Dial
        3344 Peachtree Road NE, Suite 2400
        Atlanta, GA 30326
        *gtoman@wwhgd.com*

        Peter J. Ayers, Esquire
        Law Office of Peter J. Ayers, PLLC
        2200 Bowman Avenue
        Austin, TX 78703
        *peter@ayersiplaw.com*

        *Attorneys for Plaintiffs/Counter-Defendants*

Dated: January 20, 2020        YOUNG CONAWAY STARGATT &
                                                TAYLOR, LLP

                                                */s/ Anne Shea Gaza*
                                                Anne Shea Gaza (No. 4093)
                                                Robert M. Vrana (No. 5666)
                                                Samantha G. Wilson (No. 5816)
                                                Rodney Square
                                                1000 N. King Street
                                                Wilmington, Delaware 19801
                                                *agaza@ycst.com*
                                                *rvrana@ycst.com*
                                                *swilson@ycst.com*

                                                *Attorneys for VMware, Inc.*