**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CIRBA INC. (d/b/a DENSIFY) and CIRBA IP, INC., | Civil Action No. 1:19-cv-00742-LPS |
| Plaintiffs, | |
| v. | JURY TRIAL DEMANDED |
| VMWARE, INC., | |
| Defendant. | |

<u>**FINAL JURY INSTRUCTIONS**</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................ ii

1.0    GENERAL INSTRUCTIONS ....................................................................... 1

    1.1      INTRODUCTION ..................................................................................... 1
    1.2      JURORS' DUTIES ................................................................................... 2
    1.3      EVIDENCE DEFINED ............................................................................ 3
    1.4      DIRECT AND CIRCUMSTANTIAL EVIDENCE ................................ 5
    1.5      CONSIDERATION OF EVIDENCE ....................................................... 6
    1.6      STATEMENTS OF COUNSEL ............................................................... 7
    1.7      CREDIBILITY OF WITNESSES ........................................................... 8
    1.8      NUMBER OF WITNESSES .................................................................... 9
    1.9      EXPERT WITNESSES .......................................................................... 10
    1.10    DEPOSITION TESTIMONY ................................................................. 11
    1.11    USE OF INTERROGATORIES ............................................................ 12
    1.12    EXHIBITS .............................................................................................. 13
    1.13    BURDENS OF PROOF .......................................................................... 14
    1.14    USE OF NOTES ..................................................................................... 16
2.0    THE PARTIES AND THEIR CONTENTIONS ...................................... 17

    2.1      THE PARTIES ....................................................................................... 17
    2.2.     THE PARTIES' CONTENTIONS ........................................................ 18
    2.3.     SUMMARY OF THE PATENT ISSUES ............................................. 19
3.0    THE PATENT CLAIMS ............................................................................ 20

    3.1.     PATENT LAWS ..................................................................................... 20
    3.2.     PATENT "CLAIMS" GENERALLY .................................................... 21
    3.3      CONSTRUCTION OF THE CLAIMS .................................................. 22
    3.4      INDEPENDENT AND DEPENDENT CLAIMS ................................... 24
    3.5      OPEN ENDED OR "COMPRISING" CLAIMS ................................... 25
4.0    PATENT INFRINGEMENT ...................................................................... 26

    4.1.     INFRINGEMENT GENERALLY .......................................................... 26
    4.2      DIRECT INFRINGEMENT ................................................................... 27
    4.3      INDUCED INFRINGEMENT ............................................................... 29
    4.4      DIRECT INFRINGEMENT BY A THIRD PARTY ............................. 31
    4.5      AFFIRMATIVE ACTIONS INTENDED TO CAUSE  INFRINGEMENT .. 32
    4.6      KNOWLEDGE THAT THE ACTS, IF TAKEN, WOULD CONSTITUTE
INFRINGEMENT .................................................................................................. 33
    4.7      INDUCEMENT MUST CAUSE DIRECT INFRINGEMENT ...................... 34
    4.8      WILLFUL INFRINGEMENT ............................................................... 35
5.0    INVALIDITY ............................................................................................. 36

5.1     INVALIDITY GENERALLY ......................................................... 36
5.2     PRIOR ART .................................................................................. 38
5.3     ANTICIPATION ............................................................................ 39
5.4     OBVIOUSNESS--GENERALLY ................................................... 40
5.5     SCOPE AND CONTENT OF THE PRIOR ART .......................... 42
5.6     DIFFERENCES BETWEEN THE CLAIMED INVENTION AND PRIOR
ART         ..................................................................................................... 43
5.7     LEVEL OF ORDINARY SKILL ................................................... 45
5.8     OBJECTIVE EVIDENCE OF NONOBVIOUSNESS...................... 47
6.0    SUMMARY OF THE NON-PATENT ISSUES ................................. 49

7.0    TRADEMARK LAW ........................................................................ 50

7.1     HOW A TRADEMARK IS OBTAINED ........................................ 51
7.2     TRADEMARK INTERESTS .......................................................... 52
7.3     LIKELIHOOD OF CONFUSION ................................................... 53
7.4     TRADEMARK BURDENS OF PROOF .......................................... 54
7.5     INFRINGEMENT—ELEMENTS AND BURDEN OF PROOF ................... 55
7.6     UNREGISTERED MARKS ............................................................ 56
7.7     UNREGISTERED MARK DISTINCTIVENESS ............................ 57
7.8     SPECTRUM OF MARKS .............................................................. 58
7.9     ARBITRARY TRADEMARKS....................................................... 59
7.10    SUGGESTIVE TRADEMARKS ..................................................... 60
7.11    DESCRIPTIVE TRADEMARKS ................................................... 61
7.12    GENERIC NAMES ....................................................................... 62
7.13    MARK DISTINCTIVENESS AND VALIDITY ............................. 63
8.0    SECONDARY MEANING ................................................................ 64

9.0    OWNERSHIP AND PRIORITY ........................................................ 66

10.0   LIKELIHOOD OF CONFUSION – FACTORS ................................... 67

11.0   FAIR USE........................................................................................ 70

12.0   DECEPTIVE TRADE PRACTICES .................................................. 71

13.0   DAMAGES ...................................................................................... 72

14.0   PATENT DAMAGES INTRODUCTION ............................................ 73

14.1    DATE DAMAGES BEGIN AND END............................................ 74
14.2    REASONABLE ROYALTY-GENERALLY .................................... 75
14.3    FACTORS FOR DETERMINING REASONABLE ROYALTY ................. 77
14.4    REASONABLE ROYALTY - TIMING ........................................... 80
14.5    PATENT DAMAGES INTEREST .................................................. 81
14.6    LIMITATIONS OF PATENT DAMAGES ...................................... 82

15.0   NON-PATENT DAMAGES ............................................................................... 83

15.1   DAMAGES FOR TRADEMARK INFRINGEMENT – GENERALLY ....... 83
15.2   ACTUAL DAMAGES ....................................................................... 84
16.0   DELIBERATION AND VERDICT ..................................................................... 85

16.1   INTRODUCTION ............................................................................. 85
16.2   UNANIMOUS VERDICT ................................................................. 86
16.3   DUTY TO DELIBERATE .................................................................. 87
16.4   SOCIAL MEDIA.............................................................................. 88
16.5   COURT HAS NO OPINION .............................................................. 89

## 1.0     GENERAL INSTRUCTIONS

### 1.1     INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case. Each of you has been provided a copy of these instructions. You may read along as I deliver them if you prefer.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence.

Then I will explain the positions of the parties and the law you will apply in this case. And last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

## 1.2     JURORS' DUTIES

You have two main duties as jurors. The first is to decide what the facts are from the evidence that you saw and heard in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way. You are the sole judges of the facts.

Your second duty is to take the law that I give you, apply it to the facts, and decide under the appropriate burden of proof which party should prevail on any given issue. It is my job to instruct you about the law, and you are bound by the oath you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not guess or speculate, and do not let any bias, sympathy, or prejudice you may feel toward one side or the other influence your decision in any way.

### 1.3     EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath (including deposition transcript testimony that has been played by video or read to you), the exhibits that I allowed into evidence, and the stipulations to which the parties agreed.

Certain charts and graphics have been used to illustrate testimony from witnesses. Unless I have specifically admitted them into evidence, these charts and graphics are not themselves evidence, even if they refer to, identify, or summarize evidence, and you will not have these demonstratives in the jury room.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. My legal rulings are not evidence. You should not be influenced by a lawyer's objection or by my ruling on that objection. Any of my comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And, sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record. You must completely ignore all of these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them

influence your decision in any way.

You should not be concerned with whether there were any earlier proceedings in this case or, if there were, what the outcome of any such proceedings might have been.  As I have told you previously, the Court has no opinion on the matters you are being asked to decide**.**

Make your decision based only on the evidence, as I have defined it here, and nothing else.

## 1.4    DIRECT AND CIRCUMSTANTIAL EVIDENCE

You may have heard the terms "direct evidence" and "circumstantial evidence."

Direct evidence is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believe him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact.  If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

### 1.5     CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

### 1.6    STATEMENTS OF COUNSEL

A further word about statements of counsel and arguments of counsel. The attorneys' statements and arguments are not evidence. Instead, their statements and arguments are intended to help you review the evidence presented.

If you remember the evidence differently from the way it is described by the attorneys, you should rely on your own recollection.

### 1.7    CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility. You may believe everything a witness says, or part of it, or none of it. You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony he gave at the trial. You have the right to distrust such a witness's testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

### 1.8    NUMBER OF WITNESSES

One more point about the witnesses. Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

### 1.9     EXPERT WITNESSES

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case. You are free to accept or reject the testimony of experts, just as with any other witness.

**1.10   DEPOSITION TESTIMONY**

Deposition testimony is out of court testimony given under oath and is entitled to the same consideration you would give it had the witnesses personally appeared in court.

During the trial, certain testimony was presented to you by the reading of a deposition transcript or the playing of video excerpts from a deposition. If played by video, the deposition testimony may have been edited or cut to exclude irrelevant testimony. You should not attribute any significance to the fact that the deposition videos may appear to have been edited.

### 1.11    USE OF INTERROGATORIES

You may have heard answers that either Densify or VMware gave in response to written questions submitted by the other side. The written questions are called "interrogatories." The written answers were given in writing and under oath, before the trial.

You must consider the party's answers to interrogatories in the same manner as if the answers were made from the witness stand.

**1.12   EXHIBITS**

During the course of the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room to consider as evidence for your deliberations.

The remainder of the exhibits (including charts, PowerPoint presentations and animations) were offered to help illustrate the testimony of the various witnesses. These illustrative exhibits, called "demonstrative exhibits," will not be in the jury room and have not been admitted, are not evidence, and should not be considered as evidence. Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

In some instances, certain charts and summaries may have been received into evidence to illustrate information brought out in the trial. You may use these charts and summaries as evidence, even though the underlying documents and records are not here. You should give them only such weight as you think they deserve.

## 1.13   BURDENS OF PROOF

 In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." In a case such as this, there are two different burdens of proof that are used. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence."

Densify is accusing VMware of patent infringement, trademark infringement (which I referred to as "unfair competition" in the preliminary instructions), and deceptive trade practices. Densify has the burden of proving its claims and the amount of its money damages, if any, by what is called a preponderance of evidence.  That means that Densify has to produce evidence which, when considered in light of all of the facts, leads you to believe that what Densify claims is more likely true than not.  To put it differently, if you were to put the evidence of Densify and VMware concerning infringement on opposite sides of a scale, the evidence supporting Densify's claims would have to make the scales tip somewhat on its side in each instance.  If the scale should remain equal or tip in favor of VMware, you must find for VMware.

If you find that VMware infringed one or more of the patent claims that have been asserted in this case, then as a separate question, Densify has also asserted that the infringement was willful. Densify has the burden of proving this additional contention by a preponderance of the evidence.

In this case, in addition to denying Densify's claims, VMware asserts that the '687 patent is invalid.  The patent, however, is presumed to be valid under the law.  VMware therefore has the burden of proving that the patent is invalid by clear and convincing evidence.  Clear and convincing evidence means that it is highly probable that a fact is true. Proof by clear and convincing evidence is, thus, a higher burden than proof by a preponderance of the evidence.

14

Some of you may have heard the phrase "proof beyond a reasonable doubt." That burden of proof applies only in criminal cases and has nothing to do with a civil case like this one. You should therefore not consider it in this case.

### 1.14   USE OF NOTES

You may use notes taken during trial to assist your memory. However, as I instructed you at the beginning of the case, you should use caution in consulting your notes. There is generally a tendency I think to attach undue importance to matters which one has written down. Some testimony which is considered unimportant at the time presented, and thus not written down, takes on greater importance later in the trial in light of all the evidence presented. Therefore, your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence.  Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial.

Above all, your memory should be your greatest asset when it comes time to deliberate and render a decision in this case.

## 2.0    THE PARTIES AND THEIR CONTENTIONS

### 2.1    THE PARTIES

 I will now review for you the parties in this action, and the positions of the parties that you will have to consider in reaching your verdict.

There are two plaintiffs in this case: Cirba, Inc., which does business under the name "Densify," and Cirba IP, Inc. I will refer to the plaintiffs collectively as "Densify." You should not attach evidentiary weight to the use at trial of the name "Densify" to refer to the two plaintiffs collectively. The defendant in this case is VMware, Inc., which I will refer to as "VMware" or "Defendant."

## 2.2.    THE PARTIES' CONTENTIONS

There are two patents at issue in this case: United States Patent Nos. 8,209,687 and 9,654,367. You heard the lawyers and witnesses in the case refer to Densify's patents as the '687 and '367 patents or the "Densify patents." I will do the same. Copies of the Densify patents have been given to you.

Densify contends that VMware directly infringed and induced infringement of the Densify patents, that the infringement was willful, and that Densify is entitled to damages.

VMware denies that it infringed or induced infringement of the Densify patents, or that it did so willfully. VMware also contends that the '687 patent is invalid for several independent reasons. VMware also denies that Densify is entitled to recover any damages related to the patents.

### 2.3.    SUMMARY OF THE PATENT ISSUES

I will now summarize the patent issues that you must decide and for which I will provide instructions to guide your deliberations. The specific questions you must answer are listed on the verdict sheet you will be given. Here are the issues you must decide:

1.  Whether Densify has proven by a preponderance of the evidence that VMware literally infringed or induced literal infringement of one or more of the asserted claims of the '687 patent or the '367 patent;

2.  Whether VMware has proven by clear and convincing evidence that one or more of the asserted claims of the '687 patent are invalid; and

3.  If you decide that Densify has proven that VMware infringed or induced infringement of a claim not shown to be invalid, you will decide the money damages to be awarded to compensate Densify for that infringement.

4.   Whether Densify has proven by a preponderance of the evidence that VMware willfully infringed one or more of the asserted claims of the '687 patent or the '367 patent.

I will provide more detailed instructions on each of the issues you must decide elsewhere in these jury instructions.

19

**3.0    THE PATENT CLAIMS**

**3.1.    PATENT LAWS**

At the beginning of the trial, I gave you some general information about patents and the patent system and a brief overview of the patent laws relevant to this case. I will now give you more detailed instruction about the patent laws that specifically relate to this case.

### 3.2.    PATENT "CLAIMS" GENERALLY

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims."

The patent claims are the numbered paragraphs at the end of each patent. The claims are important because it is the words of the claims that define what a patent covers. Only the claims of a patent can be infringed.

The claims are intended to define, in words, the bounds of an invention. The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage. Each of the asserted claims must be considered individually.

In patent law, the requirements of a claim are often referred to as "claim elements" or "claim limitations." For example, a claim that covers the invention of a table may recite the tabletop, four legs, and the glue that secures the legs to the tabletop. The tabletop, legs, and glue are each separate limitations of the claim. When a thing (such as a product) meets each and every requirement of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim.

Each claim may cover more or less than another claim. Therefore, what a patent covers depends, in turn, on what each of its claims covers.

You will first need to understand what each claim covers in order to decide whether there is infringement of the claim and to decide whether the claim is invalid. You must use the same claim meaning for both your decision on infringement and your decision on invalidity.

### 3.3 CONSTRUCTION OF THE CLAIMS

It is the Court's duty under the law to define what the patent claims mean. As I instructed you at the beginning of the case, I have made my determinations, and I will now instruct you on the meaning, or "construction," of the claim terms. You must apply the meaning that I give in each patent claim to decide if the claim is infringed or invalid. You must accept my definitions of these words in the claims as being correct. You must ignore any different definitions used by the witnesses or the attorneys.

You are advised that the following definitions for the following terms must be applied:

| Claim Term | Construction |
| --- | --- |
| **The "each" terms** ||
| "Evaluating each virtual guest against each virtual host and other virtual guests" | "Evaluating each virtual guest against each virtual host and other virtual machines" |
| "Each virtual guest" | Plain and ordinary meaning to a person of ordinary skill in the art |
| "Each virtual host" | Plain and ordinary meaning to a person of ordinary skill in the art |
| "Identifying the existence of virtual machines with suboptimal placements" | "Identifying the existence of virtual machines with less than optimal placements as determined by the evaluation step" |
| "Business constraint" | "A restriction or limitation based on a business parameter, such as physical location, organization department, data segregation requirements, owner, service level agreements, maintenance windows, hardware lease agreements, or software licensing agreements" |

| | |
|---|---|
| "Determine whether the utilization or performance of an entity is in an acceptable range relative to its capacity or performance limits" | "Determine whether an entity's utilization or performance is within an acceptable range, relative to that entity's capacity or performance limits" |
| "Virtualized environment" | Plain and ordinary meaning to a person of ordinary skill in the art |

For any words in the claim for which I have not provided you with a definition, you should apply the plain and ordinary meaning to a person of ordinary skill in the art.

### 3.4    INDEPENDENT AND DEPENDENT CLAIMS

This case involves two types of patent claims: independent claims and dependent claims.

An independent claim does not refer to any other claim of the patent and sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. In this case, Claims 3 and 7 of the '687 patent and Claims 1 and 13 of the '367 patent are independent claims. An independent claim must be read separately from the other claims to determine the scope of the claim.

The remaining Asserted Claims are dependent claims. A dependent claim does not itself recite all of the requirements of the claim but refers to another claim or claims for some of its requirements. In this way, the claim "depends" on another claim or claims. A dependent claim incorporates all of the requirements of the claims to which it refers. The dependent claim then adds its own additional requirements. To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other independent claims to which it refers.

### 3.5    OPEN ENDED OR "COMPRISING" CLAIMS

The beginning portion, or preamble, of several of the Asserted Claims has the word "comprising." The word "comprising" means "including the following but not excluding others." A claim that uses the word "comprising" or "including" is not limited to products having only the elements that are recited in the claim, but also covers products that have additional elements.

If you find, for example, that the Accused Products include all of the elements of a particular claim, the fact that the Accused Products might include additional elements would not avoid infringement of the claim.

## 4.0   PATENT INFRINGEMENT

### 4.1.   INFRINGEMENT GENERALLY

I will now instruct you on how to decide whether Densify has proven by a preponderance of the evidence that VMware infringed the asserted claims of the '687 and '367 patents.

Recall that Densify must prove infringement by a preponderance of the evidence, i.e., that it is more likely than not that infringement has occurred.

You have heard evidence that both sides own other patents relating to computer virtualization products and services. As I stated earlier, there are only two patents at issue in this case: the '687 and '367 patents. Ownership of another patent by VMware is not a defense to patent infringement, nor is ownership of other patents evidence of infringement. In reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed. You must compare each of the asserted patent claims, as I have defined them, to the accused product, and determine whether or not there is infringement. You should not compare the accused product with any specific example set out in the '687 or '367 patent, or with Densify's product or process. The only correct comparison is between the accused products and the language of the claim itself, as I have explained its meaning to you.

You must consider each claim individually and must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by the parties.

You must determine whether Densify has proven that VMware infringed or induced infringement of any of the claims in those two patents.

## 4.2     DIRECT INFRINGEMENT

Densify alleges that VMware literally infringes or did literally infringe the '687 and '367 patents.  In order to prove literal infringement (which I will hereafter refer to as "direct infringement"), Densify must prove that it is more likely than not that VMware made, used, offered for sale, or sold its products in a manner that meets all of the elements of any one claim. Infringement requires comparing products to the claims, not the specification.

Deciding whether a claim has been directly infringed is a two-step process. The first step is to decide the meaning of the patent claim. I have already made this decision and I have already instructed you as to the meaning of some terms of the asserted patent claims. The second step is to decide whether VMware has made, used, sold, offered for sale or imported within the United States an accused product or method covered by an asserted claim of the '687 and '367 patents.

To decide whether any of VMware's computing products and/or their use directly infringe an asserted claim, you must compare that product and/or use with the patent claim and determine whether every element (or as they also are called, limitation) of the claim is included; If so, then VMware's product and/or its use directly infringes or did infringe that claim. If not, then the VMware product and/or its use does not directly infringe that claim.

You must determine, separately for each asserted claim, whether or not there is any infringement. There is one exception to this rule. If you find that an independent claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers to that independent claim. On the other hand, if you find that an independent claim has been infringed, you must still decide, separately, whether the use meets the additional requirements of any claims that depend on the independent claim, and, thus, whether those claims have also been infringed. A dependent claim includes all the requirements of any of the

27

claims to which it refers plus additional requirements of its own.

You may find direct infringement based on as little as one instance of the claimed use being performed.  Proof of direct infringement may be based on circumstantial evidence.

To show direct infringement of a method claim, Densify must show that VMware performed each and every step in the claimed method in the United States.

For direct infringement, Densify is not required to prove that VMware intended to infringe or knew of the patent. Whether or not VMware knew its accused products infringed or even knew of the patent does not matter in determining direct infringement. Instead, all that matters is whether VMware's use of the product is covered by any one of the claims.

## 4.3    INDUCED INFRINGEMENT

Densify alleges that VMware has induced others to directly infringe the '687 and '367 patents.  Inducement to infringe a claim cannot occur unintentionally. This is different from direct infringement, which, as I have told you, can occur unintentionally.

Densify alleges that VMware is liable for infringement by actively inducing others, including customers, to directly infringe the '687 and '367 patents. More particularly, Densify asserts that VMware induced patent infringement after it became aware of the Densify patents by encouraging its customers to use its infringing product. It is not sufficient that VMware was aware of the act or acts by the third party that allegedly constitute the direct infringement.

To be liable for inducement to infringe, VMware must have known of the patent and encouraged or instructed another person how to use a product in a manner that you, the jury, find infringes or did infringe the asserted claims and must have had knowledge, or have acted with willful blindness, that the induced acts constituted patent infringement. To find willful blindness (1) VMware must have subjectively believed that there was a high probability that a patent existed covering the accused products, and (2) VMware must have taken deliberate actions to avoid learning of that infringement.  The mere fact, if true, that VMware knew or should have known that there was a substantial risk that its customers' acts would infringe the asserted patents would not be sufficient for active inducement of infringement.

As with direct infringement, you must determine whether there has been inducement on a claim-by-claim basis.

VMware is liable for inducement of infringement of a claim only if Densify proves by a preponderance of the evidence each of the following:

      1.   That allegedly infringing acts were carried out by a third party that literally

infringed one or more of the claims of the '687 and '367 patents, meeting all the criteria discussed in my instructions on the topic stated above;

2. That VMware took some affirmative action, or that VMware continued to take an action specifically intending to cause the third parties to directly infringe the '687 and '367 patents;

3. That VMware knew of the '687 and '367 patents – and that (i) VMware knew that the infringing acts, if taken, would constitute direct infringement of the '687 and '367 patents; or (ii) VMware believed that there was a high probability that the actions taken by others infringed the '687 and '367 patents – and took deliberate steps to avoid learning of that infringement;

4. That VMware's alleged inducement, as opposed to other factors, actually caused the third parties to literally infringe.

In order to establish inducement of infringement, it is not sufficient that the third party directly infringed the claim. Nor is it sufficient that VMware was aware of the act or acts by the third party that allegedly constitute the direct infringement. Rather, you must find that VMware specifically intended that the third party infringe the Densify patents or that VMware believed there was a high probability the third party would infringe the Densify patents but remained willfully blind to the infringing nature of the third party's acts, in order to find inducement of infringement.

If you find that no claim of the Densify patents has been directly infringed, you cannot find VMware liable for inducement.

## 4.4    DIRECT INFRINGEMENT BY A THIRD PARTY

The first requirement for induced infringement, which I just discussed, is that Densify must prove by a preponderance of the evidence that the allegedly infringing acts were carried out by a third party that literally infringed one or more of the claims of the '687 and '367 patents.

To directly infringe a method claim, a third party must perform each and every step of the claimed method in the United States.  It is not enough that the accused product is capable of infringing use.

If you do not find that there is direct infringement by a single actor, or if you do not find that VMware actively induced these acts, you must find that VMware did not induce infringement of the patent.

## 4.5     AFFIRMATIVE ACTIONS INTENDED TO CAUSE
## INFRINGEMENT

The second requirement for induced infringement, which I just discussed, is that Densify must prove by a preponderance of the evidence that VMware took actions with the specific intent to cause third parties to engage in infringing acts. This can be shown through direct or circumstantial evidence.

In order to establish inducement of infringement, it is not sufficient that the third parties infringe the Densify patents. Nor is it sufficient that VMware was aware of acts by others that would directly infringe. Rather, in order to find inducement, you must find that VMware intended others to use its products in at least some ways that would infringe the asserted claims of the Densify patents, took affirmative acts to encourage direct infringement, and that those actions actually caused the direct infringement of the asserted claims of the Densify patents.

Densify must prove by a preponderance of the evidence that VMware took affirmative actions intending to induce infringement.

32

### 4.6    KNOWLEDGE THAT THE ACTS, IF TAKEN, WOULD CONSTITUTE INFRINGEMENT

The third requirement for induced infringement, which I just discussed, is that Densify must prove by a preponderance of the evidence that VMware knew of the '687 and '367 patents. Densify must also prove by a preponderance of the evidence that VMware knew that the acts it induced third parties to take would, if taken, constitute infringement of the '687 and '367 patents, or that VMware believed there was a high probability that the actions taken by third parties would infringe the '687 and '367 patents and took deliberate steps to avoid learning of that infringement.

Inducing infringement cannot occur unintentionally. It is not enough for the accused inducer to lead another to engage in conduct that happens to amount to infringement. Rather, to induce infringement, the accused inducer must persuade another to engage in conduct that the inducer knows - or believes with high probability, but deliberately avoided confirming - is infringement.

### 4.7    INDUCEMENT MUST CAUSE DIRECT INFRINGEMENT

Finally, Densify must prove that VMware's alleged inducement, as opposed to other factors, actually caused third parties to directly infringe the Densify patents. This means that VMware cannot be liable for induced infringement where Densify does not show that VMware successfully communicated with and induced a third-party direct infringer and that the communication was the cause of the direct infringement by the third-party infringer.

Like all other disputed issues in this case, this final element of induced infringement can be proven by circumstantial evidence. Densify is not required to present direct proof of any direct infringer third party stating, for example, that VMware caused her to infringe. Densify must prove that VMware's actions led third parties to directly infringe a claim of the Densify patents, but Densify may do so with circumstantial – as opposed to direct – evidence. Such circumstantial evidence must be sufficient to prove that VMware's actions led third parties to directly infringe a claim of the asserted patents by performing each and every step of the claimed method in the United States. Circumstantial evidence of induced infringement is sufficient for a finding of such indirect infringement without requiring proof that any individual third-party direct infringer was actually persuaded to infringe.

### 4.8    WILLFUL INFRINGEMENT

In this case, Densify argues that VMware willfully infringed Densify's patents.

If you have decided that VMware has infringed a valid claim of the '367 or '687 patent, you must go on and address the additional issue of whether or not this infringement was willful. Willfulness requires you to determine whether Densify proved by a preponderance of the evidence that VMware knew of the asserted patents before the lawsuit was filed and intentionally infringed them. However, you may not find that VMware's infringement was willful merely because VMware knew about the patent, without more.

In determining whether Densify has proven that VMware's infringement was willful, you must consider all of the facts surrounding the alleged infringement including:

1. Whether VMware acted consistently with the standards of behavior for its industry;

2. Whether VMware intentionally copied a product of Densify that is covered by an asserted claim;

3. Whether VMware reasonably believed it did not infringe or that the asserted patent was invalid;

4. Whether VMware made a good-faith effort to avoid infringing the asserted patents, for example, whether VMware attempted to design around the asserted patents (evidence that the accused infringer attempted to avoid infringement by designing around the patent claims, even if that attempt was unsuccessful, is evidence that infringement was not willful); and

5. Whether VMware tried to cover up its infringement.

If you do decide that there was willful infringement, that decision should not affect any damages award you give in this case.

## 5.0   INVALIDITY

### 5.1   INVALIDITY GENERALLY

Patent invalidity is a defense to patent infringement.  The granting of a patent by the United States Patent and Trademark office carries with it the presumption that the patent is valid. The law presumes that the Patent and Trademark Office acted correctly in issuing the patent. Each of the asserted claims is presumed valid independently of the validity of each other claim. Nevertheless, when the validity of a patent has been put at issue as part of patent litigation, it is the responsibility of the jury to review what the Patent Office has done consistent with the Court's instructions on the law.  However, the fact that a patent application is rejected or amended before the patent is issued has no bearing on its ultimate validity.

VMware has asserted as a defense to patent infringement in this case that Densify's patents are invalid. Because each of the asserted claims is presumed valid independently of the validity of each other claim, this puts the burden on VMware of proving invalidity by clear and convincing evidence on a claim-by-claim basis that each of the asserted claims of the '687 patent is invalid. VMware may rely on prior art that was before the patent examiner during prosecution. VMware's burden of proof remains the same regardless of whether the references on which VMware is relying to invalidate a patent have previously been before the patent examiner.

Even though the Patent Office examiner allowed the claims of a patent, you have the ultimate responsibility for deciding whether the claims of the patent are proven to be invalid. For a patent to be valid, the subject matter claimed in the individual claims of the patent must be new and non-obvious. A patent cannot take away from the right of anyone who wants to use what was already known or used by others, or what would have been obvious to those of skill in the art at the time the invention was made.

VMware alleges that the '687 patent is invalid because the asserted claims are anticipated and/or rendered obvious in light of VMware's VirtualCenter 2 (DRS 2006).

I will now instruct you in more detail why VMware alleges that the asserted claims of the Densify patents are invalid.

## 5.2    PRIOR ART

Prior art is the legal term used to describe what others had done in the field before the invention was made. Prior art is the general body of knowledge in the public domain, such as articles, products, or other patents, before the invention was made. The prior art need not have been available to every member of the public, but it must have been available, without restriction, to that segment of the public most likely to avail itself of the prior art's contents.

For the asserted claims, prior art includes any of the following items received into evidence during trial:

- Any product or method known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention was made; or

- Any product or method patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the earliest effective filing date of the '687 patent (August 31, 2007).

### 5.3     ANTICIPATION

A party may claim a patent is invalid under a theory of anticipation. In order for someone to be entitled to a patent, the invention must actually be new. In general, inventions are new when the identical invention as claimed has not been used or disclosed before. If the claim is not new, we say that it was "anticipated" by prior art. A claim that is "anticipated" by the prior art is not entitled to patent protection.

Anticipation must be proved on a claim-by-claim basis.  In this case, VMware alleges that the asserted claims of the '687 patent are anticipated by VirtualCenter2 (DRS 2006). VMware must convince you that each claim was anticipated by clear and convincing evidence. To anticipate a claim, each and every element in the claim must be present in a single item of prior art, and arranged or combined in the same way as recited in the claim. You may not combine two or more items of prior art to find anticipation.

To anticipate the invention, the disclosure in the prior art reference does not have to use the same words as the claim, but all of the requirements of the claim must be there, either stated expressly or inherently, so that someone of ordinary skill in the art to which the claimed invention pertains, looking at that one reference, could make and use the claimed invention. Thus, for purposes of anticipation, you should consider that which is expressly stated or present in the item of prior art, and also that which is inherently present.

In assessing VMware's anticipation defense, you must decide whether VMware has proven by clear and convincing evidence that the prior art expressly or inherently discloses to a person of ordinary skill in the art all the physical steps of the claimed apparatus or method. Thus, you must compare the steps of the patent with the steps of the prior art method and assess whether there is a difference between them.

### 5.4 OBVIOUSNESS--GENERALLY

Another basis for claiming that a patent is invalid is obviousness. Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, an invention must not have been obvious to a person of ordinary skill in the art at the time the invention was made.  Obviousness may be shown by considering one or more than one item of prior art.

VMware contends that the asserted claims of the Densify patents are invalid for obviousness. VMware bears the burden of proving obviousness by clear and convincing evidence. VMware must show, by clear and convincing evidence, that the claimed invention would have obvious to a person having ordinary skill in the art at the time the invention was made. In determining whether the claimed invention was obvious, you must consider each claim separately. You should not use hindsight, such as by using the Densify patents as a roadmap to select from the prior art and retrace the path of the inventors. In other words, you should only consider what was known prior to the invention date, without the benefit of the later Densify patents and what those patents teach.

In order to be patentable, an invention must not have been obvious to a person of ordinary skill in the art at the time the invention was made. The issue is not whether the claimed invention would be obvious today to you, as a layperson, to me as a judge, or to a genius in the art, but whether it would have been obvious to one of ordinary skill in the art at the time it was made. The existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art. To show obviousness, the law does not require that the prior art prove, to a statistical certainty, that the claimed result would work.  In the context of obviousness, only a reasonable expectation

of success is required, not conclusive proof or absolute predictability.

You must put yourself in the place of a person of ordinary skill in the art at the time of invention. In addition, you may consider whether there was a reason to combine or modify the prior art references in the fashion claimed by the patent at issue. To find that the prior art rendered a claimed invention obvious, you must find that a person having ordinary skill in the art would have had a reasonable expectation of successfully accomplishing the claimed method.

In determining obviousness or non-obviousness of the subject matter of each of the asserted claims, you should take the following steps, which I will explain further in just a moment:

1.      Determine the scope and content of the prior art;

2.      Identify the differences, if any, between each asserted claim and the prior art;

3.      Determine the level of ordinary skill in the pertinent art at the time the invention of the patent was made; and

4.      Consider objective factors of non-obviousness – that is, additional considerations, if any, that indicate that the invention was obvious or not obvious.

Against this background, you will then decide whether the subject matter of each asserted claim would have been obvious or nonobvious to a person of ordinary skill in the pertinent art.

**5.5    SCOPE AND CONTENT OF THE PRIOR ART**

In determining obviousness, you must first determine the scope and content of the prior art. This means that you must determine what prior art is reasonably pertinent to the particular problem that the inventors faced. Prior art is reasonably pertinent if it is in the same field as the claimed invention or is from another field that a person of ordinary skill would look to in trying to solve the problem the claimed invention was trying to solve. The prior art may include any of the items discussed above in Section 5.2.

## 5.6    DIFFERENCES BETWEEN THE CLAIMED INVENTION AND PRIOR ART

Second, you should analyze whether there are any relevant differences between the prior art taken as a whole and the asserted claims of the '687 patent from the view of a person of ordinary skill in the art as of August 31, 2007.  Your analysis must determine the impact, if any, of such differences on the obviousness or nonobviousness of the invention as a whole, and not merely some portion of it.

In analyzing the differences between the claimed invention and the prior art, you do not need to look for a precise teaching in the prior art directed to the subject matter of the claimed invention. You may take into account the inferences and creative steps that a person of ordinary skill in the art would have employed in reviewing the prior art at the time of the invention. For example, if the claimed invention combined elements known in the prior art and the combination yielded results that were predictable to a person of ordinary skill in the art at the time of the invention, then this evidence would make it more likely that the claim was obvious.

On the other hand, if the combination of known elements yielded unexpected or unpredictable results, or if the prior art teaches away from combining the known elements, then this evidence would make it more likely that the claim that successfully combined those elements was not obvious.

Importantly, a claim is not proved obvious merely by demonstrating that each of the elements was independently known in the prior art. Most, if not all, inventions rely on building blocks long since uncovered, and claimed discoveries almost of necessity will likely be combinations of what is already known. Therefore, you should consider whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the

relevant field to combine the known elements in the way the claimed invention does. The reason could come from the prior art, the background knowledge of one of ordinary skill in the art, the nature of the problem to be solved, market demand, or common sense. Accordingly, you may evaluate whether there was some teaching, suggestion, or motivation to arrive at the claimed invention before the time of the claimed invention, although proof of this is not a requirement to prove obviousness.

If you find that a reason existed at the time of the invention to combine the elements of the prior art to arrive at the claimed invention, this evidence would make it more likely that the claimed invention was obvious.

Again, you must undertake this analysis separately for each claim that VMware contends is obvious.

### 5.7    LEVEL OF ORDINARY SKILL

Third, you must consider the perspective of a person of ordinary skill in the art, as explained previously.  This person is presumed to know all the prior art that you have determined to be reasonably relevant. When faced with a problem, this ordinary skilled person is able to apply his or her experience and ability to the problem and also look to any available prior art to help solve the problem.

Factors to consider in determining the level of ordinary skill in the art include: (1) the educational level and experience of people working in the field; (2) the types of problems faced by workers in the art at the time of the invention and the solutions found to those problems; (3) the prior art patents, products or devices, and publications; and (4) the sophistication of the technology in the field at the time of the invention, including how rapid innovations were made in the art at the time of the invention.

Densify contends that a person of ordinary skill in the art to which the Densify patents pertain would have been an individual with at least a bachelor's degree in computer engineering, computer science, or comparable degree and two years of experience developing software tools and/or computer systems for use in the area of information technology infrastructures and utilities in designing and evaluating virtualized environments.  Densify contends such a person would have been knowledgeable about virtualized software tools available at the time and their important features.

VMware contends that a person of ordinary skill in the art to which the Densify patents pertain would have had at least a bachelor's degree in computer science, computer engineering, or electrical engineering, and 2-3 years of experience relating to

physical and virtualized computing environments, including virtual machines, hypervisors, and host servers. VMware further contends that such a person would have been familiar with designing, implementing, monitoring, evaluating, optimizing, and managing physical and virtualized computing environments.

### 5.8    OBJECTIVE EVIDENCE OF NONOBVIOUSNESS

Fourth, you must also take into account any objective evidence (sometimes called "objective indicia" or "secondary considerations") that may shed light on whether the claims were obvious. "Objective indicia" or "secondary considerations" must be considered before a conclusion on obviousness is reached.

"Objective indicia" or "secondary considerations" can include:

(A)    Whether the invention was commercially successful at least in part as a result of the merits of the claimed invention (rather than the result of design needs or market-pressure advertising or similar activities);

(B)    Whether the invention satisfied a long-felt need;

(C)    Whether others copied the invention;

(D)    Whether the invention achieved unexpected results compared to the closest prior art; evidence of unexpected results may be used to rebut a case of obviousness even if that evidence was obtained after the patent's filing or issue date; there is no requirement that an invention's properties and advantages were fully known before the patent application was filed, or that the patent application contains all of the work done in studying the invention;

(E)    Whether others tried and failed to make the invention;

(F)    Whether others in the field praised the invention;

(G)    Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention;

(H)    Whether the inventor proceeded contrary to accepted wisdom in the field; and

(I)    Whether others invented the invention at roughly the same time.

Densify has the burden to show evidence of "objective indicia" or "secondary

considerations" and to show that there is a connection, sometimes called a "nexus," between the evidence showing any of these factors and the claimed invention, if this evidence is to be given weight by you in arriving at your conclusion on the obviousness issue. However, VMware always maintains the ultimate burden to show obviousness by clear and convincing evidence, taking into account any objective indicia that you may find.

## 6.0     SUMMARY OF THE NON-PATENT ISSUES

I will now summarize the non-patent issues that you must decide and for which I will provide more detailed instructions to guide your deliberations. Densify seeks damages against VMware for trademark infringement and deceptive trade practices.  VMware denies that it engaged in trademark infringement or deceptive trade practices.  Densify must prove these claims by a preponderance of the evidence.

Here are the issues you must decide:

1.   Whether Densify has proven that "DENSIFY" is a valid and protectable trademark owned by Densify.

2.   Whether Densify has proven it had trademark rights in "DENSIFY" before VMware first used that word in its marketing materials.

3.   Whether Densify has proven that VMware engaged in trademark infringement.

4.   Whether Densify has proven that VMware engaged in deceptive trade practices.

5.   If you find that the VMware infringed Densify's trademark, you must also determine whether VMware did so intentionally.

6.   If you decide that Densify has proven that VMware engaged in trademark infringement, you will decide the money damages to be awarded to compensate Densify for those acts.

I will now provide more detailed instructions on each of the non-patent issues you must decide.

## 7.0     TRADEMARK LAW

A trademark is a word, name, symbol, or device, or any combination of these items that indicates the source of goods. A trademark may be registered or unregistered.  Assuming that Densify proves it owns a valid and protectable trademark, your infringement analysis is the same regardless of registration. The owner of a trademark has the right to exclude others from using that trademark or a similar mark that is likely to cause confusion among the potential purchasers of goods and services in the relevant marketplace. The main function of a trademark is to identify and distinguish goods or services as the product of a particular manufacturer or merchant and to protect its goodwill.

### 7.1    HOW A TRADEMARK IS OBTAINED

A person acquires the right to exclude others from using the same mark or a similar mark that is likely to cause confusion in the marketplace by being the first to use it in the marketplace, or by using it before the alleged infringer. Rights in a trademark are obtained only through commercial use of the mark.

## 7.2    TRADEMARK INTERESTS

A trademark owner may enforce the right to exclude others in an action for trademark infringement under both federal and state laws.

### 7.3    LIKELIHOOD OF CONFUSION

To prove infringement, Densify must prove, by a preponderance of the evidence, that VMware, without Densify's consent, used in commerce a reproduction, copy, counterfeit or colorable imitation of Densify's marks in connection with the distribution or advertisement of goods, such that VMware's use of the mark is likely to cause confusion as to the source of the origin of the goods or services; an affiliation, connection or association with another's goods; or the endorsement or approval of the goods or services by another.  It is not necessary that the mark used by VMware be an exact copy of Densify's mark. Rather, Densify must demonstrate that, viewed in its entirety, the mark used by VMware is likely to cause confusion in the minds of reasonably prudent purchasers or users as to the source of the product in question.

### 7.4    TRADEMARK BURDENS OF PROOF

In this case, Densify contends that VMware has infringed a Densify trademark.  Densify has the burden of proving by a preponderance of the evidence that the asserted trademark is protectable, is owned by Densify, and that VMware infringed it.

In defense, VMware contends that the word that Densify claims is its trademark, "DENSIFY," is not used as or protectable as a trademark. VMware also contends that its use of the word is protected by the doctrine of fair use.  VMware has the burden of proving by a preponderance of the evidence that its use falls within the doctrine of fair use.

### 7.5    INFRINGEMENT—ELEMENTS AND BURDEN OF PROOF

On Densify's claim for trademark infringement, Densify has the burden of proving each of the following elements by a preponderance of the evidence:

1. "DENSIFY" is a valid, protectable trademark;

2. Densify owns "DENSIFY" as a trademark and service mark; and

3. VMware used "DENSIFY" without Densify's consent in a manner that is likely to cause confusion among the ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods.

If you find that Densify has proved each of the elements on which it has the burden of proof, your verdict should be for Densify.  If, on the other hand, Densify has failed to prove any of these elements, your verdict should be for VMware.

### 7.6      UNREGISTERED MARKS

Densify's claimed mark is not registered.  Unregistered trademarks can still be valid and provide the trademark owner with the exclusive right to use those marks. Densify must prove by a preponderance of the evidence that its unregistered mark is valid.  A valid trademark is a word, name, symbol, device, or any combination of these items that is either:

1. inherently distinctive; or

2. descriptive, but has acquired a secondary meaning.

Only if you determine Densify proved by a preponderance of the evidence that "DENSIFY" is a valid trademark should you consider whether Densify owns that mark or whether VMware's actions infringed it.

Only if you determine that "DENSIFY" is not inherently distinctive should you consider whether it is descriptive but became distinctive through the development of secondary meaning. I will now explain the terms "inherently distinctive," "descriptive," and "secondary meaning."

### 7.7    UNREGISTERED MARK DISTINCTIVENESS

In determining distinctiveness, you must consider how strongly the trademark indicates that a good comes from a specific source. This is an important factor to consider in assessing its validity and for determining whether the trademark's use by the defendant creates for consumers a likelihood of confusion as to source, sponsorship, affiliation, or approval of the goods with the plaintiff's trademark.

Densify asserts that "DENSIFY" is a valid and protectable trademark and service mark for its software products used to optimize virtual machine placements in virtual environments and the related software and services Densify provides. Densify contends that VMware's use of that mark in connection with VMware's technology and services infringes or infringed Densify's mark and is likely to cause confusion about the origin of goods and services. In determining distinctiveness, you must consider how strongly "DENSIFY" indicates that a good comes from a specific source.  This is an important factor to consider in assessing its validity as a trademark and for determining whether VMware's use of this word creates for consumers a likelihood of confusion as to source, sponsorship, affiliation or approval of VMware's goods.

In order to determine if Densify has met its burden of showing that "DENSIFY" is a valid trademark, you should classify it on the spectrum of trademark distinctiveness that I will explain in the next instruction.

An inherently distinctive trademark is a word, symbol or device, or combination of them, which intrinsically identifies a particular source of a good in the market. The law assumes that an inherently distinctive trademark is one that almost automatically tells a consumer that it refers to a brand or a source for a product, and that consumers will be predisposed to equate the trademark with the source of a product.

## 7.8    SPECTRUM OF MARKS

Trademark law provides great protection to distinctive or strong trademarks.  Conversely, trademarks that are not as distinctive or strong are called "weak" trademarks and receive less protection from infringing uses. Trademarks that are not distinctive are not entitled to any trademark protection. For deciding trademark protectability you must consider whether a trademark is inherently distinctive. Trademarks are grouped into four categories according to their relative strength or distinctiveness.  These four categories are, in order of strength or distinctiveness: arbitrary (which is inherently distinctive), suggestive (which also is inherently distinctive), descriptive (which is protected only if it acquires in consumers' minds a "secondary meaning," which I explain further in another Instruction), and generic names (which are entitled to no protection).

### 7.9     ARBITRARY TRADEMARKS

The first category of "inherently distinctive" trademarks is arbitrary trademarks. They are considered strong marks and are clearly protectable. They involve the arbitrary, fanciful, or fictitious use of a word to designate the source of a product or service. Such a trademark is a word that in no way describes or has any relevance to the particular product or service it is meant to identify.  It may be a common word used in an unfamiliar way. It may be a newly-created word or parts of common words which are applied in a fanciful, fictitious, or unfamiliar way, solely as a trademark.

For instance, the common word "apple" became a strong and inherently distinctive trademark when used by a company to identify the personal computers that company sold.  The company's use of the word "apple" was arbitrary or fanciful because "apple" did not describe and was not related to what the computer was, its components, ingredients, quality, or characteristics.  "Apple" was being used in an arbitrary way to designate for consumers that the computer comes from a particular manufacturer or source.

### 7.10   SUGGESTIVE TRADEMARKS

The next category is suggestive trademarks. These trademarks are also inherently distinctive but are considered weaker than arbitrary trademarks. Unlike arbitrary trademarks, (which are in no way related to the product or service or its components, quality, or characteristics,) suggestive trademarks imply some characteristic or quality of the product or service to which they are attached.  If the consumer must use imagination or any type of multi-stage reasoning to understand the trademark's significance, then the trademark does not describe the product's features, but merely suggests them.

A suggestive use of a word involves consumers associating the qualities the word suggests to the product or service to which the word is attached.  For example, when "apple" is used not to indicate a certain company's computers, but rather "Apple–A–Day" Vitamins, it is being used as a suggestive trademark.  "Apple" does not describe what the vitamins are. However, consumers may come to associate the healthfulness of "an apple a day keeping the doctor away" with the supposed benefits of taking "Apple–A–Day" Vitamins.

## 7.11   DESCRIPTIVE TRADEMARKS

The third category is descriptive trademarks. These trademarks directly identify or describe some aspect, characteristic, or quality of the product or service to which they are affixed in a straightforward way that requires no exercise of imagination to be understood.

For instance, the word "apple" is descriptive when used in the trademark "CranApple" to designate a cranberry-apple juice.  It directly describes ingredients of the juice.  Other common types of descriptive trademarks identify where a product comes from, or the name of the person who makes or sells the product.  Thus, the words "Apple Valley Juice" affixed to cider from the town of Apple Valley is a descriptive trademark because it geographically describes where the cider comes from.  Similarly, a descriptive trademark can be the personal name of the person who makes or sells the product.  So, if a farmer in Apple Valley, Judy Brown, sold her cider under the label "Judy's Juice" (rather than CranApple) she is making a descriptive use of her personal name to indicate and describe who produced the apple cider and she is using her first name as a descriptive trademark.

### 7.12   GENERIC NAMES

The fourth category is entitled to no protection at all. They are called generic names and they refer to a general name of the product or service, as opposed to the plaintiff's brand for that product or service. Generic names are part of our common language that we need to identify all such similar products or services. A generic name is a name for the product or service on which it appears. If the primary significance of the alleged mark is to name the type of product or service rather than the manufacturer or provider, the term is a generic name and cannot be a valid trademark. If the majority of relevant consumers would understand the term to name the type of product rather than the manufacturer, the primary significance of the term is generic and not entitled to protection as a trademark.

The word "apple" can be used as a generic name and not be entitled to any trademark protection.  This occurs when the word is used to identify the fruit from an apple tree.

The computer maker who uses the word "apple" as a trademark to identify its personal computer, or the vitamin maker who uses that word as a trademark on vitamins, has no claim for trademark infringement against the grocer who used that same word to indicate the fruit sold in a store.  As used by the grocer, the word is generic and does not indicate any particular source of the product.  As applied to the fruit, "apple" is simply a commonly-used name for what is being sold.

### 7.13    MARK DISTINCTIVENESS AND VALIDITY

Densify believes that its mark is suggestive, and in the alternative, that the mark has achieved secondary meaning, while VMware claims that Densify's mark is merely descriptive and has not achieved secondary meaning.

If you decide that "DENSIFY" is arbitrary or suggestive, it is considered to be inherently distinctive.  An inherently distinctive trademark is valid and protectable.

On the other hand, if you determine that "DENSIFY" is generic, it cannot be distinctive and therefore is not valid nor protectable.  In that instance, you must render a verdict for VMware on the charges of trademark infringement.

If you decide that "DENSIFY" is descriptive, you will not know if it is valid or invalid until you consider whether it has gained distinctiveness by the acquisition of secondary meaning, which I explain in another Instruction.

## 8.0    SECONDARY MEANING

If you determine that "DENSIFY" is descriptive, you must consider the recognition it has among prospective consumers in order to determine whether it is valid and protectable even though it is descriptive.  This market recognition is called the trademark's "secondary meaning."

A word, name, symbol, or device (or any combination of these items) acquires a secondary meaning when it has been used in such a way that its primary significance in the minds of the prospective consumers is not the product itself, but the identification of the product with a single source, regardless of whether consumers know who or what that source is. You must find that the preponderance of the evidence shows that a significant number of the consuming public associates "DENSIFY" with a single source, in order to find that it has acquired secondary meaning.

When you are determining whether "DENSIFY" has acquired a secondary meaning, consider the following factors:

(1) Consumer Perception. Whether the people who purchase the products or services that bear the claimed trademark associate the trademark with Densify;

(2) Advertisement. To what degree and in what manner Densify may have advertised under the claimed trademark;

(3) Demonstrated Utility. Whether Densify successfully used this trademark to increase the sales of its products and services;

(4) Extent of Use. The length of time and manner in which Densify used the claimed trademark;

(5) Exclusivity. Whether Densify's use of the claimed trademark was exclusive;

(6) Copying. Whether the defendant intentionally copied Densify's trademark; and

(7) Actual Confusion. Whether VMware's use of Densify's trademark has led to actual confusion among a significant number of consumers.

Descriptive marks are protectable only to the extent you find they acquired distinctiveness through secondary meaning by the public coming to associate the marks with the owner of the marks. Descriptive marks are entitled to protection only as broad as the secondary meaning they have acquired, if any. If they have acquired no secondary meaning, they are entitled to no protection and cannot be considered valid marks.

Densify here alleges that its mark acquired secondary meaning in the relevant marketplace. Densify has the burden of proving that "DENSIFY" has acquired a secondary meaning. VMware has the burden of proving that "DENSIFY" lacks a secondary meaning. The mere fact that Densify is using the word "DENSIFY" or that Densify claims it began using it before VMware does not mean that the mark has acquired secondary meaning. There is no particular length of time that a trademark must be used before it acquires a secondary meaning.

## 9.0     OWNERSHIP AND PRIORITY

The law entitles the trademark owner to exclude others from using that trademark. A person acquires the right to exclude others from using a trademark by being the first to use it in the marketplace or by using it before the alleged infringer does. A person also acquires the right to exclude others from using a trademark if industry or public usage creates, for a majority of relevant consumers, an association between the person and the mark prior to the alleged infringer's use.

If you find "DENSIFY" to be inherently distinctive, you must consider whether Densify used it as a trademark for its products before VMware began to use the word "DENSIFY" to market its own products.

If you find "DENSIFY" to be descriptive but to have acquired secondary meaning, you must consider whether it acquired secondary meaning for Densify's products before VMware began to use the word "DENSIFY" to market its own products.

A trademark is "used" for purposes of this instruction when a product is transported or sold in commerce in the U.S. and the trademark is attached to the product or placed on its label or container, or if that is not practical, placed on documents associated with the goods or their sale.

If Densify has not shown by a preponderance of the evidence that Densify used "DENSIFY" as a valid trademark before VMware's use of the same, then you cannot conclude that Densify is the owner of the trademark.

## 10.0    LIKELIHOOD OF CONFUSION – FACTORS

You must consider whether VMware's use of "densify," "densifying," and "densification" is likely to cause confusion about the source of Densify's or VMware's goods.

I will suggest some factors you should consider in deciding likelihood of confusion. The presence or absence of any particular factor that I suggest should not necessarily resolve whether there was a likelihood of confusion, because you must consider all relevant evidence in making this determination.  As you consider the likelihood of confusion you should examine the following:

1. **Strength or Weakness of Densify's mark**. The more the consuming public recognizes Densify's mark as an indication of origin of virtual machine placement software and related software and services, the more likely it is that consumers would be confused about the source of VMware's own virtual machine placement software and related software and services if VMware uses similar marks.

2. **Similarity of Densify's mark and the words and symbols used by VMware.** If there is great similarity between Densify's mark and the terms and symbols used by VMware, there is a greater chance that consumers are likely to be confused by VMware's use of the relevant words and symbols.

3. **Similarity of Densify's and VMware's Goods and Services**. If VMware and Densify market the same or related kinds of virtual optimization computing goods and services, there may be a greater likelihood of confusion about the source of the virtual optimization computing goods and services than otherwise.

4. **Actual Confusion**. If there is evidence of actual buyer confusion concerning Densify's mark and the relevant words and symbols used by VMware, this

strongly suggests a likelihood of confusion. However, Densify need not produce evidence of actual buyer confusion in order for you to find that a likelihood of confusion exists.

5. **VMware's Intent in Adopting the Relevant Words.** Evidence that VMware adopted the relevant words with the intent to cause confusion between their virtual machine placement optimization software and services and Densify's virtual machine placement optimization software and services should be weighed heavily in favor of a finding of likelihood of confusion if: (a) VMware's intent to confuse or deceive is demonstrated by clear and convincing evidence, and (b) the virtual machine placement optimization software and services labeling and marketing are also affirmatively deceiving. On the other hand, any evidence of VMware's good faith in seeking to avoid confusion (including the prominent use or placement of VMware's name or trademarks in connection with the sale or provision of its virtual optimization computing goods and services) should be weighed against a finding of likelihood of confusion.

6. **Distribution Channels**. If Densify's and VMware's virtual machine placement optimization software and services are likely to be sold to the same or similar customers or through the same distribution channels, this increases the likelihood of confusion.

7. **The Degree of Purchaser Care**. The more costly the virtual machine placement optimization software and services, the more sophisticated, careful and discriminating the buyers are likely to be. Thus, they may be less likely to be confused by similarities in Densify's mark and VMware's use of "densify,"

"densifying," and "densification."

8. **The length of time VMware has used the mark without evidence of actual confusion arising.**

9. **Other**. Other facts suggesting that the consuming public might expect Densify to manufacture both products, or expect Densify to manufacture a product in VMware's market, or expect that Densify is likely to expand into VMware's market.

Although you should consider all of the above factors as part of making your decision, the above list is not intended to be exclusive and you should consider any other factors or evidence that bear on likelihood of confusion.

In considering these factors, your general knowledge, and any other evidence, you should not treat any single factor as dispositive; nor should you treat this as a simple mathematical exercise where the party with most of the above factors in its favor wins. In other words, while you should consider all the above factors, some factors may be more important than others in the context of this case.  Thus, you should balance all the above factors and any other relevant factors or evidence to determine whether, in light of all the circumstances of this case, consumers are likely to be confused.

## 11.0    FAIR USE

The owner of a trademark cannot exclude others from making a fair use of that trademark. A defendant makes fair use of a mark when the defendant uses it as other than a trademark, to accurately describe the source of the defendant's own products or services.

VMware contends that it fairly used "densify," "densifying," and "densification" to describe VMware's software. A defendant makes fair use of a trademark when it:

1. uses the mark other than to distinguish the defendant's goods from the plaintiff's and to indicate the source of the defendant's goods;

2. uses the mark fairly and in good faith; and

3. uses the mark only to describe the defendant's goods or services as those of the defendant's and not at all to describe the plaintiff's product.

VMware has the burden of proving its fair use of "densify," "densifying," and "densification" by a preponderance of the evidence.

## 12.0    DECEPTIVE TRADE PRACTICES

Densify also alleges that VMware violates the Delaware Deceptive Trade Practices Act.

If you find for Densify on its trademark infringement claim, you should also find for Densify on its deceptive trade practice claim.  Similarly, if you find for VMware on Densify's trademark infringement claim, you should also find for VMware on Densify's deceptive trade practice claim.

## 13.0   DAMAGES

All the instructions that I have given you up to this point have been about determining liability, meaning the determination as to whether VMware has infringed Densify's patents, has infringed Densify's trademarks, or has engaged in deceptive trade practices.  If you determine that VMware is liable for any of the asserted claims, then you must consider the issue of the amount of damages that should be awarded to Densify. If you find that each of the asserted claims is either invalid or not infringed, then you should not consider damages in your deliberations. I will instruct you now on how to determine the amount of damages, if any.  By instructing you on damages, I am not suggesting which party should win this case, on any issue.

Densify has the burden to establish each element of its damages, including the amount of the damages, by a preponderance of the evidence. In other words, you should award only those damages that Densify establishes that it more likely than not suffered. Densify must prove the amount of damages with reasonable certainty, but need not prove the amount of damages with mathematical precision.  You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.

In this case, Densify seeks damages as measured by a reasonable royalty. A reasonable royalty is defined as the money amount Densify and VMware would have agreed upon as a fee for use of the invention at the time prior to when infringement began.  I will now give you more detailed instructions regarding damages, looking first at damages for patent infringement and then at damages for the non-patent claims.

## 14.0    PATENT DAMAGES INTRODUCTION

If you find that VMware infringed or induced infringement of any valid claim of the

Densify patents, you must then consider what amount of damages to award to Densify for the

infringement.  If you find that each of the asserted claims is either invalid or not infringed, then

VMware is not liable for patent infringement and you need not address damages in your

deliberations.

The damages you award must be adequate to compensate Densify for the infringement.

They are not meant to punish an infringer.

## 14.1   DATE DAMAGES BEGIN AND END

Densify filed this lawsuit on April 25, 2019. Densify may seek patent damages for up to six years before this lawsuit was filed. Therefore, the maximum period over which Densify may recover damages for the '687 patent is from April 25, 2013 through the present.  For the '367 patent, the maximum damages period is May 16, 2017 through the present.

In determining damages, you must determine when the damages began for each asserted patent. For each patent, there are at least two potential damages starting dates in this case.

For the '687 Patent:

A) If you find that VMware has directly infringed the '687 Patent, the damages period begins on April 25, 2013 to the present, but damages are only available for VMware's own use of its accused products and not its customers' use; and

B) If you find that VMware has induced infringement of the '687 Patent, the damages period begins on the date on which all the requirements of such infringement had been satisfied to the present.

For the '367 Patent:

A) If you find that VMware has directly infringed the '367 Patent, the damages period begins on May 16, 2017, the date the '367 Patent issued, to the present, but damages are only available for VMware's own use of its accused products and not its customers' use; and

B) If you find that VMware has induced infringement of the '367 Patent, the damages period begins on the date on which all the requirements of such infringement had been satisfied to the present, but no earlier than May 16, 2017.

## 14.2   REASONABLE ROYALTY-GENERALLY

Densify is seeking damages in the form of a reasonable royalty in this case.  A reasonable royalty is the royalty that would have resulted from a hypothetical negotiation between the patent owner and the alleged infringer just before the infringement began. In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the infringer would have been if they had entered into an agreement at that time, and if they had acted reasonably in the negotiations. You should assume that both parties to the hypothetical negotiation believed the patent to be valid and infringed and that both parties are willing to enter into a license. You should also assume that the patent holder and the infringer would have acted reasonably and would have entered into a license agreement.

Having that in mind, you may consider any relevant fact in determining the reasonable royalty for the use of a patented invention, including the opinion testimony of experts. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.

A reasonable royalty is typically made up of (1) a base and (2) a rate (or percentage) that is applied to that base. The reasonable royalty award must be apportioned and based only on the incremental value that the patented invention adds to the end product, and the patent holder must apportion value between the patented features and any non-patented features contained in the accused products. The reasonable royalty for method claims must also be limited to only those circumstances in which the steps of the claimed method were performed. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product and no more. Although direct evidence is not required to prove all specific instances of infringement, the damages award ought to be correlated, in some respect, to

the extent the infringing method is used by consumers. Damages for indirect infringement are

not limited to a specific number of instances of actual infringing use proven with direct evidence.

### 14.3    FACTORS FOR DETERMINING REASONABLE ROYALTY

In determining a reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the kinds of factors that you may consider in making your determination are:

1.      The royalties received by the patent owner for the licensing of the patent in suit, proving or tending to prove an established royalty.

2.      The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3.      The nature and the scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4.      The patent owner's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity.

5.      The commercial relationship between the licensee and the patent owner at the time of the hypothetical negotiation, such as whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6.      The effect of selling the patented product in promoting sales of other products of the licensee; the existing value of the invention to the patent owner as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.

7.      The remaining life of the patents-in-suit and the terms of the license.

8.      The established profitability of the products made under the patents-in-suit; their commercial success; and their current popularity.

9.      The utility and advantages of the patent property over the old modes or devices, if any, that had been used for achieving similar results.

10.     The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the patent owner at the time of the hypothetical negotiation; and the benefits to those who have used the invention.

11.     The extent to which the licensee has made use of the invention; and any evidence probative of the value of that use.

12.     The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.     The portion of the realizable profit that should be credited to the inventions as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.     The opinion and testimony of qualified experts.

15.     The amount that a licensor (such as the patent owner) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

16.     Any other economic factor that a normally prudent businessperson would, under similar circumstances, take into consideration in negotiating the hypothetical license. This may

include the availability of commercially acceptable, noninfringing alternatives at the time of the hypothetical negotiation.

No one of these factors is dispositive, and you can and should consider the evidence that has been presented to you on any of these factors. You may also consider any other factors that in your mind would have increased or decreased the royalty the accused infringer would have been willing to pay and the patent holder would have been willing to accept.

### 14.4   REASONABLE ROYALTY - TIMING

The relevant date for the hypothetical reasonable royalty negotiation is at the time the infringement began. However, you may also consider in your determination of reasonable royalty any information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain circumstances include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives.

The damages period might not coincide with the date of the first infringement. That is because the patent law limits damages to a six-year period before the filing of the complaint or counterclaim for infringement.

Remember, however, you may only award damages for any infringement you have found occurred during the damages periods I previously provided to you in Instruction 14.1.

### 14.5   PATENT DAMAGES INTEREST

Neither Densify's nor VMware's calculations include interest. Therefore, in arriving at your damages calculation, you should not consider interest in any way because it is the function of the Court to award interest.

### 14.6   LIMITATIONS OF PATENT DAMAGES

If you award damages for induced infringement, you must limit the damages to circumstances in which all the elements needed to find induced infringement have been satisfied. In order to recover damages for induced infringement, Densify must either prove that the accused VMware products necessarily infringe the asserted patents or prove acts of direct infringement by others that were induced by VMware.  The amount of damages for induced infringement is limited by the number of instances of direct infringement.  Densify must prove acts of direct infringement of the asserted patents, for example, by showing individual acts of direct infringement or by showing that a particular class of uses directly infringes.

## 15.0   NON-PATENT DAMAGES

### 15.1   DAMAGES FOR TRADEMARK INFRINGEMENT – GENERALLY

If you find based on the instructions you have been given that VMware infringed Densify's trademark and/or falsely designated the origin of its products, you may award Densify damages in an amount you determine to be fair and equitable, consisting of Densify's actual damages attributable to VMware's infringement.

## 15.2   ACTUAL DAMAGES

If you find for Densify on its trademark infringement claim, you must determine Densify's actual damages.

Densify has the burden of proving actual damages by a preponderance of the evidence.

Damages means the amount of money which will reasonably and fairly compensate Densify for any injury you find was caused by the VMware's infringement of Densify's trademark.

You should consider the following: (1) The injury to or loss of Densify's reputation; (2) The injury to or loss of Densify's goodwill, including injury to Densify's general business reputation; (3) The expense of preventing customers from being deceived; (4) The cost of future corrective advertising reasonably required to correct any public confusion caused by the infringement; and (5) other damages Densify suffered.

When considering prospective costs, you must not overcompensate. Accordingly, your award of such future costs should not exceed the actual damage to the value of Densify's mark at the time of the infringement by VMware.

**16.0    DELIBERATION AND VERDICT**

**16.1    INTRODUCTION**

I have concluded the part of my instructions explaining the rules for considering some of the testimony and evidence. Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can.  I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is Juror No. 1.

One more thing about messages. Do not ever write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be. That should stay secret until you are finished.

## 16.2   UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.  Remember at all times that you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you. I will review it with you in a moment. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form. You will then return to the Courtroom and my deputy will read aloud your verdict.  Place the completed verdict sheet in the envelope we will give you.  Do not show the completed verdict form to anyone or share it with anyone until you are in the Courtroom.

It is proper to add the caution that nothing said in these instructions, and nothing in the verdict form, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility.

### 16.3   DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that- your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

**16.4   SOCIAL MEDIA**

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smartphone, iPhone, blackberry, tablet or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog or website such as Facebook, LinkedIn, YouTube, Instagram, Snapchat, or Twitter to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

### 16.5   COURT HAS NO OPINION

Let me finish by repeating something I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.