IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

CIRBA INC. (d/b/a DENSIFY)       :
and CIRBA IP, INC.,            :
                                    :
           Plaintiffs,      :
                                      :
       v.                  :     C.A. No. 19-742-LPS
                                      :
VMWARE, INC.,              :     ==UNSEALED ON JUNE 4, 2020==
                                      :
           Defendant.      :

---

## **MEMORANDUM ORDER**

On April 25, 2019, Plaintiffs Cirba Inc. and Cirba IP, Inc. (collectively, "Densify" or "Plaintiffs") sued Defendant VMware, Inc. ("VMware" or "Defendant") for (among other things) infringement of U.S. Patent Nos. 8,209,687 (the "'687 patent") and 9,654,367 the "'367 patent") (the "patents-in-suit"). (D.I. 1)  The Court denied Plaintiffs' motion for a preliminary injunction on August 6, 2019. (D.I. 137)  The Court then presided over an expedited, nine-day jury trial in January 2020. (*See* D.I. 587-97)  On January 24, 2020, the jury returned a verdict finding VMware infringed both the '687 and '367 patents and awarding damages in the amount of $235,724,765 and $1,112,111, respectively. (D.I. 549)

The parties filed and briefed numerous post-trial motions. (*See, e.g.*, D.I. 601, 604)  On May 15, 2020, the Court heard oral argument on all pending motions. (*See* Transcript ("Tr."))  Thereafter, Densify requested leave to file additional briefing (*see* D.I. 745), which VMware opposes (*see* D.I. 747).

Having considered all of the parties' filings and arguments, and for the reasons stated below, IT IS HEREBY ORDERED that:

1.      VMware's Motion to Dismiss Cirba Inc. for Lack of Standing (D.I. 601) ("Standing Motion") is GRANTED.

2.      Cirba Inc. is DISMISSED as a party to this action.

3.      The parties shall file supplemental briefing consistent with the directions provided at the conclusion of this Order.

The Standing Motion is just one of many disputes the parties have put before the Court following trial.  The Court has determined that the most reasonable and appropriate manner of proceeding is to resolve this single motion and then obtain the parties' further views as to the impact of that resolution on the still-pending issues.

By its Standing Motion, VMware contends that Cirba Inc. must be dismissed as a plaintiff because it is a "bare licensee" to the patents-in-suit and, therefore, lacks standing to sue. Plaintiffs counter that Cirba Inc. is, instead, an "exclusive licensee" to the patents-in-suit and, thus, has standing to sue as a co-plaintiff with the patents' owner, Cirba IP, Inc.  The Court has determined that application of the legal standards provided by the Federal Circuit to the agreements executed by Cirba Inc. and Cirba IP, Inc. leads to the conclusion that Cirba Inc. is a bare licensee which lacks standing to sue and must be dismissed.

"Standing is a constitutional requirement pursuant to Article III and it is a threshold jurisdictional issue." *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1363 (Fed. Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).[1]  A plaintiff bears the burden of persuasion to show it has standing.  *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir. 1991); *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed.

---

[1] Standing is "comprised of both constitutional and prudential components," *Oxford Assocs. v. Waste Sys. Auth. of E. Montgomery Cty.*, 271 F.3d 140, 145 (3d Cir. 2001), but the Standing Motion here relates only to constitutional standing.

3

Cir. 2005). "Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring his claim." *Samsung Elecs. Co., Ltd. v. ON Semiconductor Corp.*, 541 F. Supp. 2d 645, 648 (D. Del. 2008); *see also Ballentine v. United States*, 486 F.3d 806 (3d Cir. 2007) ("A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.").

"[T]he touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010). The owner of a patent has standing to enforce its right to exclude others from practicing its patent without its consent. *See* 35 U.S.C. § 281 (providing "patentee" has right to initiate "civil action for infringement of [its] patent"); 35 U.S.C. § 100(d) ("The word 'patentee' includes not only the patentee to whom the patent was issued but also the successors in title to the patentee."); *see also Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005) ("[I]f the patentee transfers all substantial rights under the patent, it amounts to an assignment and the assignee may be deemed the effective patentee under 35 U.S.C. § 281 for purposes of holding constitutional standing to sue another for patent infringement in its own name.").

Likewise, an exclusive licensee – that is, a party which "hold[s] exclusionary rights and interests created by patent statutes" even if it does not enjoy "all substantial rights to the patent" – also has standing to sue for infringement of any patent to which it has an exclusive license. *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007); *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1553 (Fed. Cir. 1995) (characterizing exclusive licensee as one who

"shar[es] the property rights represented by a patent") (internal quotation marks omitted).  "[A]n

exclusive licensee having fewer than all substantial patent rights . . . that seeks to enforce its

rights in a patent generally must sue jointly with the patent owner."  *Intellectual Prop. Dev., Inc.*

*v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1347-48 (Fed. Cir. 2001).

　　　　"By contrast, a bare licensee, i.e., a party with only a covenant from the patentee that it

will not be sued for infringing the patent rights, lacks standing to sue third parties for

infringement of the patent."  *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir.

2007).  "A bare licensee cannot cure its lack of standing by joining the patentee as a party."  *Id.*

at 1193-94.

　　　　Because a licensee's standing to sue for patent infringement turns on whether the licensee

enjoys an exclusive license or is merely a bare licensee, determining which type of license a

plaintiff holds is dispositive.  When faced with a dispute over the type of license involved, the

Federal Circuit has directed that courts engage in the following analysis:

> Determining whether a licensee is an exclusive licensee or a bare
> licensee is a question of ascertaining the intent of the parties to the
> license as manifested by the terms of their agreement and
> examining the substance of the grant.  ***The use of the word
> "exclusive" is not controlling***; what matters is the substance of the
> arrangement.  Because patent rights are rights to "exclude others,"
> *see* 35 U.S.C. § 154(a)(1), ***a licensee is an exclusive licensee only
> if the patentee has promised, expressly or impliedly, that "others
> shall be excluded from practicing the invention"*** within the field
> covered by the license.  Put another way, an exclusive license is a
> license to practice the invention . . . accompanied by the patent
> owner's promise that others shall be excluded from practicing it
> within the field of use wherein the licensee is given leave.  Thus, ***if
> a patentee-licensor is free to grant licenses to others, licensees
> under that patent are not exclusive licensees***.

*Textile Prods. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998) (internal citations and

quotation marks omitted; internal ellipses in original; emphasis added); *see also Molon Motor*

*and Coil Corp. v. Nidec Motor Corp.*, 946 F.3d 1354, 1361 (Fed. Cir. 2020) (quoting *Textile Prods.*, 134 F.3d at 1484, and reiterating that "an exclusive license is a license to practice the patented invention 'accompanied by the patent owner's promise that others shall be excluded from practicing it within the field of use wherein the licensee is given leave'").

Hence, if a party "has not received an express or implied promise of exclusivity under the patent, *i.e.,* the right to exclude others from making, using, or selling the patented invention," the licensee has a bare license, as it "has received only the patentee's promise that that party will not be sued for infringement." *Rite-Hite*, 56 F.3d at 1552 (internal citations omitted). Such a party, lacking exclusionary rights, also lacks standing to sue for patent infringement.

Having set out the governing legal standards, the Court turns to the specific dispute before it. Two agreements govern the pertinent relationships between the two Plaintiffs, Cirba IP, Inc. (hereinafter, "IP") and Cirba Inc. (hereinafter "Inc.").

On March 21, 2016, Inc. transferred all of its rights in certain patents (including, without dispute, the patents-in-suit) to IP. (*See* D.I. 603 Ex. 2) ("Assignment Agreement") The pertinent provisions of this Assignment Agreement are as follows:

- Inc., the "Assignor," "is the owner of the inventions as described in the patents and patent applications listed in Schedule A attached hereto, hereinafter collectively referred to as the 'Patents,'" which include the patents-in-suit;

- IP, the "Assignee," "desires to acquire the Assignor's entire right, title and interest in and to the inventions and the Patents;" and

- Inc. "does hereby sell, assign, transfer and set over to the Assignee [i.e., IP] . . . its entire right, title, interest, property and benefit, in and to the Patents, . . . including . . . all rights of enforcement thereto, including all rights to sue or recover for the past

infringement thereof, . . . the same to be held and enjoyed as fully and exclusively as they would have been by [Inc.] had this assignment and transfer not been made."

(D.I. 603 Ex. 2 at 1)

Also on March 21, 2016, IP, identified as the "Corporation," and Inc., the "Licensee," executed a License Agreement. (PTX-1249)[2] Under the License Agreement, IP granted a license back to Inc. That license included "the patents described in 'Schedule A,'" which indisputably include the patents-in-suit. The pertinent provisions of the License Agreement are as follows:

- "Subject to the terms and conditions specified in this [License] Agreement, the Corporation [IP] hereby grants, and the Licensee [Inc.] hereby accepts, an *exclusive*, transferable, worldwide license to use the Products," which is defined to include the patents-in-suit;[3]

- "The Licensee [Inc.] acknowledges that, between the Licensee [Inc.] and the Corporation [IP], *the Corporation [IP] is the exclusive owner of all proprietary rights*, including rights based upon trade secret, *patent* and copyright laws, in and to the Products and the Documentation and information thereof, and agrees to recognize the same and to abide by the terms thereof. *This Agreement gives the Licensee [Inc.] no rights in such proprietary rights.*"

_____

[2] The License Agreement includes a choice-of-law provision designating the law of Canada and of the Province of Ontario as governing its interpretation. (PTX-1249 at 3) No party has made any argument – either in its briefing or during oral argument – that this provision has any impact on the Standing Motion. (*See, e.g.*, Tr. at 102; D.I. 672 at 25; D.I. 685 at 12; D.I. 712 at 25)

[3] "The term '**Products**' means all of the Software, as such term is defined below, and all intellectual property rights thereto, including the patents described in Schedule 'A' attached hereto, used in or necessary for the Licensee to undertake the provision and sale of licenses of the Software to its customers . . . ." (PTX-1249 at 1)

(PTX-1249 at 1-3) (emphasis added)

Together, the Assignment Agreement and License Agreement render Inc. no more than a bare licensee.

The Assignment Agreement resulted in **IP** having the "entire right, title, interest, property and benefit, in and to the Patents," including all "rights of enforcement" and "all rights to sue or recover for the past infringement thereof."  (D.I. 603 Ex. 2 at 1)  So the Assignment Agreement left **Inc.** with no rights whatsoever in the patents-in-suit.  The only rights Inc. enjoys with respect to those patents are those rights granted to Inc. by IP in the License Agreement.

In turn, the License Agreement grants Inc. what is described as "an exclusive, transferable, worldwide license to use" the patents-in-suit (among other intellectual property). (PTX-1249 at 1)  But the License Agreement also expressly states that **IP** remains "the ***exclusive owner of all proprietary rights***, including rights based upon . . . ***patent*** . . . laws," and expressly adds that it "***gives the Licensee [Inc.] no rights in such proprietary rights***."  (PTX-1249 at 2-3) (emphasis added)  The end result is that while ***Inc. is free to practice*** the patents-in-suit as it wishes, ***IP is free to enforce (or not enforce) its exclusionary rights*** in connection with the patents-in-suit as it, IP, wishes.  Hence, Inc. lacks any right to exclude; it is, then, a bare licensee, and not an exclusive licensee. *See Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1031 (Fed. Cir. 1995) ("[T]he patent owner may freely license others, or may tolerate infringers, and in either case no right of the patent licensee is violated.  Practice of the invention by others may indeed cause him pecuniary loss, but it does him no legal injury.") (internal quotation marks omitted).

Plaintiffs argue that "no rights are reserved in the License Agreement to license another entity."  (D.I. 672 at 25)  It is true that there is no express reservation of such rights by IP.

8

*Crucially, however, there is also no prohibition, restriction, or limitation of any kind on IP's rights to license other entities in addition to Inc*.

Plaintiff concedes, as it must, that the License Agreement contains no such express provision.  (*See* Tr. at 97)  Plaintiff suggests that IP implicitly agreed to limit its ability to license others as this is the intent of the License Agreement, as reflected in that agreement's express characterization of the license being granted to Inc. as "an exclusive . . . license."  (*Id.*; *see also* D.I. 672 at 25 (contending that License Agreement "makes clear that the intent of the parties was to exclude others"))  The law is clear, however, that distinguishing between an exclusive license and a bare license does not turn on the language the parties use to describe the license.  *See Textile Prods.*, 134 F.3d at 1484 ("The use of the word 'exclusive' is not controlling; what matters is the substance of the arrangement."); *Ortho Pharm. Corp.*, 52 F.3d at 1032 (explaining "it is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology" that determines if it is exclusive licensee, "not simply that the word 'exclusive' may or may not appear in the license"); *see also generally Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991) ("[T]he use of the term 'exclusive license' . . . is not dispositive; what the documents in fact recite is dispositive.").  The "substance" of the License Agreement is that IP is the sole owner of the patents-in-suit and no provision of that Agreement imposes any legally-binding limitation on IP's ability to grant licenses.  Thus, any license IP grants – including the license to Inc. (which is the only license it has granted) – is a nonexclusive license, regardless of what the parties to the license choose to call it.

At best for Plaintiffs, the License Agreement made IP the sole licensee to the patents-in-suit on March 21, 2016, but it did nothing to deprive Inc. of its lawful ability to grant another

license to another party at any subsequent time.  The result is that IP is not an exclusive licensee under the law.  As VMware correctly points out, "[t]hat no one else has been licensed does not show Cirba IP *cannot* grant more licenses."  (D.I. 715 at 12) (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 956 (Fed. Cir. 2006))

Ultimately, Plaintiffs have failed to demonstrate that IP expressly or even impliedly promised not to grant a license to the patents-in-suit to any entity other than Inc.  "To qualify as an exclusive license, an agreement must clearly manifest the patentee's promise to refrain from granting to anyone else a license in the area of exclusivity."  *Textile Prod.*, 134 F.3d at 1484. The Assignment Agreement and License Agreement do not clearly manifest any such promise. Accordingly, Inc. is a bare licensee, lacks standing to sue, and must be dismissed.

VMware further argues that Inc.'s lack of standing warrants a new trial, as allegations of harm to Inc. – which does business as "Densify" – were "central to [Densify's] trial presentation and VMware's rebuttal."  (D.I. 712 at 25)  At this time, however, the Court will not grant a new trial based on dismissal of Inc. (although neither is the Court denying that request at this point).

Instead, the Court is not yet sure of the impact of today's decision on the jury verdict and the parties' still-pending requests for relief, including VMware's motions for judgment as a matter of law and/or a new trial.  The parties will be given an opportunity to provide additional briefing on these points.  The Court is especially interested in understanding the parties' positions on how the January trial would have looked different had IP been the sole Plaintiff and whether there is any likelihood that the outcome of that trial would have differed if Inc. had not been in the case.[4]

---

[4] As best as the Court can discern or recollect, the earliest reference VMware made to its argument that Plaintiff Inc. must be dismissed from the case for lack of standing was in the proposed final pretrial order, which was filed on January 2, 2020, just 11 days before trial.  (D.I.

At the same time, the Court will also benefit from additional briefing focused on one of VMware's non-infringement arguments: that Plaintiffs failed to present sufficient evidence at trial to permit the jury reasonably to have found infringement of the '687 patent, given a purported failure of proof on the "virtualized environment" limitation of the claims.  VMware presented this as one of multiple bases for judgment of non-infringement (or alternatively for a new trial on infringement) in its post-trial briefing and focused on it during oral argument. Plaintiffs were asked repeated questions during argument about Defendant's position and the Court would benefit from having Plaintiffs' most careful response before determining whether the verdict of infringement can stand.

Accordingly, the parties shall provide further briefing as follows:

A.      Simultaneous letter briefs, not to exceed seven (7) pages per side, due on June 11, addressing the following issues:

> (i) the impact, if any, that the Court's ruling on standing (a) would have had on the January trial, had the Court dismissed Inc. prior to trial, and (b) has on any motion or request for relief pending before the Court; and

> (ii) whether the '687 patent's limitations were met within a particular virtualized environment.

---

439)  Even at that time, VMware did not request an opportunity to brief the standing issue prior to trial, stating merely that "[t]o the extent that the Court wants to resolve this issue pre-trial, VMware proposes [a] short briefing schedule."  (D.I. 439 at 33-34; *see also id.* Ex. 3 at 2 n.2 (noting VMware's proposed briefing schedule "should the Court wish to resolve this issue prior to trial"))  The Court decided the day before the pretrial conference that it would defer consideration of standing until after trial, as Plaintiffs had requested.  (*See* D.I. 460 at 7)

The Court recognizes that the issue of subject matter jurisdiction can be raised at any time.  *See, e.g.*, *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884) (holding that challenge to subject matter jurisdiction may be raised at any time during proceedings, including by court *sua sponte*).  Nevertheless, the parties should include in their forthcoming briefing any argument they have as to whether the timing by which the standing issue was raised should affect what (if any) additional relief is warranted due to the dismissal of Inc. as a party.

   B.  Simultaneous answering letter briefs, not to exceed five (5) pages per side, due on June 19.

   C.  Simultaneous reply letter briefs, not to exceed three (3) pages per side, due on June 24.

   IT IS FURTHER ORDERED that because this Memorandum Order has been issued under seal, the parties shall meet and confer and, no later than tomorrow, **June 4 at 12:00 p.m.**, advise the Court whether any party is requesting any redactions.  The Court's present belief is that nothing in this Order needs to be redacted and that the analysis of the standing issue cannot be meaningfully understood without knowing the specific language of the agreements quoted. Nonetheless, should any party believe it can meet the legal standards for any redactions, it shall submit a proposed redacted version of this Order, along with a supporting memorandum containing argument and citation to authority, by the deadline noted above.  Thereafter, the Court will release a public version of this Order.

June 3, 2020
Wilmington, Delaware

             HONORABLE LEONARD P. STARK
             UNITED STATES DISTRICT JUDGE