# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CIRBA INC. D/B/A DENSIFY
and CIRBA IP, INC.,

     *Plaintiffs/Counter-Defendants,*

  v.

VMWARE, INC.,

     *Defendant/Counter-Plaintiff.*

Civil Action No. 1:19-cv-00742-MN

(Consolidated)



## CIRBA INC.'S BRIEF IN SUPPORT OF ITS
## MOTION FOR INJUNCTIVE RELIEF

Dated: May 3, 2022

Morris James LLP
Kenneth L. Dorsney (#3726)
kdorsney@morrisjames.com
Cortlan Hitch (#6720)
chitch@morrisjames.com
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800

**ATTORNEYS FOR CIRBA INC.**
**(d/b/a DENSIFY)**

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 1

    A.    Inc.'s Once-Vibrant Business, Built On Its Patented Invention. ................... 1

    B.    Inc.'s Relationship With VMware ............................................................ 2

    C.    Inc. Filed This Case To Protect Its Business From VMware's Infringement................................................................................................ 5

    D.    The 2016 License Between Inc. And IP. .................................................. 6

    E.    Post-Trial, The Court Determined Inc. Lacked Constitutional Standing And Ordered A New Trial. ........................................................ 7

    F.    The Federal Circuit's Mandamus Decision ............................................. 8

    G.    Inc. And IP Amended The 2016 License And Then Merged. ................... 9

    H.    Inc.'s VMware Platform Business ███████████████ .............. 10

ARGUMENT ................................................................................................................ 11

I.    Inc. Has Standing and Already Succeeded on the Merits. ................................. 12

    A.    Article III Requires *Injury-in-Fact*, Which Inc. Has In Spades, Not Exclusionary Rights. ............................................................................. 12

    B.    VMware Forfeited the Statutory Question. ................................................ 16

    C.    With Inc. and IP's Merger, There Is No Need for a New Trial and a Permanent Injunction Should Be Issued. ................................................ 17

II.    Inc. Is Suffering Irreparable Harm. ................................................................... 18

III.    The Balance of the Equities And Public Interest Weigh in favor of injunctive relief. ............................................................................................................... 19

CONCLUSION ............................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abbott Labs. v. Sandoz, Inc.*,
  544 F.3d 1341 (Fed. Cir. 2008)...................................................................................20

*Abraxis Bioscience, Inc. v. Navinta LLC*,
  625 F.3d 1359 (Fed. Cir. 2010)...................................................................................13

*AnywhereCommerce, Inc. v. Ingenico, Inc.*,
  517 F. Supp. 3d 45 (D. Mass. 2021) ...........................................................................14

*Apple Inc. v. Samsung Elecs. Co.*,
  735 F.3d 1352 (Fed. Cir. 2013)...................................................................................19

*Apple Inc. v. Samsung Elecs. Co.*,
  809 F.3d 633 (Fed. Cir. 2015).....................................................................................20

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
  2010 WL 817519 (M.D. Pa. Mar. 9, 2010), *aff'd*, 477 F. App'x 740 (Fed. Cir.
  2012) ............................................................................................................................18

*Aug. Tech. Corp. v. Camtek, Ltd.*,
  2015 WL 520546 (D. Minn. Feb. 9, 2015) ..................................................................18

*Baxalta Inc. v. Bayer Healthcare LLC*,
  2021 WL 1063099 (D. Del. Mar. 18, 2021) ................................................................14

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
  967 F.3d 1353 (Fed. Cir. 2020)...................................................................................20

*BlephEx, LLC v. Myco Indus., Inc.*,
  24 F.4th 1391 (Fed. Cir. 2022) .....................................................................................1

*Bos. Sci. Scimed, Inc. v. Medtronic Vascular, Inc.*,
  497 F.3d 1293 (Fed. Cir. 2007)...................................................................................10

*Boston Sci. Corp. v. BioCardia, Inc.*,
  524 F. Supp. 3d 914 (N.D. Cal. 2021) ........................................................................14

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012)...............................................................................18, 20

*Cohens v. State of Virginia*,
  19 U.S. 264 (1821)......................................................................................................12

ii

*Edwards Lifesciences AG v. CoreValve, Inc.*,
   2014 WL 1493187 (D. Del. Apr. 15, 2014)...................................................................20

*Enventure Global Tech. Inc. v. Weatherford U.S., L.P.*,
   2020 WL 6144620 (S.D. Tex. June 11, 2020) ..............................................................14

*Focus Products Grp. Int'l, LLC v. Kartri Sales Co.*,
   2021 WL 1946756 (S.D.N.Y. May 14, 2021) ...............................................................14

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
   349 F.3d 1373 (Fed. Cir. 2003)...................................................................................10

*Gilda Indus., Inc. v. United States*,
   446 F.3d 1271 (Fed. Cir. 2006)...................................................................................16

*Insituform Techs., Inc. v. CAT Contracting, Inc.*,
   385 F.3d 1360 (Fed. Cir. 2004)...................................................................................18

*Kenall Mfg. Co. v. Cooper Lighting, LLC*,
   2020 WL 4015324 (N.D. Ill. Jul. 16, 2020)..................................................................14

*Lexmark International, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)................................................................................... *passim*

*Lone Star Silicon Innovations LLC v. Nanya Technology Corp.*,
   925 F.3d 1225 (Fed. Cir. 2019)...................................................................... *passim*

*Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*,
   176 F.3d 669 (3d Cir. 1999).......................................................................................15

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 ..............................................................................................................12

*Mas-Hamilton v. LaGard, Inc.*,
   156 F.3d 1206 (Fed. Cir. 1998).............................................................................10, 18

*Mendenhall v. Barber-Greene Co.*,
   26 F.3d 1573 (Fed. Cir. 1994).....................................................................................15

*Midwest Energy Emissions Corp. v. Vistra Energy Corp.*,
   2020 WL 3316056 (D. Del. June 18, 2020)..................................................................14

*PPG Indus., Inc. v. Guardian Indus. Corp.*,
   75 F.3d 1558, 1567 (Fed. Cir. 1996)............................................................................20

*Pulse Elecs., Inc. v. U.D. Elec. Corp.*,
   2021 WL 1378756 (S.D. Cal. Apr. 12, 2021)...............................................................14

*Rite-Hite Corp. v. Kelley Co., Inc.*,
   56 F.3d 1538 (Fed. Cir. 1995) (en banc)................................................13

*RMH Tech. LLC v. PMC Indus., Inc.*,
   352 F. Supp. 3d 164 (D. Conn. 2018)....................................................19

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011)..............................................................19

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
   402 F.3d 1198 (Fed. Cir. 2005)..............................................................18

*Schwendimann v. Arkwright Advanced Coating, Inc.*,
   959 F.3d 1065 (Fed. Cir. 2020)....................................................... *passim*

*TransUnion LLC v. Ramirez*,
   141 S.Ct. 2190 (2021)..............................................................................15

*Trebo Mfg., Inc. v. Firefly Equip., LLC*,
   748 F.3d 1159 (Fed. Cir. 2014)..............................................................12

*United Access Techs., LLC v. Verizon Internet Servs*
   2021 WL 1200650 (D. Del. Mar. 26, 2021) ..........................................14

*WiAV Sols., LLC v. Motorola, Inc.*,
   631 F.3d 1257 (Fed. Cir. 2010)..............................................................13

**Rules**

Fed. R. Civ. P. 12................................................................................15, 16

Fed. R. Civ. P. 54................................................................................15, 16

**Other Authorities**

*Royal Bank of Canada v. El-Bris Ltd.*,
   [2008] 92 O.R. 3d 779, 783 (Can. Ont. C.A.)........................................10

Cirba, Inc. d/b/a Densify ("Inc.") respectfully submits this Brief in support of its concurrently filed Motion for Injunctive Relief (the "Motion").

## INTRODUCTION

Inc. and its wholly owned subsidiary, Cirba IP, Inc. ("IP"), filed this case to stop patent infringement by Inc.'s direct competitor, VMware Inc. ("VMware"). As explained by Inc.'s CEO, Inc. sued because it "just want[ed] VMware to stop, and [Inc.] want[ed] to be able to compete fairly." D.I. 661 at 1067:25–1068:1. Now, three years later, the consequences of that infringement are evident. ███████████████████████████████████████████████ If nothing changes, a monopolist and adjudged willful infringer will ████████████████████, all because of a (now fixed) scrivener's error.

The principal reason the Court granted a new trial was because it dismissed Inc. as a plaintiff for lack of constitutional standing and then concluded, in light of that dismissal, the jury heard too much evidence specific to Inc.'s competitive harm. *See* D.I. 946 at 7–11; *see also* D.I. 994 at 47:8. Inc. and IP have since merged. There is no reason to have another trial, and this Court should protect Inc. from VMware's ongoing willful infringement through the grant of an injunction. Inc. respectfully requests that the Court grant a permanent injunction — which, necessarily, requires reinstating the verdict — over sales of the products the jury found to willfully infringe. Alternatively, Inc. asks that the Court grant a preliminary injunction over sales of the same products "to prevent ongoing trespasses . . . ." *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1404 (Fed. Cir. 2022).

## BACKGROUND

### A. INC.'S ONCE-VIBRANT BUSINESS, BUILT ON ITS PATENTED INVENTION.

With roots dating back to 1999, Inc. built its business on innovation. D.I. 1066 ¶ 4. Inc.'s software addresses the needs of companies with large IT infrastructures, which face complex

challenges in determining how to manage their virtualized environments efficiently and effectively.[1] *See* D.I. 607 ¶¶ 7–21; D.I. 13 ¶ 55.  Inc.'s software manages and optimizes virtual infrastructure and saves companies millions of dollars in server and software costs, among other benefits.  D.I. 607 ¶¶ 7–21; D.I. 13 ¶ 76.  Inc. built a customer following over the years and began this case with ████████ ████████.  *See* D.I. 1066 ¶ 14.  These customers included ████████ ████████, among other Fortune 5000 companies.  *See id.*, Ex. 1.  Inc. won numerous awards and has been recognized as an industry leader in this space.  *See* D.I. 607 ¶ 18.  And the Patent and Trademark Office awarded numerous patents for Inc.'s innovations.  Four are involved in this case and two were the subject of the January 2020 trial: U.S. Patent Nos. 8,209,687 (the "'687 patent") and 9,654,367 (the "'367 patent").[2]  *See* Decl. of Ariel C. Green Anaba ("Green Decl.") § 1.

### B.  INC.'S RELATIONSHIP WITH VMWARE

VMware is a company historically focused on virtualization software and is known for its innovation of a hypervisor[3] (marketed as a product called vSphere).  D.I. 1066 ¶ 8.  It has what amounts to a monopoly over on-premise virtual capacity optimization.  *Id.*; *see also, e.g.*, D.I. 659 at 736:1–739:9; D.I. 660 at 825:20–827:13.  According to VMware, 99% of Fortune 1000 companies deploy its hypervisor.  *See* D.I. 1008 ¶ 8.  It has over 24,000 employees and 500,000 customers.  *See id.*  For the

---

[1] Virtualization relies on software to simulate hardware functionality and create a virtual environment, which allows companies to run more than one application on a single physical server using virtual machine ("VM") technology.  *See* D.I. 13 ¶ 54; *see also* D.I. 607 ¶ 9.  In virtualized environments, the physical server and related software can be called a "host."  D.I. 13 ¶ 56.  Virtual capacity optimization can involve servers located "on-premises" and those located in the "cloud."  *See* D.I. 616 ¶¶ 6–7.  "On-premise" virtualization involves customers who virtualize "their own servers, in data centers owned or leased by them for their virtualization needs."  *Id.* ¶ 6.

[2] The two other patents are U.S. Patent Nos. 10,523,492 (the "'492 patent") and 10,951,459 (the "'459 patent").

[3] The hypervisor is the layer of software that enables virtualization.

quarter ending February 24, 2022, VMware generated over $3.5 billion in revenue and spent over $1 billion on "[s]ales and marketing." Green Decl. at 199–200 ¶ 166. It "controls the virtual machine industry trade show: VMworld," dictating which companies get to speak and promote their products to potential customers. D.I. 1066 ¶ 9. Every one of Inc.'s on-premise customers on the VMware platform uses VMware's Distributed Resource Scheduler ("DRS") product (included within vSphere), and this accounted for ██████████████████ at the outset of this lawsuit. *Id.* ¶¶ 10, 14; *see also* Appendix of Exhibits ("Appx."), Ex. 128 at 12:3–18. Most on-premise customers use vROps (another VMware virtual capacity optimization product) too. *See* D.I. 1066 ¶ 10. Put simply, VMware's

████████████████████████████████████████████████████████████

███████████████████████████████████████ *Id.*

     For years, Inc.'s innovative capabilities attracted VMware's attention, and Inc. engaged in intense acquisition/partnership discussions with VMware. *See* D.I. 14, ¶¶ 49–78; D.I. 606 ¶¶ 3–6; *see also, e.g.*, Green Decl. §§ 2, 4–6; Appx., Ex. 128, 187. In 2007, over 25 VMware employees attended partnership meetings with Inc., including VMware's current CEO Raghu Raghuram, other senior executives, and a large technology team. D.I. 14 ¶ 54; *see also, e.g.*, D.I. 606 ¶ 3–5; *id.*, Exs. 1–4; Green Decl. § 2. In 2014, ██████ (an Inc. and VMware customer) prompted VMware to consider acquiring Inc. once more. D.I. 659 at 726:2–729:1; *see also* Green Decl. § 4; *id.* at 24 ¶ 22. VMware already had been studying Inc.'s technology on its own. *See* Green Decl. § 3; D.I. 660 at 782:10–16.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ *See* Green Decl. § 4. Inc. shared this information with VMware with the understanding that VMware would keep it confidential, using it only for exploring acquisition of Inc. *See, e.g.*, Green Decl. at 27–29 ¶¶ 26–27. ████████████████████████████████████

███████████████████████████████████████████████████ *See,*

*e.g.*, Green Decl. §§ 4–5, 7–8, 10.

      VMware's current CEO, Mr. Raghuram, testified that, in 2015, VMware had been willing to purchase Inc. for approximately $200 to 300 million.  D.I. 660 at 779:11–15; *see also* Green Decl. at 82–83 ¶ 58.  Discovery revealed that ████████████████████████████

████████████████████████████████████████████████████

██████████████  *See, e.g.*, D.I. 659 at 740:23–741:20; D.I. 660 at 779:16–795:6; *id.* at 796:15–18, 796:22–803:6; *id.* at 804:10–14, 808:13–816:16; Green Decl. §§ 4–5.  In the end, VMware decided to build Inc.'s patented technology for itself.  *See* Green Decl. §§ 7–8, 14.  Estimates were that VMware could make as much as $6 billion over time on this valuable software, ████████████████

████████  *See, e.g.*, D.I. 609 ¶¶ 8–19; *id.*, Ex. B; D.I. 660 at 938; D.I. 606, Ex. 6 at 22, Green Decl. § 17.

      VMware took Inc.'s confidential information shared during acquisition discussions and used it to design new features within DRS, vROps, and VMC on AWS (among other products).  *See, e.g.*, D.I. 605 at 16–20; D.I. 606 ¶ 4; *id.*, Exs. 5–6; D.I. 658 at 310:16–312:10; D.I. 660 at 780:1–781:6, 782:1–7, 783:25–795:6, 797:2–801:12, 812:25–816:16, 875:3–879:11, 902:22–903:18; Green Decl. § 8.  Additionally, VMware managed to access Inc.'s product and ████████████████████

███████████████████████████████████████████.  *See, e.g.*, D.I. 660 at 782:8– 784:7; Appx., Ex. 128 at 25:11–26:25, 30:24–31:25, 52:4–53:7, 68:24–70:24, 71:18–72:4, 72:16–22, 73:3–25, 81:4–83:2; *see also, e.g.*, Green Decl. § 7.  ████████████████████████████

██████████████████████████████████████████████████.  *See* Green Decl. § 7.[4] █████████████████████████████████████████████████

--------------------------------------------------------

[4] ██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████    *See* Green Decl. at 90 ¶ 63; D.I. 660 at 791:11–793:20,

801:13–803:6.

VMware wanted to copy Inc.'s key features because *customers* clamored for them. *See, e.g.*,

D.I. 606, Ex. 5 at 1; D.I. 658 at 409:13–25; D.I. 659 at 677:2–10, 678:10–679:12, 735:7–18; D.I. 660

at 940:1–944:9, 952:2–961:11; D.I. 661 at 1000:18–1001:12; Green Decl. § 9. To the same end,

VMware targeted key Inc. employees to develop accused features. *See* D.I. 606 ¶¶ 5–6; *id.*, Ex. 7–8.

The stated purpose was to "destroy [Inc.]" D.I. 660 at 916:18–918:6. Indeed, VMware acknowledged

that building Inc.'s technology would "put a bullet in Cirba's head." Green Decl. at 128 ¶ 95.

## C. INC. FILED THIS CASE TO PROTECT ITS BUSINESS FROM VMWARE'S INFRINGEMENT.

On April 25, 2019, Inc. and IP brought this suit against VMware for, *inter alia*, infringement

of the '687 patent the '367 patent. D.I. 1. Eleven days later, Inc. moved for a preliminary injunction

to prevent the irreparable harm from VMware's sales of infringing products that would occur while

the parties waited for a trial. D.I. 11, 12, 14, 15. Inc. presented evidence of irreparable harm to Inc.'s

business and employees and asked the Court to enjoin VMware's ongoing infringement so that Inc.

could compete with the market exclusivity offered by the patents. *See* D.I. 138 at 43:25–45:20, 161:5–

163:5, 163:12–165:11, 166:12–168:13. The Court denied a preliminary injunction in favor of

scheduling a jury trial for five months later. The extremely expedited schedule was intended to address

the threat of irreparable harm. *See id.* at 199:21–200:1, 203:8–11; Appx., Ex. 93 at 10:7–11:4.

In January 2020, the case was tried to a jury. After a nine-day trial, the jury concluded that

DRS, vROps and VMC on AWS infringe and that VMware's infringement was willful, awarded $237

million in damages, and rejected VMware's invalidity defenses. D.I. 549, 550.

---

████████████████████    Green Decl. at 101–103 ¶¶ 75–76. ██████████████████████████
████████████████████    *See, e.g.*, *id.* at 103–109 ¶¶ 77–82.

Inc. and IP then moved for targeted permanent injunctive relief.  D.I. 604, 605.  Inc. was suffering the irreparable harm from VMware's willful infringement that it foretold before trial; it had ████████████████████████████ since the filing of the suit.  *See* D.I. 1066 ¶ 14.  But the Court never reached their request, instead dismissing Inc. for lack of Article III standing based on its interpretation of a 2016 license agreement (the "2016 License") between Inc. and IP.  D.I. 752; D.I. 946 at 17–18.

### D.  THE 2016 LICENSE BETWEEN INC. AND IP.

Employees of Inc. were the inventors listed on the '687 and '367 patents (the patents in the 2020 trial).  D.I. 1, Exs. 12, 16.  The '687 patent issued in 2012 and was assigned to Inc.  *See* Appx., Ex. 31.  During the 2015 acquisition discussions with VMware, Inc. undisputedly owned all right, title, and interest in the patents-in-suit.  *See*  D.I. 946 at 9–10.  In 2016, the acquisition discussions with VMware resumed and Inc. also entered acquisition discussions with Hewlett Packard.  *See* Decl. of Gerald William Smith ("Smith Decl.") ¶ 5.  At that time, Inc. engaged in tax planning with its advisors. As a Canadian company, ███████████████████████████



████████████████████████████████████████████████

██████████████████████████████████  *See* Decl. of Darryl Irwin ("Irwin Decl.") ¶¶ 3–6; Decl. of Cynthia Bliss ("Bliss Decl.") ¶¶ 4–12; Smith Decl. ¶¶ 4–11.  ██████████████████ ██████████████████████████  *See* Irwin Decl. ¶ 3; *see also* Green Decl. at 207–208 ¶¶ 170– 172.  ████████████████████████  *See* Irwin Decl. ¶¶ 3–6; Bliss Decl. ¶¶ 4–12; Smith Decl. ¶¶ 4–12, 14–15; *see also* D.I. 757, Ex. A at 63:17–64:2, 111:13–20, 112:17–25.

Accordingly, Inc. formed IP as its wholly-owned subsidiary and transferred title to its intellectual assets to IP.  *See* Green Decl. at 206 ¶ 169.  This transfer included all rights to past causes of action and claims for damages.  *Id.*  Inc., in turn, ████████████████████████████ ████████████████████████████  Smith Decl. ¶¶ 4-15; Bliss Decl. ¶ 4-12; Irwin Decl.

6

¶¶ 3-6.  *See* Bliss Decl. ¶ 9; Smith Decl.

¶ 9; D.I. 757, Ex. A at 60:8–61:7, 62:1–16, 68:13–70:15.

*See* Irwin

Decl. ¶¶ 3–6; Bliss Decl. ¶¶ 4–12; Smith Decl. ¶¶ 4–15.

*Inc.* was responsible for every aspect of IP's business — they shared an address and directors, and Inc. managed the finances, maintained the patents, and developed software practicing the patents. *See* D.I. 757, Ex. A at 59:18–25, 65:14–66:21, 84:13–21, 88:15–89:2, 122:21–123:4; 156:22–157:6; 303:25–304:10. Inc. alone (lawfully) practiced the patents, *owned* and had complete control over IP (and any licensing policy), and did not allow IP to license to any entity other than Inc. *See id.*

### E. POST-TRIAL, THE COURT DETERMINED INC. LACKED CONSTITUTIONAL STANDING AND ORDERED A NEW TRIAL.

Post-trial, the Court dismissed Inc. for lack of constitutional standing based on its interpretation of the 2016 License. D.I. 752. It determined that the 2016 License, while exclusive on its face, did not confer exclusive rights to exclude others from practicing the patent. *See id.* at 8–10. It determined that Article III standing was lacking under Federal Circuit precedent that predated the Supreme Court's *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), decision. *See id.*

After the dismissal, the Court solicited the parties' views on what, "if any," relief should be granted given that dismissal. D.I. 752 at 11. Ultimately, the Court granted a new trial. D.I. 946. While the Court considered the totality of the circumstances, the lynchpin of its opinion was that the trial would have "looked quite different had Inc. been dismissed prior to trial." *Id.* at 8. It concluded that much of the evidence regarding competitive harm to Inc. may have been excluded because IP did not sell products and services, and it would have been difficult or impossible for IP to have fairly portrayed itself as a VMware competitor. *Id.* at 7–11; *see also* D.I. 946 at 6, 8–11; D.I. 994 at 47:6–10.

## F.  THE FEDERAL CIRCUIT'S MANDAMUS DECISION

Inc. sought an interlocutory appeal of the constitutional standing issue, *see* D.I. 960, 961, which this Court denied, *see* D.I. 991.  Inc. then petitioned for a writ of mandamus.  *See* D.I. 1013, 1014. Inc.'s argument centered on what is required to show Article III standing after *Lexmark*, and the Federal Circuit's decisions in *Lone Star Silicon Innovations LLC v. Nanya Technology Corp.*, 925 F.3d 1225 (Fed. Cir. 2019) and *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065 (Fed. Cir. 2020).  Inc. argued that § 281's requirements no longer concerned Article III standing.

After calling for a response and holding oral argument, the Federal Circuit's mandamus decision left the constitutional issue for another day.  *See* D.I. 1045 at 8–9.  It also upheld the district court's interpretation of the contract — i.e., that Inc. lacked a right to exclude or other exclusionary right — at least in terms of the arguments that had been presented.  *See* D.I. 1045 at 6.

The Federal Circuit went on to address whether Inc.'s statutory deficit under § 281 was an alternative basis to affirm the new trial order.  Inc. argued that VMware had forfeited any such *statutory* (as opposed to *constitutional*) objection by not raising it until after trial.[5]  The Federal Circuit concluded that, on the record before it, it could not determine whether there was such a forfeiture because the record had not been developed as to whether Inc. was prejudiced by such a forfeiture.  D.I. 1045 at 11.  Inc. argued that it was prejudiced because a mere statutory defect (as opposed to a constitutional defect) could have been corrected in any number of ways, including by simply amending the 2016 License to clarify the intent.  *Id.*  But the Federal Circuit determined that further factual development was required, *id.*, as follows:

> Accordingly, we have no factual record addressing a specific contract alteration and no
> development of, or district court ruling on, legal arguments about the consequences of such

---

[5] This Court had reasoned that VMware's challenge was not untimely was because a "challenge to the Court's constitutional standing goes to the Court's subject matter jurisdiction and may be raised at any time." D.I. 946 at 10 n.4; *see also* D.I. 752 at 3 n.1.

an alteration for Inc.'s rights. [. . .] We therefore do not address what if any possibility of cure Inc. might have had or might yet have.  In so stating, we are neither inviting or discouraging an attempt to cure.  We simply conclude that, on the present record, Inc. could readily have been dismissed for want of a statutory right to sue for the very reason that the district court dismissed Inc. for want of constitutional standing.

Since the mandamus decision, VMware unsuccessfully sought to stay the litigation.  *See* D.I. 1101.  The Court also ruled on a renewed claim construction issue in Inc.'s favor, such that the claim construction presented to another jury would be the same in relevant respects.  *See* D.I. 1160.

### G. <u>INC. AND IP AMENDED THE 2016 LICENSE AND THEN MERGED.</u>

In March 2021, Inc. and IP amended the 2016 License Agreement.  *See* Smith Decl. ¶¶ 12–15.



*See id.*

Appx., Ex. 21 § 14.1.  Further,

*Id.*  Inc. and IP also confirmed,

*Id.*  Inc. and IP further amended the 2016 License as follows:



*Id.* § 14.2.  Finally, the parties agreed, ███████████████████████████████████

███████████████████████████████████  *Id.* § 15.

Further, Inc. and IP have submitted declarations from those involved in the original 2016 License demonstrating the original intent was for it to convey truly exclusive patent rights to Inc. and that all IP was intended to retain was paper title to the patent.  *See* Smith Decl.; Irwin Decl.; Bliss Decl. Indeed, one minor change to the 2016 License would have clarified this; namely, changing the reservation of "all proprietary rights" to IP to "title."[6]  *See* Smith Decl. ¶ 15.

In April 2022, Inc. and IP merged.  *See* Smith Decl. ¶ 17.  The amalgamated company succeeds to all rights and interests of Inc. and IP.  *See id.*; Business Corporations Act (Ontario) §§ 174–179 (attached as Exhibit A); *see also, e.g., Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998); *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1377 (Fed. Cir. 2003); *Bos. Sci. Scimed, Inc. v. Medtronic Vascular, Inc.*, 497 F.3d 1293, 1295 (Fed. Cir. 2007).

**H.  INC.'S  VMWARE  PLATFORM  BUSINESS** ███████████████████████



VMware's infringement and anticompetitive behavior ████████████████████████

███████████████████████  if the Court does not intervene.  Inc. has ████████████

███████████████████████  *See* D.I. 1066, Ex. 2; Decl. of Riyaz Somani ("Somani Decl.") ¶ 10.  As of February 2022, ████████████████████████

███████████████████████████████████  *See* Somani Decl. ¶ 9.  Customer

---

[6] If necessary, IP will file a motion for rectification (the Canadian version of reformation) to fix "an inaccurately drawn written agreement so that it conforms to the agreement the parties intended to make."  *Royal Bank of Canada v. El-Bris Ltd.*, [2008] 92 O.R. 3d 779, 783 (Can. Ont. C.A.) (attached as Exhibit B); *see also Schwendimann*, 959 F.3d at 1072.



██████████   *See, e.g.*, Somani Decl., Att. A at 1 ████████████████████

██████ ); *id.* at 2 (███████████████████████████ ); *id.* at 4 (██████

████████████████████████████████████ ); *id.* at 5

(████████████████████████ ); *id.* at 9 (█████████████████

███████ ); *id.* at 11 (█████████████████████████ ); *id.* at 12

(████████████████████████████████ ); (███████

█████████████████████████████ ); *id.* (██████████

████████████████████████ ); *id.* at 1–24 (collecting reasons

for VMware platform █████████████████████ ); *see also* Appx., Ex. 19, 101, 104,

105.  Inc. ████████████████████ *See* D.I. 1066 ¶¶ 14–15.  Inc. also ███████

██████████████████████████████ *See* Smith Decl. ¶ 18.  Inc. ████

███████████████████████████ *Id.* ¶ 19.  And █████████████████

███████████████████████████████████████████

███████████████████████ *See id.* ¶ 16.

As further discussed *infra*, █████████████████████████ Since

the willful infringement verdict, VMware's targeting of Inc. has intensified, ███████████

██████████████████████ It has waged a war of attrition in this Court,

weaponizing discovery to force the expenditure of millions of dollars to defend against VMware's

eight patent counterclaims, which even if successful are worth under $1 million in total.[7]

**ARGUMENT**

---

[7] Recognizing this dynamic, the Court repeatedly imposed cost shifting on VMware's abusive discovery tactics.  *See* D.I. 947; D.I. 1147.

Preliminary injunctive relief is appropriate where a plaintiff can show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury absent an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *See Trebo Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1165 (Fed. Cir. 2014).

Court intervention is necessary to rectify a serious anomaly and stop a manifest injustice.  Inc. is the entity suffering irreparable harm as the result of VMware's ongoing already-adjudicated patent infringement.  Yet, under the Court's previous ruling, Inc. lacks Article III injury-in-fact to sue.  That disconnect is untenable and highlights the need for this Court to revisit a decision that ignores the on-the-ground reality of Inc.'s situation.  Absent injunctive relief, Inc.'s VMware platform business — ████████████████████████████████████████████ — will disappear.  Inc. already succeeded on the merits and should, thus, have its verdict reinstated and a permanent injunction issued as to sales of the products a jury found to infringe.  At the very least, preliminary injunctive relief is necessary ████████████████████████████████████ at the next trial.

## I.    INC. HAS STANDING AND ALREADY SUCCEEDED ON THE MERITS.

### A.    ARTICLE III REQUIRES *INJURY-IN-FACT*, WHICH INC. HAS IN SPADES, NOT EXCLUSIONARY RIGHTS.

To have standing, a plaintiff "must have suffered an 'injury in fact' which is (a) concrete and particularized and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (cleaned up).  These requirements are "an essential and unchanging part of the case-or-controversy requirement of Article III" and do not vary based on the statutory or common-law claim at issue.  *Id.*  Once a plaintiff has demonstrated satisfaction of these minimal, constitutional requirements, a federal court has "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. State of Virginia*, 19 U.S. 264, 404 (1821).  In *Lexmark*, the Supreme Court "clarified that so-called 'statutory standing' defects do not

implicate a court's subject-matter jurisdiction." *Lone Star*, 925 F.3d at 1235.  As the Supreme Court

put it in *Lexmark*:

> We have on occasion referred to [whether a plaintiff has a cause of action under a certain statute] as "statutory standing" and treated it as effectively jurisdictional.  That label is an improvement over the language of "prudential standing," since it correctly places the focus on the statute.  But it, too, is misleading, since "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case."

*Lexmark*, 572 U.S. at 128 n.4 (attribution omitted).

For decades, the Federal Circuit treated the statutory requirements of § 281 — and, in particular,

the presence of exclusionary rights — as jurisdictional.  *See, e.g.*, *WiAV Sols., LLC v. Motorola, Inc*.,

631 F.3d 1257, 1265 (Fed. Cir. 2010); *see also, e.g., Rite-Hite Corp. v. Kelley Co., Inc*., 56 F.3d 1538,

1551–54 (Fed. Cir. 1995) (en banc) (treating § 281 requirements as "jurisdictional").  Because the

Federal Circuit previously treated § 281's requirements as jurisdictional, it also held that defects could

not be fixed after the complaint was filed.  *See Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359,

1364 (Fed. Cir. 2010).  That old understanding of the § 281 requirements as jurisdictional is no longer

viable.

Two recent Federal Circuit cases recognized that *Lexmark* abrogated earlier caselaw treating

possession of exclusionary rights under § 281 as jurisdictional: *Lone Star* and *Schwendimann*.  In *Lone*

*Star*, the Court clarified that "*Lexmark* is irreconcilable with our earlier authority treating § 281 as a

jurisdictional requirement."  925 F.3d at 1235.  "[W]hether a party possesses all substantial rights in a

patent does not implicate standing or subject matter jurisdiction."  *Id.  Schwendimann* reinforced that

result and provided further clarity.  There, the plaintiff thought she had been assigned rights to a patent

at the time of filing but, in fact, had not, and did not take corrective action until the defendant filed a

motion to dismiss.  *See* 959 F.3d at 1068–70.  The district court nonetheless retroactively reformed the

corrected assignment.  The Federal Circuit affirmed, concluding that the plaintiff's complete lack of

13

legal rights to the patent at the outset did not pose an Article III problem. *See id.* at 1071.  Judge Reyna dissented, concluding that because the plaintiff did not possess exclusionary rights when the suit was filed, she lacked Article III standing. *See id.* at 1077, 1081 (Reyna, J., dissenting).  He read *Lone Star* to establish only that a plaintiff with *some* exclusionary rights did not need something more — "i.e., '*all* substantial rights' in the patent" — to satisfy Article III. *Id.* at 1077 (*citing Lone Star*, 925 F.3d at 1234–35).  The *Schwendimann* majority rejected this argument:

> The dissent disagrees and asserts that the Patent Act's prerequisites must be treated as jurisdictional because the right to exclude has constitutional underpinnings.  There are two problems with that contention.  First, *Lone Star* states the opposite in a precedential decision.  The dissent, like all subsequent panels, is bound by *Lone Star*.  Second, not only has the Supreme Court made clear that virtually all statutory filing prerequisites are non-jurisdictional, but it has held that the registration requirement in the Copyright Act is non-jurisdictional.  The Copyright Act is no less tied to the Intellectual Property Clause in the Constitution than is the Patent Act.

*Id.* at 1071 n.6 (citations omitted).  And, while not reaching the constitutional issue, the Federal Circuit, in this case, acknowledged the post-*Lexmark* direction of the law: "the clarity of the statutory requirement suggests that the statute (not the Constitution) should decide plaintiff status in disputes like the current one in the future."  D.I. 1045 at 9.  And courts across the country have recognized that, post *Lexmark*, exclusionary rights under § 281 are no longer necessary for Article III standing.  *See, e.g., Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc.*, 2021 WL 1946756, at *2 (S.D.N.Y. May 14, 2021) (holding § 281 statutory requirements are not jurisdictional); *Baxalta Inc. v. Bayer Healthcare LLC*, 2021 WL 1063099, at *3 (D. Del. Mar. 18, 2021); *AnywhereCommerce, Inc. v. Ingenico, Inc.*, 517 F. Supp. 3d 45, 48–49 (D. Mass. 2021); *Kenall Mfg. Co. v. Cooper Lighting, LLC*, 2020 WL 4015324, at *2 (N.D. Ill. Jul. 16, 2020); *Enventure Global Tech. Inc. v. Weatherford U.S., L.P.*, 2020 WL 6144620, at *1 n.1 (S.D. Tex. June 11, 2020); *see also, e.g., Boston Sci. Corp. v. BioCardia, Inc.*, 524 F. Supp. 3d 914, 918 (N.D. Cal. 2021).   Other district courts have not acknowledged the change brought by *Lexmark*, *Lone Star*, and *Schwendimann*. *See, e.g., Pulse Elecs.,*

*Inc. v. U.D. Elec. Corp.*, 2021 WL 1378756, at *7 (S.D. Cal. Apr. 12, 2021); *United Access Techs., LLC v. Verizon Internet Servs., Inc.*, 2021 WL 1200650, at *7 n.9 (D. Del. Mar. 26, 2021).

In short, there is no special, patent specific addition to Article III's transsubstantive rule of injury-in-fact, traceability, and redressability. *See TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021). Inc. easily satisfies the constitutional minima for Article III standing. Inc. invented the technology covered by the patents-in-suit, developed products covered by those patents, and sought to compete with the benefit of market exclusivity afforded by those patents *long before any separate subsidiary existed*. It never licensed the patents to a third party. In short, Inc. is, and always has been, the one and only practicing entity whose business depends on the '687 and '367 patents. The business that ███████████████ and was a leader in the virtual machine workload optimization space, with sophisticated customers is ███████████████████████ due to VMware's infringement. Inc.'s monetary, competitive, and financial injuries are at the core of the injury long recognized by Article III. *See TransUnion*, 141 S.Ct. at 2204; *see also Lexmark*, 572 U.S. at 125 (lost sales and damage to business reputation sufficient under Article III).

The Court's dismissal of Inc. for lack of Article III standing cannot be reconciled with the reality that *Inc.* is the practicing entity whose ███████████████ on the patents that VMware is infringing. If Inc. were bringing unfair competition claims against VMware, rather than patent claims, no one would question its standing. That should be the beginning and the end of the matter, as the standing inquiry does not differ with subject matter.

Inc., of course, recognizes this Court's prior no-standing ruling. But courts retain the power to revisit rulings, especially when it comes to matters of Article III standing. *Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1582 (Fed. Cir. 1994); *see also* Fed. R. Civ. P. 12(h)(3), 54(b). Although Inc. does not agree this issue should be considered under the reconsideration standard, even if it was,

the conclusion that Inc. lacks Article III standing is "manifest error[.]"  *See Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

## B.  VMWARE FORFEITED THE STATUTORY QUESTION.

In contrast to subject matter jurisdiction, which may be raised at any time, whether a plaintiff meets the statutory prerequisites for bringing an action under the Patent Act must be timely raised and preserved, and can be forfeited.  *See e.g.*, *Gilda Indus., Inc. v. United States*, 446 F.3d 1271, 1280 (Fed. Cir. 2006).

VMware did not properly raise the statutory issue pre-trial in its Answer, a Rule 12(b)(6) motion, a Rule 12(c) motion, or a summary judgment motion (nor did it seek leave to do so).  Instead, VMware listed standing in the Pretrial Order as an issue to be tried, D.I. 439, Ex. 3 at 2, but then it did not try the issue.  There were no jury instructions on Inc.'s standing, and VMware requested none.  It made no oral motion for judgment as a matter of law on this issue.  D.I. 661 at 1153:11–1155:23; D.I. 662 at 1544:13–1545:14; Trial Tr. Vol. G at 1638–1643, 1687–88 (attached as Exhibit C).  VMware, Inc., and the Court deferred the standing question until after trial precisely because VMware presented it as a question of subject matter jurisdiction, which can be raised at any time.  *See* D.I. 602 at 25; D.I. 672 at 24–25; D.I. 752 at 3 n.1; D.I. 946 at 10 n.4; *see also*, Appx., Ex. 94 at 27:34–28:10; D.I. 1045 at 11.  Indeed, to date, VMware has never filed a motion based on anything but Article III standing.

The Federal Circuit concluded that the record had not yet been developed as to whether Inc. suffered prejudice from any forfeiture by VMware of the statutory argument.  *See* D.I. 1045 at 11–12. Inc. has now made such a record.  Had a statutory challenge been identified pre-trial, Inc. and IP would have fixed the scrivener's error in the 2016 License, which always was intended to be exclusive, *see, e.g.*, Smith Decl. ¶¶ 4–15, and the trial would have proceeded as it did, with the same outcome.  Inc. has amended the 2016 License Agreement to eliminate any doubt that it conferred sufficient rights for

Inc. to sue for patent infringement.  The merger could have occurred before trial too.  Those fixes easily could have been effectuated before trial.

The prejudice from VMware's forfeiture is readily apparent.  Rather than a $237 million jury verdict of willful infringement (and, presumably, an injunction to prevent further such infringement), Inc. has worse than nothing.  It has been dismissed as a plaintiff and rendered unable to protect itself against the onslaught of willful infringement designed to scavenge Inc.'s business — a ███████████ ████████████████████████████████████████████████████.  That prejudice is due to VMware's failure to raise timely the statutory question before trial.  The challenged defect in the contract was, at most, a scrivener's error that did not reflect the intent of the parties that Inc. could have, and would have, easily corrected.  Once corrected, the trial would have proceeded as it did, with the jury finding VMware willfully infringed Inc.'s patents.  Accordingly, VMware's failure to raise the statutory issue pre-trial was prejudicial and any challenge based on § 281 has been forfeited.

### C.  WITH INC. AND IP'S MERGER, THERE IS NO NEED FOR A NEW TRIAL AND A PERMANENT INJUNCTION SHOULD BE ISSUED.

In addition, and independently, the Court should reinstate the verdict and issue a permanent injunction because Inc. and IP now have been merged into a single entity and succeed as to each other's rights.  *See* Smith Decl. ¶ 17.  The central basis for the Court's new trial ruling was that with Inc. no longer a plaintiff on the patent claims, the trial may have been different — in particular, the jury may not have heard so much evidence of competitive harm to Inc.  D.I. 946 at 8–10.  In light of the merger, that justification lacks any basis.  The evidence of competitive harms would have been identical.

VMware has suggested that the Court would have ordered a new trial on some other basis.  To the contrary, immediately after trial (before it accepted VMware's constitutional standing argument), the Court told the parties:

> My current inclinations are to deny all requested relief with respect to infringement,
> invalidity, and damages for both the [']687 and '367 patents. . . .  VMware chose not to

present a damages expert, and the jury could have reasonably credited all of [Inc.]'s expert's testimony and opinions.

D.I. 575 at 2. Any alleged "skepticism" regarding Inc.'s infringement proof only arose after the Court dismissed Inc.'s claims based on its erroneous constitutional analysis and suggested it would throw out half of Inc.'s evidence along with it. *See* D.I. 946 at 8–10. Inc.'s dismissal was the self-described "principal" basis for the Court's new trial decision. D.I. 994 at 47:8. Now that Inc. and IP are one, no such concerns remain, *see, e.g.*, *Mas-Hamilton*, 156 F.3d at 1211, and there is no good reason for another trial on the '687 and '367 patents. *See also Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1204 (Fed. Cir. 2005); *Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1372 (Fed. Cir. 2004); *Aug. Tech. Corp. v. Camtek, Ltd.*, 2015 WL 520546, at *6 (D. Minn. Feb. 9, 2015). For this reason, the verdict should be reinstated and the "success" prong of a permanent injunction has been satisfied.

Even if the Court declines to reinstate the verdict and grant a permanent injunction, now that Inc. and IP are one entity, their previous win at trial demonstrates an overwhelming likelihood that they will prevail in a new trial. Simply put, Inc. is likely to succeed on the merits of its patent infringement claim because it already has.

## II.     INC. IS SUFFERING IRREPARABLE HARM.

The right to exclude is particularly important where the parties are competitors, and where the patentee, like Inc., has chosen to not license its patent to other companies. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2010 WL 817519, at *4 (M.D. Pa. Mar. 9, 2010), *aff'd*, 477 F. App'x 740 (Fed. Cir. 2012). Irreparable harm can include "loss of goodwill, damage to reputation, and loss of business opportunities." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). Inc. is suffering all of those harms and more. As set forth *supra* at 3–5, VMware's willful infringement has ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. *Somani Decl.* ¶¶ 6–12; *id.*,

Att. A; D.I. 1066 ¶¶ 14–19.  That irreparable competitive and reputational injury has been VMware's

aim all along.  For years, VMware has engaged in a systematic campaign to run Inc. out of business

and poach its customers by infringing Inc.'s patents.  

████████████, monetary damages from a second willful infringement verdict will be cold comfort.[8]

The ██████ of VMware's efforts is apparent not only in Inc.'s ████████████

████████████. *See* Somani Decl., Att. A; *see*

*also* Green Decl. ¶¶ 81, 86.  Inc. is not ████████████. *See*

Green Decl. ¶¶ 80, 82–83, 85.  Its customers are ████████████

████████████ *See* D.I. 1066

¶¶ 10–18; *see also* Somani Decl., Att. A. ████████████

████████████ *See* D.I. 609, Ex. B.  For Inc., the effect is clear: ████████████

████████████ *See* D.I. 1066 ¶¶ 14–19, Exs. 1–3.  Put simply, Inc.'s

VMware platform business ████████████ and VMware's continuing infringement is to blame.

## III.  THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF INJUNCTIVE RELIEF.

VMware will not suffer cognizable harm from the entry of a preliminary injunction.  An

injunction will stop the flow of ill-gotten gains from its willful infringement.  That is hardly the type

of "harm" with which equity is concerned.  "A party cannot escape an injunction simply … because

_____

[8] Ignoring this mountain of evidence, VMware blamed Turbonomic and IBM's recent acquisition of Turbonomic for Inc.'s troubles.  *See* D.I. 1226 at 2.  ████████████
████████████ *See, e.g.*, D.I. 616 ¶¶ 14, 16–20; D.I. 1066 ¶¶ 8–13.  Finally, that Inc. has experienced irreparable harm from Turbonomic and IBM does not mean that it has not also been irreparably harmed from VMware's infringement. *See Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1364 (Fed. Cir. 2013); *see also RMH Tech. LLC v. PMC Indus., Inc.*, 352 F. Supp. 3d 164, 202 (D. Conn. 2018).

its primary product is an infringing one." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011).  And even if lost income from discontinued infringement counted as harm in this context, ███████████████████████████  Where, as here, there is a significant mismatch in terms of the parties' sizes, revenue sources, and magnitude of harm, the balance of equities favors an injunction.  *See Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1378–79 (Fed. Cir. 2020).

Finally, the public interest plainly supports injunctive relief.  There is a "strong public policy favoring the enforcement of patent rights."  *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996).  Protecting patent rights protects the public interest in the patent system and the innovation it fosters.  *Celsis In Vitro*, 664 F.3d at 931; *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362–63 (Fed. Cir. 2008).  Indeed, as the Federal Circuit has recognized, "the public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions."  *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015).  Enforcing patent rights is especially important where, as here, the infringer's conduct is "egregious" and should be "deterred."  *Edwards Lifesciences AG v. CoreValve, Inc.*, 2014 WL 1493187, at *11 (D. Del. Apr. 15, 2014).  Further, a preliminary injunction would merely prevent VMware from selling features that will still be available from Inc., so customers will not lose out on beneficial technology.

## CONCLUSION

For the foregoing reasons, Inc. respectfully asks the Court to reinstate the verdict and issue a permanent injunction over sales of products that the jury found to infringe — i.e., DRS, vROps, and VMC on AWS.  Alternatively, Inc. respectfully asks the Court to issue a preliminary injunction over sales of the same products through such time as there is a final appealable judgment.  Attached as Exhibit A to the Motion is a proposed order of the Court.

Dated: May 3, 2022

Respectfully submitted,

_/s/ Kenneth L. Dorsney_

Christine E. Lehman (*pro hac vice*)
clehman@reichmanjorgensen.com
Adam Adler (*pro hac vice*)
aadler@reichmanjorgensen.com
Aisha Mahmood Haley (*pro hac vice*)
amhaley@reichmanjorgensen.com
Connor S. Houghton (*pro hac vice*)
choughton@reichmanjorgensen.com
Reichman Jorgensen Lehman &
Feldberg LLP
1909 K St. NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
Telecopier: (650) 623-1449

Sarah O. Jorgensen (*pro hac vice*)
sjorgensen@reichmanjorgensen.com
Reichman Jorgensen Lehman &
Feldberg LLP
1201 West Peachtree, Suite 2300
Atlanta, GA 30309
Telephone: (404) 609-1040
Telecopier: (650) 623-1449

Khue V. Hoang (*pro hac vice*)
khoang@reichmanjorgensen.com
Wesley L. White (*pro hac vice*)
wwhite@reichmanjorgensen.com
Reichman Jorgensen Lehman &
Feldberg LLP
750 Third Avenue, Suite 2400
New York, NY 10017
Telephone: (212) 381-1965
Telecopier: (650) 623-1449

Kenneth L. Dorsney (#3726)
kdorsney@morrisjames.com
Cortlan Hitch (#6720)
chitch@morrisjames.com
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800

Courtland L. Reichman (*pro hac vice*)
creichman@reichmanjorgensen.com
Shawna Ballard (*pro hac vice*)
sballard@reichmanjorgensen.com
Jennifer P. Estremera (*pro hac vice*)
jestremera@reichmanjorgensen.com
Kate Falkenstien (*pro hac vice*)
kfalkenstien@reichmanjorgensen.com
Michael G. Flanigan (*pro hac vice*)
mflanigan@reichmanjorgensen.com
Ariel C. Green Anaba (*pro hac vice*)
agreen@reichmanjorgensen.com
Reichman Jorgensen Lehman &
Feldberg LLP
100 Marine Parkway, Suite 300
Redwood Shores, California 94065
Telephone: (650) 623-1401
Telecopier: (650) 623-1449

**ATTORNEYS FOR CIRBA INC.
(d/b/a DENSIFY)**